# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UBS FINANCIAL SERVICES INC.,** | ) | **Case No.:** _____ |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **PHIL G. FIORE JR, JEFFREY H.** | ) | |
| **FARRAR, LOUIS GLORIA, and** | ) | |
| **THOMAS M. GAHAN,** | ) | |
| | ) | |
| **Defendants.** | ) | **JUNE 16, 2017** |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff UBS Financial Services Inc. ("UBS"), by its attorneys, hereby brings the following Complaint For Injunctive And Other Relief against Defendants Phil G. Fiore Jr. ("Fiore"), Jeffrey H. Farrar ("Farrar"), Louis Gloria ("Gloria"), and Thomas M. Gahan ("Gahan") (collectively, "Defendants") for:

(a) Breach of the non-solicitation and non-disclosure provisions contained in multiple agreements defendant Fiore signed during his UBS employment;

(b) Breach of the non-solicitation provisions contained in the UBS Financial Advisor Team Agreement signed by defendants Farrar, Gloria, and Gahan;

(c) Misappropriation of UBS's trade secrets in violation of the Connecticut Uniform Trade Secrets Act ("CUTSA");

(d) Violation of the Connecticut Unfair Trade Practices Act ("CUTPA");

(e) Breach of fiduciary duties that Farrar, Gloria, and Gahan owed to UBS during their employment; and

(f) Unfair competition.

For its Complaint against Defendants, Plaintiff states as follows:

## SUMMARY OF THE DISPUTE

1.      On June 2, 2017, defendants Farrar, Gloria, and Gahan resigned from UBS without prior notice and immediately joined UBS competitor Procyon Private Wealth Partners, LLC.[1] Procyon had been recently formed by their former UBS colleague, defendant Fiore, who had been terminated by UBS in November 2016.

2.      At UBS, Defendants had been part of a team of financial advisors, institutional consultants and support staff known as the FDG Group who managed approximately $8 billion in assets for individual and institutional UBS clients generating approximately $6 million in annual revenue.

3.      Almost immediately after defendants Farrar, Gloria and Gahan joined Procyon, Defendants began soliciting UBS clients to leave UBS and do business instead with Defendants at Procyon.  Defendants used confidential UBS client information to accomplish the solicitation.

4.      Defendants' solicitation of UBS clients and misuse of confidential UBS client information, which continues unabated, is in direct breach of non-solicitation and non-disclosure agreements they signed at UBS.

5.      In addition, Defendants have been misleading UBS clients by stating that their former UBS team, the FDG Group, "is now" Procyon or that the entire team had moved to Procyon, when in fact Defendants constituted only part of the FDG Group and other members of the FDG Group – including two founding members – remain at UBS.   Defendants' misrepresentations have caused substantial client confusion and concern.

6.      UBS also believes that Defendants began competing against UBS during the six-month period between defendant Fiore's termination in November 2016 and when the other

---

[1]  Procyon Partners, LLC, Procyon Private Wealth Partners, LLC, and Procyon Institutional Partners, LLC (collectively, "Procyon") were formed by defendant Fiore in early 2017. Since June 2, 2017, all Defendants have been employed by Procyon in its Shelton, Connecticut office.

defendants resigned on June 2, 2017. Upon information and belief, Fiore – with the knowledge of the other defendants – for months had had been telling clients about the plan to set-up Procyon and soliciting those clients to move their business to Procyon once the firm was operational.

7.      By this action, UBS seeks injunctive relief pending arbitration of the merits of this dispute to protect itself from the irreparable harm being caused by the Defendants' conduct.

8.      UBS is filing, concurrently with the filing of this action, an arbitration against Defendants before FINRA Dispute Resolution on the merits of the dispute seeking damages and permanent injunctive relief.

## PARTIES, JURISDICTION, AND VENUE

9.      UBS is a Delaware corporation with its principal place of business in the State of New Jersey. UBS transacts business in this judicial district from its offices in Stamford, Connecticut (the "Stamford office"). UBS is a securities broker-dealer and commodities futures commission merchant that provides a wide range of financial services to its clients. UBS provides services to its clients through its financial advisors, who work from UBS offices throughout the country.

10.      The Defendants are individuals who were formerly employed by UBS as financial advisors in its Stamford office. On information and belief, the Defendants are citizens of the State of Connecticut.

11.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because the parties are citizens of different states and the amount in controversy in this action exceeds $75,000, exclusive of interest and costs.

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a) in that a substantial part of the conduct giving rise to UBS's claim occurred in this District and the Defendants reside in this District.

### FIORE'S UBS EMPLOYMENT AND AGREEMENTS AT ISSUE

13.     From April 24, 2009 until November 30, 2016, Fiore was employed by UBS as a financial advisor in its Stamford office.

14.     On or about April 24, 2009, Fiore signed a Transition Agreement with UBS, in which he agreed to the following post-employment restrictions:

> Non-Solicitation of Clients: In the event Employee's employment with UBSFS is terminated for any reason whatsoever, whether voluntarily or involuntarily, Employee agrees, for a period of one year from the date of termination or until such time that all amounts owed by the Employee to UBSFS and all related entities have been fully repaid, whichever is earlier, to not solicit, directly or indirectly, any of the clients who maintain accounts at UBSFS ("Clients of UBSFS") whom Employee serviced during his/her employment at UBSFS or other Clients of UBSFS whose names became known to Employee while in the employ of UBSFS.
>
> "Solicit" as set forth in this paragraph means that the Employee will not initiate, whether directly or indirectly, any contact or communication of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client or that may have the effect of inviting, encouraging or requesting a client:
>
> > (a)     to transfer his/her UBSFS account(s) to the Employee or his/her new employer; or
> > (b)     to open a new account with Employee or his/her new employer; or
> > (c)     to otherwise discontinue his/her existing relationship with UBSFS.
>
> Confidentiality of Client Information: All information concerning Clients of UBSFS, former clients of UBSFS and prospective clients of UBSFS must be treated as confidential and must not be disclosed to anyone outside of UBSFS unless the disclosure is expressly authorized by the client, required by law, rule, regulation or legal process. Employee further expressly agrees that, in the event Employee's employment is terminated for any reason whatsoever, whether voluntarily or involuntarily, Employee may not take any records or information referring or relating to Clients of UBSFS, former clients of UBSFS and prospective clients of UBSFS, whether originals or copies, in hard copy or computerized form.

Fiore executed additional Transition Agreements with UBS on or about April 24, 2011 and April 24, 2012, as well as Deferred Cash Award Agreements ("DCA Agreements") on or about April 24, 2014, February 19, 2015, and February 22, 2016. Copies of the Transition Agreements and DCA Agreements executed by Fiore are attached hereto as Exhibits A - F. Each of these agreements contained comparable post-employment restrictions on solicitation of clients and non-disclosure of client information. *E.g.*, Exhibit A at p. 3, ¶¶5 & 6; Exhibit B at p. 3, ¶¶5 & 6; Exhibit C at 3, ¶¶5 & 6; Exhibit D at pp. 7-8, ¶¶7 & 8; Exhibit E at pp. 5-6, ¶¶4 & 5; Exhibit F at pp. 7-8, ¶¶7 & 8.

15.     During his UBS employment, Fiore worked as part of a financial advisor team known as the FDG Group with defendants Farrar, Gloria and Gahan, as well as UBS financial advisors Steve DesRochers ("DesRochers") and Dean Gaugler ("Gaugler"), among others. Fiore, DesRochers and Gaugler were the founding members of the FDG Group.

16.     In 2016, the FDG Group serviced client accounts with approximately $8 billion in assets under management generating nearly $6 million in annual gross revenue.

17.     Included among the UBS clients serviced by the FDG Group were clients introduced to them by UBS financial advisors outside of their team, including financial advisors in other UBS branch offices, so that the clients could receive specialized investment consulting services from the FDG Group.

18.     The members of the FDG Group, including Fiore, signed a Financial Advisor Team Agreement (the "February 2016 Team Agreement," attached hereto as Exhibit G) governing their servicing of team accounts.

19.     In the February 2016 Team Agreement, Fiore expressly agreed that, upon the termination of his employment with UBS, he would be prohibited from soliciting any clients of UBS serviced by the FDG Group:

> Upon termination of employment of any Team Member or former Team Member, the departing Team Member or former Team Member agrees that, in addition to any other non-solicitation obligations he/she may have in any other agreement with UBS or its predecessors, including but not limited to those contained in:
> …
> • Employee Transition [Agreement]
> …
>
> he/she will not solicit, for a period of one year from the date of termination of the departing Team Member's employment, any clients of [UBS] serviced by the Team.

Ex. G at p. 5, ¶11(A).

20.     The February 2016 Team Agreement further provided that the non-solicit in that agreement would not "apply to client accounts the departing Team Member introduced to the Team either at its inception or during its existence" unless the such solicitation was "prohibited by a non-solicitation provision in another agreement…." Ex. G at p. 5, ¶11(B).  The Transitions Agreements and DCA Agreements constitute other agreements that prohibit solicitation of all UBS accounts.

21.     The February 2016 Team Agreement also requires that Fiore adhere to confidentiality and non-disclosure provisions concerning UBS's business and its customers. Specifically, the February 2016 Team Agreement provides:

> **Confidential Information.**  Each Team Member hereby agrees not to disclose to any person any Confidential Information relating to [UBS] except in the course of carrying out his or her duties for [UBS] or as required by law or governmental agency with jurisdiction.   For purposes of this paragraph, "Confidential Information" means any nonpublic information concerning [UBS]'s financial data, strategic business plans, product development, customer lists, customer financial information, marketing plans, and any other proprietary information;

except for specific items that have become publicly available other than through a breach by you of this paragraph 20 or any other confidentiality agreement….

Ex. G at p. 7, ¶20.

## FARRAR'S, GLORIA'S, AND GAHAN'S UBS EMPLOYMENT AND AGREEMENTS AT ISSUE

22.     Until June 2, 2017, Farrar, Gloria, and Gahan were employed as UBS financial advisors in the Stamford office.

23.     After Fiore's termination from UBS in November 2016, Farrar, Gloria, and Gahan signed a new team agreement (the "December 2016 Team Agreement), with DesRochers and Gaugler.  A copy of the December 2016 Team Agreement is attached hereto as Exhibit H.

24.     In the December 2016 Team Agreement, Farrar, Gloria, and Gahan expressly agreed that, upon the termination of their employment with UBS, they would be prohibited from soliciting any clients of UBS serviced by the FDG Group, unless they introduced the client to the team:

> If the employment of any Team Member (current or former) terminates for any reason, that Team Member will not, for a period of one year from the employment termination date, solicit any clients that were serviced by the Team. **This provision does not apply to client accounts the departing Team Member introduced to the Team, either at its inception or during its existence.** Nothing in this Non-Solicitation provision limits any rights UBS or any Team Member may have under the Protocol for Broker Recruiting ("Protocol").

Ex. H at p. 2, ¶5 (emphasis in original).[2]

25.     Throughout their UBS employment, Farrar, Gloria, and Gahan also repeatedly acknowledged the confidentiality of information concerning UBS's clients. Each advisor was provided, and was required to read and comply with all firm policies and procedures, including

---

[2]  Farrar and Gahan also executed Transition Agreements and DCA Agreements with UBS, each of which contained comparable post-employment restrictions on solicitation of clients and non-disclosure of client information as discussed above in regard to defendant Fiore.  Farrar executed Transitions Agreements in April 2009, April 2011, April 2012, and a DCA Agreement in February 2014. Gahan executed his DCA Agreement in February 2015.

the UBS Financial Services, Inc. Code of Conduct and Investment Advisor Code of Ethics ("the Code of Conduct"). Similar to Fiore, Farrar, Gloria, and Gahan's continued employment by UBS was conditioned upon, *inter alia,* their agreement to comply with UBS's policies and procedures, including the Code of Conduct and other policies designed to ensure the confidentiality and security of UBS's confidential client and business information.

26.     In connection with their employment at UBS, Farrar, Gloria, and Gahan agreed to be bound by the Code of Conduct, agreed to maintain the confidentiality of UBS's Confidential Information and acknowledged that they would not be permitted to retain, disclose or utilize any of UBS's Confidential Information after the termination of their UBS employment.

## DEFENDANTS' WRONGFUL CONDUCT

27.     On November 30, 2016, Defendant Fiore was terminated from UBS.

28.     Upon information and belief, in early 2017, Fiore formed Procyon and named himself Procyon's Executive Managing Director and Chief Executive Officer.

29.     Upon information and belief, during the period between his termination and when the other defendants resigned from UBS to join Procyon, Fiore was contacting UBS clients serviced by the FDG Group, telling the clients about his plans and soliciting the clients to move their business to move their business to Procyon once the firm was operational.

30.     Upon information and belief, Farrar, Gloria and Gahan were aware of Fiore's solicitation of the clients and nevertheless failed to inform UBS management of Fiore's activities.

31.     Upon information and belief, Farrar, Gloria, and Gahan coordinated with Fiore in setting up Procyon. Defendants Farrar, Gloria and Gahan hid their plans from their teammates DesRochers and Gaugler.

32.     On June 2, 2017, defendants Farrar, Gloria, and Gahan resigned from UBS without prior notice and immediately began working for Procyon.

33.     Along with their resignation letters, Farrar, Gloria, and Gahan submitted to their UBS branch manager lists of UBS clients that they planned to solicit, which included the clients' names, addresses, phone numbers, email addresses and account titles.[3]

34.     Despite the December 2016 Team Agreement's clear prohibition on solicitation of clients they did not introduce to the team, many of the clients identified on the list were not introduced to the team by Farrar, Gloria, and/or Gahan.  Instead, they are clients Farrar, Gloria, and Gahan came to know through their participation in the FDG Group.

35.     On information and belief, defendants Farrar, Gloria and Gahan retained a copy of the client lists they submitted with their resignation letters.

36.     Almost immediately after defendants Farrar, Gloria and Gahan joined Procyon, Defendants began soliciting UBS clients, including clients that defendants Farrar, Gloria and Gahan did not introduce, to leave UBS and do business instead with Defendants at Procyon.

37.     That same day – i.e., June 2, 2017 – Defendants sent a blast email to UBS clients informing the clients of their new affiliation with Procyon and stating "[o]ur team will be reaching out to you in the coming days to discuss any questions you may have about this change,

---

[3] In their resignation letters, defendants Farrar, Gloria and Gahan purported to invoke the "Protocol for Broker Recruiting" (the "Protocol"), to which both UBS and Procyon are signatories. Under the Protocol, signatory firms agree not to enforce their rights regarding non-solicitation of clients if the conditions of the Protocol are met, allowing brokers moving from one Protocol firm to another to take the "client name, address, phone number, email address, and account title of the clients that they serviced while at the firm." However, the Protocol expressly carves out from its application accounts serviced under written financial advisor team agreements.  Those agreements, even under the Protocol, are controlled by their own terms with respect to designating what clients may and may not be solicited upon a financial advisor's departure, except that financial advisors will always be allowed to solicit clients they introduced to the team. A copy of the Protocol is attached hereto as Exhibit I.

including the details about the smooth transition of your accounts to your new custodian partner...." A copy of the June 2 email is attached as Exhibit J.

38.     In addition to sending the blast email, Defendants have made phone calls to UBS clients, including multiple clients defendants Farrar, Gloria and Gahan did not introduce, soliciting the clients to move their business to Procyon.

39.     Upon information and belief, Defendants have used the lists defendants Farrar, Gloria and Gahan submitted with their resignation letters, which contain confidential UBS client information, to accomplish the solicitation.

40.     In their communications with UBS clients, Defendants have sought to give clients the impression that the entire FDG Group has moved to Procyon, including by stating in the blast email that "The Team of FDG Group is Now Procyon Partners," by stating on their LinkedIn biographies that "Formerly known as the FDG Group, Procyon Partners made their move to independence in June of 2017," and by telling clients during phone calls that the entire team had moved.

41.     Since June 2, 2017, UBS clients have reported to UBS that they have been confused and misled to believe that the entire FDG Group left UBS to join Procyon. UBS clients have also expressed concern over who is managing and servicing their assets at UBS due to their mistaken belief that the entire FDG Group has left UBS.

42.     In truth, the FDG Group, including founding members DesRochers and Gaugler, continues to exist at UBS and continues to service the team's clients.

43.     Upon information and belief, part of Defendants' plan involved how to take key staff members of the FDG Group with them to Procyon. To that end, on June 1, 2017, the day before their mass departure from UBS, Farrar, Gloria, and Gahan informed the FDG Group staff

members that they would be having a team bowling event. However, rather than taking the staff out bowling, Farrar, Gloria, and Gahan instead brought them to Procyon's office and solicited them to join the advisors at their new employer.

44.     FDG Group support staff Christopher Foster, Robert Ossers, and Richard Appaluccio resigned from UBS to join Procyon the same day as Farrar, Gloria, and Gahan.

45.     As a result of Defendants' actions, UBS has sustained and will continue to sustain severe and irreparable injury to its business unless injunctive relief is immediately granted.

## GROUNDS FOR INJUNCTIVE RELIEF
## PENDING EXPEDITED ARBITRATION

46.     Under the FINRA Code of Arbitration Procedure for Industry Disputes (the "FINRA Code"), the merits of the dispute between UBS and Defendants are subject to binding arbitration before FINRA. Pursuant to and in accordance with Rule 13804 of the FINRA Code, UBS will proceed with expedited arbitration on the merits of the parties' dispute at such time as a panel of arbitrators is appointed to hear the dispute and in compliance with any schedule set by the panel. To resolve this dispute as promptly as possible, UBS will immediately commence an arbitration proceeding against Defendants before FINRA promptly after the filing of this action.

47.     Rule 13804 of the FINRA Code expressly permits parties' applications to a court of competent jurisdiction for provisional injunctive relief pending expedited arbitration on the merits of the controversy.

## COUNT I
## BREACH OF CONTRACT – FIORE'S BREACH OF THE TRANSITION
## AGREEMENTS AND DEFERRED CASH AWARD AGREEMENTS

48.     UBS repeats, realleges and incorporates by reference ¶¶1 through 47, inclusive, above, as this ¶48 of Count I, as completely as if set forth in full herein.

49.     Fiore has violated, and continues to violate, the Transition Agreements and Deferred Cash Award Agreements (Exhibits A-F hereto) in the manner described above.

50.     UBS has performed its obligations and conditions unless otherwise excused.

51.     As a direct and proximate result of Fiore's breach of the Transition Agreements and Deferred Cash Award Agreements, UBS has suffered and will continue to suffer the irreparable harm described above.

**COUNT II**
**BREACH OF CONTRACT – FARRAR, GLORIA, AND GAHAN'S BREACH OF THE DECEMBER 2016 TEAM AGREEMENT**

52.     UBS repeats, realleges and incorporates by reference ¶¶1 through 51, inclusive, above, as this ¶52 of Count II, as completely as if set forth in full herein.

53.     Farrar, Gloria, and Gahan have violated, and continue to violate, the December 2016 Team Agreement (Exhibit H hereto) in the manner described above.

54.     UBS has performed its obligations and conditions unless otherwise excused.

55.     As a direct and proximate result of Farrar, Gloria, and Gahan's breach of the December 2016 Agreement, UBS has suffered and will continue to suffer the irreparable harm described above.

**COUNT III**
**MISAPPROPRIATION OF TRADE SECRETS**

56.     UBS repeats, realleges and incorporates by reference ¶¶1 through 55, inclusive, above, as this ¶56 of Count III, as completely as if set forth in full herein.

57.     The Connecticut Uniform Trade Secrets Act prohibits any person from utilizing the trade secrets of another for that person's commercial advantage. That Act defines trade secrets to include:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(i)      derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and

(ii)     is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  [Conn. Gen. Stat. §§35-50 to 35-58.]

58.      The information contained in the records, computer systems and databases of UBS that the Defendants misappropriated for their own use constitute "trade secrets" as defined in the Connecticut Uniform Trade Secrets Act.  The information contained in those records and databases constitute a "compilation" that, as demonstrated by the uses made by Defendants of the information contained in UBS's records, clearly "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use." If that information did not have such "independent economic value", Defendants would not have had reason to misappropriate UBS's confidential customer information and use it to solicit UBS customers to discontinue doing business with UBS and instead to do business with Procyon.

59.      UBS employs reasonable efforts to maintain the confidentiality of its records.

60.      The information contained in UBS's records constitutes "trade secrets" that are entitled to protection under the Connecticut Uniform Trade Secrets Act.

61.      The conduct of Defendants described above constitutes misappropriation of UBS's proprietary information and trade secrets in violation of the Connecticut Uniform Trade Secrets Act.

62.     As a direct and proximate result of Defendants' violation of the Connecticut Uniform Trade Secrets Act, UBS has suffered and will continue to suffer irreparable injury and loss.

## COUNT IV
## VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT

63.     UBS repeats, realleges and incorporates by reference ¶¶1 through 62, inclusive, above, as this ¶63 of Count IV, as completely as if set forth in full herein.

64.     The Connecticut Unfair Trade Practices Act, Connecticut General Statues §42-110a, *et. seq.* ("CUTPA"),  prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *See* Conn. Gen. Stat. §42-110b(a)

65.     Defendants' conduct in making misleading communications to UBS clients stating that that the FDG Group "is now Procyon" or that the entire FDG Group has moved to Procyon is unethical, unscrupulous, unfair, deceptive and constitutes an unfair method of competition or trade practice in violation of CUPTA.

66.     As a consequence of the foregoing, UBS has suffered and will continue to suffer irreparable harm and loss.

67.     Pursuant to the Connecticut General Statue §42-110g(c), a copy of this Complaint is being mailed to the Connecticut Attorney General and the Commissioner of Consumer Protection.

## COUNT V
## BREACH BY FARRAR, GLORIA, AND GAHAN OF
## FIDUCIARY DUTIES OWED TO UBS

68.     UBS repeats, realleges and incorporates by reference ¶¶1 through 67, inclusive, above, as this ¶68 of Count V, as completely as if set forth in full herein.

69.     At all times during their UBS employment, Farrar, Gloria, and Gahan owed UBS a fiduciary duty of complete loyalty and fidelity to UBS's interests. At all times during the course of their UBS employment, they were obligated to act solely and exclusively in UBS's best interests, and were prohibited from acting in a manner contrary to UBS's legitimate business interests.

70.     On information and belief, Farrar, Gloria, and Gahan breached their fiduciary duties and obligations to UBS by: (a) misappropriating UBS's business records and furnishing those records to Procyon, a competitor of UBS; and (b) while still employed by UBS, arranging for the solicitation (through the use of the purloined UBS records) of the customers whose accounts they serviced at UBS to transfer their accounts to Procyon.

71.     Farrar, Gloria, and Gahan also breached their fiduciary duties to UBS by making secret plans with others, while they were still employed by UBS, to deprive UBS of its records, clients, and trade secrets.

72.     As a direct and proximate result of Farrar, Gloria, and Gahan's breaches of their fiduciary duties to UBS, UBS has suffered and will continue to suffer irreparable injury and financial losses that are incalculable.

## COUNT VI
## UNFAIR COMPETITION

73.     UBS repeats, realleges and incorporates by reference ¶¶1 through 72, inclusive, above, as this ¶73 of Count VI as completely as if set forth in full herein.

74.     The conduct of the Defendants described above constitutes common law unfair competition.

75.     As a direct and proximate result of the acts and course of conduct of the Defendants that are described above, UBS has suffered and will continue to suffer irreparable injury and harm that is incalculable.

### RELIEF REQUESTED

WHEREFORE, Plaintiff UBS Financial Services Inc. respectfully requests that this Court:

A.     Enter immediately a Temporary Restraining Order against Defendants Phil G. Fiore Jr. ("Fiore"), Jeffrey H. Farrar ("Farrar"), Louis Gloria ("Gloria"), and Thomas M. Gahan ("Gahan") (collectively "Defendants"), directing as follows:

1.  Restraining and enjoining defendant Fiore, and all persons acting in concert with him (including, but not limited to any officer, employee, agent or other representative of Procyon Partners, LLC, Procyon Private Wealth Partners, LLC, and Procyon Institutional Partners, LLC (collectively, "Procyon"), Defendants' new employer), from soliciting, directly or indirectly, any clients of UBS whom he serviced during his UBS employment or whose names became known to him while in the employ of UBS;

2.  Restraining and enjoining defendants Farrar, Gloria, and Gahan, and all persons acting in concert with them (including, but not limited to any officer, employee, agent or other representative of Procyon), from soliciting, directly or indirectly, any UBS clients serviced by the FDG Group whom Farrar, Gloria, and/or Gahan did not introduce to the team under the Financial Advisor Team Agreements (the "Non-Introduced Team Clients"), or any other client of UBS not serviced by the FDG Group ("Non-Team Clients") whose name became known to them while in the employ of UBS;

3.  Restraining and enjoining Defendants, and all persons acting in concert with them (including, but not limited to any officer, employee, agent or other representative of Procyon), from using, disclosing or transmitting for any purpose (including but not limited to solicitation of said clients), any information contained in the records of UBS relating to the Non-Introduced Team Clients or Non-Team Clients, including but not limited to the names, addresses, and financial information of said clients;

4.  Restraining and enjoining Defendants, and all persons acting in concert with them (including, but not limited to any officer, employee, agent or other representative of Procyon), from misrepresenting the status of the FDG Group at

UBS, including representing that the FDG Group has become Procyon or that the entire FDG Group has departed from UBS; and

5. Requiring Defendants, and all persons acting in concert with them (including, but not limited to any officer, employee, agent or other representative of Procyon), to return to UBS as promptly as possible all originals, copies or other reproductions, in any form whatsoever, of any record or document containing UBS's confidential or proprietary information relating to the Non-Introduced Team Clients or Non-Team Clients, and to purge or destroy any computerized record of UBS relating to those clients that is within the Defendants' possession, custody or control.

B.     Continue the Temporary Restraining Order in full force and effect through and including a hearing before this Court on UBS's request for the entry of a Preliminary Injunction, and set such a hearing at a date convenient for the Court;

C.     Following the hearing on the request for a preliminary injunction, convert the Temporary Restraining Order into a Preliminary Injunction, to remain in effect until the merits of the parties' dispute are resolved by a full panel of arbitrators appointed pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure for Industry Disputes;

D.     Maintain the requested Order in full force and effect and direct the parties to proceed toward an expedited arbitration hearing on the merits before a duly appointed panel of arbitrators in accordance with Rule 13804 of the FINRA Code of Arbitration Procedure; and

E.     Grant UBS such other and further relief as the Court deems to be just and equitable under the circumstances.

Dated at New Haven, Connecticut this 16th day of June, 2017.

Respectfully submitted,

PLAINTIFF, UBS FINANCIAL SERVICES INC.

/s/ Stephen P. Rosenberg
Stephen P. Rosenberg (CT26601)
LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street, Suite 300
New Haven, CT  06510
Telephone: 203.974.8700
Facsimile: 203.974.8799
sprosenberg@littler.com

James L. Komie (*pro hac vice pending*)
Michael D. Lee (*pro hac vice pending*)
HOWARD & HOWARD ATTORNEYS PLLC
200 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: 312.372.4000
Facsimile: 312.939.5617
jkomie@howardandhoward.com
mlee@howardandhoward.com

Its Attorneys

# EXHIBIT A

## TRANSITION AGREEMENT #3621

This Transition Agreement ("Agreement") is entered into this 24th day of April, 2009, between UBS Financial Services Inc., a Delaware corporation, and its successors and/or assigns ("UBSFS") and Phil Fiore("Employee").

1.    <u>Transition Payments</u>:  Subject to the terms and conditions set forth in this Agreement, on the dates set forth below, UBSFS agrees to pay Employee transition payments in the amounts set forth immediately below less applicable withholdings for federal, state and local taxes:

$217,738.08 on 4/24/2010,

$213,575.53 on 4/24/2011,

$209,412.98 on 4/24/2012,

$205,250.43 on 4/24/2013,

$201,087.87 on 4/24/2014,

$196,925.32 on 4/24/2015,

$192,762.77 on 4/24/2016,

$188,600.22 on 4/24/2017,

$184,437.66 on 4/24/2018,

2.    <u>Conditions For Payments</u>:  UBSFS shall have no obligation to make any transition payment hereunder in the event that Employee's employment with UBSFS is terminated, either voluntarily or involuntarily, by Employee or UBSFS for any reason whatsoever other than death or disability (as defined herein).  Further, UBSFS shall not be obligated to make any transition payment hereunder unless: (a) Employee has, at all times since the date of this Agreement, remained in the full-time, active employment of UBSFS; (b) Employee has obtained and maintained in full force and effect all licenses and registrations from the Financial Industry Regulatory Authority ("FINRA"), securities exchanges, state securities commissions and other regulatory bodies as UBSFS shall determine is necessary or appropriate in order for Employee to conduct securities or commodities transactions or otherwise perform the functions for which he/she is employed; and (c) Employee is current on all of his or her outstanding obligations to UBSFS and all related entities.  For purposes of any applicable wage and hour laws, rules or regulations, Employee hereby acknowledges that the transition payments are not earned by the Employee until any amounts owed to UBSFS, or any related entity, by the Employee are paid.  Employee further acknowledges that he or she will not be entitled to any part-year or pro-rata transition payment if his or her employment terminates prior to the date the next transition payment is due to be made by UBSFS.

3.     Death Or Disability:  If Employee shall die or incur a disability while a full-time employee of UBSFS, then UBSFS shall make a lump sum payment of the transition payments remaining on the date of the Employee's death or the date Employee incurred such a disability.  Such lump sum payment shall be subject to applicable withholdings and shall be remitted to Employee (or his/her estate) or, at UBSFS's option, applied to any financial obligation Employee (or his/her estate) has to UBSFS, or any related entity, as soon as administratively feasible, but in no event later than March 15 of the calendar year following the year in which such event occurs.   For purposes of this Agreement, "disability" shall mean a "total disability" as such term is used in the UBSFS Long Term Disability ("LTD") Plan), provided, however, that if a total disability as defined in the LTD Plan does not constitute a "disability" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended, or the regulations promulgated thereunder ("I.R.C. Section 409A"), then disability for purposes of this Agreement shall have the meaning set forth in I.R.C. Section 409A.

4.     Arbitration:   With the exception of claims for injunctive relief or for the denial of benefits under the UBSFS's disability or medical plans, Employee and UBSFS agree that, unless prohibited by applicable law, any disputes between Employee and UBSFS including claims concerning compensation, benefits or other terms or conditions of employment and termination of employment, or any claims for discrimination, retaliation or harassment, or any other claims whether they arise by statute or otherwise, including but not limited to, claims arising under the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964, as amended, The Age Discrimination in Employment Act of 1967, The Worker Adjustment and Retraining Notification Act, The Employee Retirement Income Security Act, The Americans With Disabilities Act, The Equal Pay Act of 1963, The Americans With Disabilities Act of 1990, The Family and Medical Leave Act of 1993, The Sarbanes- Oxley Act, or any other federal, state or local employment or discrimination laws, rules or regulations, including wage and hour laws, will be determined by arbitration as authorized and governed by the arbitration law of the state of New Jersey. Any such arbitration will be conducted under the auspices and rules of the Financial Industry Regulatory Authority ("FINRA"), except that Employee may elect to arbitrate discrimination claims under any federal, state or local law (including claims of harassment and retaliation under those laws) before JAMS pursuant to its Employment Arbitration Rules and Procedures and subject to the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness. Subject to the parties' right to appeal or seek vacatur under applicable law, Employee and UBSFS agree that the decision of the Arbitrator(s) will be final and binding on the parties and that the Arbitrator(s) is authorized to award whatever remedies would be available to the parties in a court of law.  Employee and UBSFS further agree that any disputes between Employee and UBSFS shall be heard, as set forth above, by FINRA or JAMS without consolidation of such claims with any other person or entity.  Employee waives any right to commence, be a party to or an actual or putative class member of any class or collective action arising out of or relating to Employee's employment with UBSFS or termination of employment with UBSFS.

2

Information about JAMS, including its Employment Arbitration Rules and Procedures can found at www.jamsadr.com. If Employee chooses to arbitrate before JAMS, then, where permitted by law, Employee only shall be responsible for those arbitration fees and costs that Employee would have been required to bear in a FINRA arbitration.

5.   Non-Solicitation Of Clients: In the event Employee's employment with UBSFS is terminated for any reason whatsoever, whether voluntarily or involuntarily, Employee agrees, for a period of one year from the date of termination or until such time that all amounts owed by the Employee to UBSFS and all related entities have been fully repaid, whichever is earlier, to not solicit, directly or indirectly, any of the clients who maintain accounts at UBSFS ("Clients of UBSFS") whom Employee serviced during his/her employment at UBSFS or other Clients of UBSFS whose names became known to Employee while in the employ of UBSFS.

"Solicit" as set forth in this paragraph means that the Employee will not initiate, whether directly or indirectly, any contact or communication of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client or that may have the effect of inviting, encouraging or requesting a client:

(a)   to transfer his/her UBSFS account(s) to the Employee or his/her new employer; or

(b)   to open a new account with Employee or his/her new employer; or

(c)   to otherwise discontinue his/her existing business relationship with UBSFS.

6.   Confidentiality Of Client Information: All information concerning Clients of UBSFS, former clients of UBSFS and prospective clients of UBSFS must be treated as confidential and must not be disclosed to anyone outside UBSFS unless the disclosure is expressly authorized by the client, required by law, rule, regulation or legal process. Employee further expressly agrees that, in the event Employee's employment is terminated for any reason whatsoever, whether voluntarily or involuntarily, Employee may not take any records or information referring or relating to Clients of UBSFS, former clients of UBSFS and prospective clients of UBSFS, whether originals or copies, in hard copy or computerized form.

7.   Other Agreements: In the event that Employee enters into other agreements with UBSFS that contain non-solicitation and/or confidentiality obligations, including, but not limited to, Corporate Employee Account Servicing Agreements, Receiving and/or Retiring or Transitioning Financial Advisor Agreements, Financial Advisor Team Agreements, and/or Account Assignment Agreements, the non-solicitation and/or confidentiality provisions of any such agreement shall govern Employee's conduct with respect to the solicitation of clients and use of client information covered by those Agreements.

8.   Remedies: In the event that any of the provisions contained in the Non-Solicitation of Clients and/or Confidentiality of Client Information paragraphs of this Agreement are breached by Employee, Employee understands that Employee will be liable to UBSFS for any damage and/or injury, including but not limited to reasonable attorney's fees, incurred to enforce the provisions of this Agreement.  Employee also specifically

3

agrees that, in the event of breach of the Non-Solicitation of Clients and/or Confidentiality of Client Information paragraphs of this Agreement, damages alone will be an inadequate remedy and UBSFS will, in addition to damages for breach, be entitled to injunctive or other equitable relief against Employee to enforce the provisions of these paragraphs.

EMPLOYEE FURTHER EXPRESSLY CONSENTS TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER OR A PRELIMINARY INJUNCTION BY ANY COURT OR ARBITRATION PANEL WITH JURISDICTION OVER EMPLOYEE TO PROHIBIT THE BREACH OF ANY PROVISION OF THIS AGREEMENT, OR TO MAINTAIN THE STATUS QUO PENDING THE OUTCOME OF ANY ARBITRATION PROCEEDING THAT MAY BE INITIATED; AND, FURTHER, THAT THE ISSUE OF TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF MAY BE DECIDED BY A COURT AND NOT BY AN ARBITRATION PANEL SHOULD UBSFS IN ITS DISCRETION ELECT TO SEEK SUCH RELIEF.

9.    Assignment:  This Agreement may be assigned by UBSFS and the benefits and obligations hereof shall inure to UBSFS's successors and assigns (and all references herein to UBSFS shall together be deemed to refer to such successors or assigns as the case may be).

10.    Terms And Modifications:  This Agreement contains all of the terms of the agreement between the parties hereto relating to the subject matter hereof and may not be amended, modified or discharged, nor may any provision hereof be waived, orally, by course of dealing or otherwise, unless such amendment, modification, discharge or waiver shall be in writing and duly executed by UBSFS.  The non-exercise by UBSFS of any right or remedy in any particular instance shall not constitute a waiver thereof in that or any other instance. Any provision hereof found to be illegal, invalid or unenforceable for any reason whatsoever shall not affect the validity, legality or enforceability of the remainder hereof.

11.    Not An Employment Contract:   Employee expressly acknowledges that his/her employment with UBSFS is "at will" and that this Agreement is not an employment contract or agreement to employ Employee for a specified period of time or a promise of continued employment with UBSFS for any period whatsoever.  Accordingly, Employee acknowledges that his/her employment may be terminated with or without cause and with or without notice at any time at his/her option or that of UBSFS .

12.    Governing Law:  This Agreement shall be governed by and construed and enforced in accordance with the laws of the state of New Jersey without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, Employee has executed this Agreement as of the date set forth above

EMPLOYEE:

4

UBS Financial Services Inc.

By: _____

# EXHIBIT B

**TRANSITION AGREEMENT**

This Transition Agreement ("Agreement") is entered into this 24th day of April, 2011, between UBS Financial Services Inc., a Delaware corporation, and its successors and/or assigns, including all affiliates and related entities ("UBSFS") and PHIL FIORE ("Employee").

1.     Transition Payments:   Subject to the terms and conditions set forth in this Agreement, on the dates set forth below, UBSFS agrees to pay Employee transition payments in the amounts set forth immediately below less applicable withholdings for federal, state and local taxes:

> $25,623.07, on Apr 24, 2012
> $24,998.32, on Apr 24, 2013
> $24,373.58, on Apr 24, 2014
> $23,748.83, on Apr 24, 2015
> $23,124.09, on Apr 24, 2016
> $22,499.34, on Apr 24, 2017
> $21,874.60, on Apr 24, 2018

2.     Conditions For Payments:   UBSFS shall have no obligation to make any transition payment hereunder in the event that Employee's employment with UBSFS is terminated, either voluntarily or involuntarily, by Employee or UBSFS for any reason whatsoever other than death or disability (as defined herein).  Further, UBSFS shall not be obligated to make any transition payment hereunder unless Employee: (a) has, at all times since the date of this Agreement, remained in the full-time, active employment of UBSFS; (b) has obtained and maintained in full force and effect all licenses and registrations from the Financial Industry Regulatory Authority ("FINRA"), securities exchanges, state securities commissions and other regulatory bodies as UBSFS shall determine is necessary or appropriate in order for Employee to conduct securities or commodities transactions or otherwise perform the functions for which he/she is employed; (c) at UBSFS's option, and subject to applicable law, opens and maintains a Resource Management Account ("RMA") at UBSFS, authorizes UBSFS to deposit all transition payments that he or she may be entitled to pursuant to this Agreement into the RMA and further authorizes UBSFS to offset any outstanding obligations to UBSFS from Employee's RMA; and (d) is current on all of his or her outstanding obligations to UBSFS and all related entities.  For purposes of any applicable wage and hour laws, rules or regulations, Employee hereby acknowledges that the transition payments are not earned by the Employee until any amounts owed to UBSFS, or any related entity, by the Employee are paid.  Employee further acknowledges that he or she will not be entitled to any part-year or pro-rata transition payment if his or her employment terminates prior to the date the next transition payment is due to be made by UBSFS.

3.     Death Or Disability:  If Employee shall die or incur a disability while a full-time employee of UBSFS, then UBSFS shall make a discounted accelerated lump sum

payment of the remaining transition payments as of the date of the Employee's death or at the time that Employee is terminated by UBSFS due to disability. Such lump sum payment shall be discounted by a rate equal to the mid-term AFR in effect at the time of death or termination due to disability. Payment shall be subject to all applicable withholdings and shall be remitted to Employee (or his/her estate) or, at UBSFS's option, applied to any financial obligation Employee (or his/her estate) has to UBSFS, or any related entity, as soon as administratively feasible following the date that Employee is terminated due to death or disability, but in no event later than March 15 of the calendar year following the year in which such event occurs. For purposes of this Agreement, "disability" shall mean that Employee cannot perform all the material duties of Employee's regular occupation as such term is used in the UBSFS Long Term Disability ("LTD") Plan), provided, however, that if a disability as defined in the LTD Plan does not constitute a "disability" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended, or the regulations promulgated thereunder ("I.R.C. Section 409A"), then disability for purposes of this Agreement shall have the meaning set forth in I.R.C. Section 409A.

   4.   Arbitration:   With the exception of claims for injunctive relief or for the denial of benefits under the disability or medical plans of UBSFS and/or any related entities, Employee and UBSFS agree that, unless prohibited by applicable law, any disputes between Employee and UBSFS including claims concerning compensation, benefits or other terms or conditions of employment and termination of employment, or any claims for discrimination, retaliation or harassment, or any other claims whether they arise by statute or otherwise, including but not limited to, claims arising under the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964, as amended, The Age Discrimination in Employment Act of 1967, The Worker Adjustment and Retraining Notification Act, The Employee Retirement Income Security Act, The Americans With Disabilities Act, The Equal Pay Act of 1963, The Americans With Disabilities Act of 1990, The Family and Medical Leave Act of 1993, or any other federal, state or local employment or discrimination laws, rules or regulations, including wage and hour laws, will be determined by arbitration as authorized and governed by the arbitration law of the state of New Jersey. Any such arbitration will be conducted under the auspices and rules of the Financial Industry Regulatory Authority ("FINRA"), except that Employee may elect to arbitrate discrimination claims under any federal, state or local law (including claims of harassment and retaliation under those laws) before JAMS pursuant to its Employment Arbitration Rules and Procedures and subject to the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness. Subject to the parties' right to appeal or seek vacatur under applicable law, Employee and UBSFS agree that the decision of the Arbitrator(s) will be final and binding on the parties and that the Arbitrator(s) is authorized to award whatever remedies would be available to the parties in a court of law.

   Employee and UBSFS further agree that any disputes between Employee and UBSFS shall be heard, as set forth above, by FINRA or JAMS without consolidation of such claims with any other person or entity. Employee waives any right to commence, be a party to or an actual or putative class member of any class or collective action arising out of or relating to Employee's employment with UBSFS or termination of employment with UBSFS. Notwithstanding anything to the contrary herein, Employee and UBSFS further agree that if, for any reason, the waiver of Employee's right to commence, be a party to or

an actual or putative class member of a class or collective proceeding within or outside of an arbitration proceeding is found to be unenforceable by a decisionmaker, then any such class or collective claim shall be filed, litigated and adjudicated in a court of competent jurisdiction, and not in arbitration.

Information about JAMS, including its Employment Arbitration Rules and Procedures can found at www.jamsadr.com. If Employee chooses to arbitrate before JAMS, then, where permitted by law, Employee only shall be responsible for those arbitration fees and costs that Employee would have been required to bear in a FINRA arbitration.

5.     Non-Solicitation Of Clients:  Subject to applicable law and Paragraph 7 of this Agreement, in the event Employee's employment with UBSFS is terminated for any reason whatsoever, whether voluntarily or involuntarily, Employee agrees, for a period of one year from the date of termination or until such time that all amounts owed by the Employee to UBSFS and all related entities have been fully repaid, whichever is earlier, to not solicit, directly or indirectly, any of the clients who maintain accounts at UBSFS ("Clients of UBSFS") whom Employee serviced during his/her employment at UBSFS or other Clients of UBSFS whose names became known to Employee while in the employ of UBSFS.

"Solicit" as set forth in this paragraph means that the Employee will not initiate, whether directly or indirectly, any contact or communication of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client or that may have the effect of inviting, encouraging or requesting a client:

(a)     to transfer his/her UBSFS account(s) to the Employee or his/her new employer; or

(b)     to open a new account with Employee or his/her new employer; or

(c)     to otherwise discontinue his/her existing business relationship with UBSFS.

6.     Confidentiality Of Client Information:  All information concerning Clients of UBSFS, former clients of UBSFS and prospective clients of UBSFS must be treated as confidential and must not be disclosed to anyone outside UBSFS unless the disclosure is expressly authorized by the client, required by law, rule, regulation or legal process. Employee further expressly agrees that, in the event Employee's employment is terminated for any reason whatsoever, whether voluntarily or involuntarily, Employee may not take any records or information referring or relating to Clients of UBSFS, former clients of UBSFS and prospective clients of UBSFS, whether originals or copies, in hard copy or computerized form.

7.     Other Agreements:  In the event that Employee enters into other agreements with UBSFS or any related entities that contain non-solicitation and/or confidentiality obligations, including, but not limited to, any deferred compensation, equity or other award plans, Offer Letters, Letters of Understanding, Corporate Employee Account Servicing Agreements, Receiving and/or Retiring or Transitioning Financial Advisor Agreements, Financial Advisor Team Agreements, and/or Account Assignment Agreements, the non-solicitation and/or confidentiality provisions of any such agreement

3

shall govern Employee's conduct with respect to the solicitation of clients and use of client information covered by those Agreements.

8.     Remedies:  In the event that any of the provisions contained in the Non-Solicitation of Clients and/or Confidentiality of Client Information paragraphs of this Agreement are breached by Employee, Employee understands that Employee will be liable to UBSFS for any damage and/or injury, including but not limited to reasonable attorney's fees, incurred to enforce the provisions of this Agreement.  Employee also specifically agrees that, in the event of breach of the Non-Solicitation of Clients and/or Confidentiality of Client Information paragraphs of this Agreement, damages alone will be an inadequate remedy and UBSFS will, in addition to damages for breach, be entitled to injunctive or other equitable relief against Employee to enforce the provisions of these paragraphs.

EMPLOYEE FURTHER EXPRESSLY CONSENTS TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER OR A PRELIMINARY INJUNCTION BY ANY COURT OR ARBITRATION PANEL WITH JURISDICTION OVER EMPLOYEE TO PROHIBIT THE BREACH OF ANY PROVISION OF THIS AGREEMENT, OR TO MAINTAIN THE STATUS QUO PENDING THE OUTCOME OF ANY ARBITRATION PROCEEDING THAT MAY BE INITIATED; AND, FURTHER, THAT THE ISSUE OF TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF MAY BE DECIDED BY A COURT AND NOT BY AN ARBITRATION PANEL SHOULD UBSFS IN ITS DISCRETION ELECT TO SEEK SUCH RELIEF.

9.     Assignment:  This Agreement may be assigned by UBSFS and the benefits and obligations hereof shall inure to UBSFS's successors and assigns (and all references herein to UBSFS shall together be deemed to refer to such successors or assigns as the case may be).

10.     Terms And Modifications:  This Agreement contains all of the terms of the agreement between the parties hereto relating to the subject matter hereof and may not be amended, modified or discharged, nor may any provision hereof be waived, orally, by course of dealing or otherwise, unless such amendment, modification, discharge or waiver shall be in writing and duly executed by UBSFS.  The non-exercise by UBSFS of any right or remedy in any particular instance shall not constitute a waiver thereof in that or any other instance. Any provision hereof found to be illegal, invalid or unenforceable for any reason whatsoever shall not affect the validity, legality or enforceability of the remainder hereof.

11.     Not An Employment Contract:   Employee expressly acknowledges that his/her employment with UBSFS is "at will" and that this Agreement is not an employment contract or agreement to employ Employee for a specified period of time or a promise of continued employment with UBSFS for any period whatsoever.  Accordingly, Employee acknowledges that his/her employment may be terminated with or without cause and with or without notice at any time at his/her option or that of UBSFS .

12.     Governing Law:  This Agreement shall be governed by and construed and enforced in accordance with the laws of the state of New Jersey without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, Employee has executed this Agreement as of the date set forth above

EMPLOYEE:

*Phil Fiore*

UBS Financial Services Inc.

By: Matthew Luutan

5

# EXHIBIT C

**TRANSITION AGREEMENT**

This Transition Agreement ("Agreement") is entered into this 24th day of April, 2012, between UBS Financial Services Inc., a Delaware corporation, and its successors and/or assigns, including all affiliates and related entities ("UBSFS") and PHIL FIORE ("Employee").

1.    <u>Transition Payments</u>:  Subject to the terms and conditions set forth in this Agreement, on the dates set forth below, UBSFS agrees to pay Employee transition payments in the amounts set forth immediately below less applicable withholdings for federal, state and local taxes:

> $53,688.29, on Apr 24, 2013
> $53,004.05, on Apr 24, 2014
> $52,319.80, on Apr 24, 2015
> $51,635.56, on Apr 24, 2016
> $50,951.32, on Apr 24, 2017
> $50,267.07, on Apr 24, 2018

2.    <u>Conditions For Payments</u>:  UBSFS shall have no obligation to make any transition payment hereunder in the event that Employee's employment with UBSFS is terminated, either voluntarily or involuntarily, by Employee or UBSFS for any reason whatsoever other than death or disability (as defined herein).  Further, UBSFS shall not be obligated to make any transition payment hereunder unless Employee: (a) has, at all times since the date of this Agreement, remained in the full-time, active employment of UBSFS; (b) has obtained and maintained in full force and effect all licenses and registrations from the Financial Industry Regulatory Authority ("FINRA"), securities exchanges, state securities commissions and other regulatory bodies as UBSFS shall determine is necessary or appropriate in order for Employee to conduct securities or commodities transactions or otherwise perform the functions for which he/she is employed; (c) at UBSFS's option, and subject to applicable law, opens and maintains a Resource Management Account ("RMA") at UBSFS, authorizes UBSFS to deposit all transition payments that he or she may be entitled to pursuant to this Agreement into the RMA and further authorizes UBSFS to offset any outstanding obligations to UBSFS from Employee's RMA; and (d) is current on all of his or her outstanding obligations to UBSFS and all related entities.  For purposes of any applicable wage and hour laws, rules or regulations, Employee hereby acknowledges that the transition payments are not earned by the Employee until any amounts owed to UBSFS, or any related entity, by the Employee are paid.  Employee further acknowledges that he or she will not be entitled to any part-year or pro-rata transition payment if his or her employment terminates prior to the date the next transition payment is due to be made by UBSFS.

3.    <u>Death Or Disability</u>:  If Employee shall die or incur a disability while a full-time employee of UBSFS, then UBSFS shall make a discounted accelerated lump sum payment of the remaining transition payments as of the date of the Employee's death or at

the time that Employee is terminated by UBSFS due to disability.  Such lump sum payment shall be discounted by a rate equal to the mid-term AFR in effect at the time of death or termination due to disability.  Payment shall be subject to all applicable withholdings and shall be remitted to Employee (or his/her estate) or, at UBSFS's option, applied to any financial obligation Employee (or his/her estate) has to UBSFS, or any related entity, as soon as administratively feasible following the date that Employee is terminated due to death or disability, but in no event later than March 15 of the calendar year following the year in which such event occurs.  For purposes of this Agreement, "disability" shall mean that Employee cannot perform all the material duties of Employee's regular occupation as such term is used in the UBSFS Long Term Disability ("LTD") Plan), provided, however, that if a disability as defined in the LTD Plan does not constitute a "disability" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended, or the regulations promulgated thereunder ("I.R.C. Section 409A"), then disability for purposes of this Agreement shall have the meaning set forth in I.R.C. Section 409A.

4.    Arbitration:    With the exception of claims for injunctive relief or for the denial of benefits under the disability or medical plans of UBSFS and/or any related entities, Employee and UBSFS agree that, unless prohibited by applicable law, any disputes between Employee and UBSFS including claims concerning compensation, benefits or other terms or conditions of employment and termination of employment, or any claims for discrimination, retaliation or harassment, or any other claims whether they arise by statute or otherwise, including but not limited to, claims arising under the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964, as amended, The Age Discrimination in Employment Act of 1967, The Worker Adjustment and Retraining Notification Act, The Employee Retirement Income Security Act, The Americans With Disabilities Act, The Equal Pay Act of 1963, The Americans With Disabilities Act of 1990, The Family and Medical Leave Act of 1993, or any other federal, state or local employment or discrimination laws, rules or regulations, including wage and hour laws, will be determined by arbitration as authorized and governed by the arbitration law of the state of New Jersey. Any such arbitration will be conducted under the auspices and rules of the Financial Industry Regulatory Authority ("FINRA"), except that Employee may elect to arbitrate discrimination claims under any federal, state or local law (including claims of harassment and retaliation under those laws) before JAMS pursuant to its Employment Arbitration Rules and Procedures and subject to the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness.  Subject to the parties' right to appeal or seek vacatur under applicable law, Employee and UBSFS agree that the decision of the Arbitrator(s) will be final and binding on the parties and that the Arbitrator(s) is authorized to award whatever remedies would be available to the parties in a court of law.

Employee and UBSFS further agree that any disputes between Employee and UBSFS shall be heard, as set forth above, by FINRA or JAMS without consolidation of such claims with any other person or entity.  Employee waives any right to commence, be a party to or an actual or putative class member of any class or collective action arising out of or relating to Employee's employment with UBSFS or termination of employment with UBSFS.  Notwithstanding anything to the contrary herein, Employee and UBSFS further agree that if, for any reason, the waiver of Employee's right to commence, be a party to or an actual or putative class member of a class or collective proceeding within or outside of

an arbitration proceeding is found to be unenforceable by a decisionmaker, then any such class or collective claim shall be filed, litigated and adjudicated in a court of competent jurisdiction, and not in arbitration.

Information about JAMS, including its Employment Arbitration Rules and Procedures can found at www.jamsadr.com.  If Employee chooses to arbitrate before JAMS, then, where permitted by law, Employee only shall be responsible for those arbitration fees and costs that Employee would have been required to bear in a FINRA arbitration.

5.      Non-Solicitation Of Clients:  Subject to applicable law and Paragraph 7 of this Agreement, in the event Employee's employment with UBSFS is terminated for any reason whatsoever, whether voluntarily or involuntarily, Employee agrees, for a period of one year from the date of termination or until such time that all amounts owed by the Employee to UBSFS and all related entities have been fully repaid, whichever is earlier, to not solicit, directly or indirectly, any of the clients who maintain accounts at UBSFS ("Clients of UBSFS") whom Employee serviced during his/her employment at UBSFS or other Clients of UBSFS whose names became known to Employee while in the employ of UBSFS.

"Solicit" as set forth in this paragraph means that the Employee will not initiate, whether directly or indirectly, any contact or communication of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client or that may have the effect of inviting, encouraging or requesting a client:

(a)      to transfer his/her UBSFS account(s) to the Employee or his/her new employer; or

(b)      to open a new account with Employee or his/her new employer; or

(c)      to otherwise discontinue his/her existing business relationship with UBSFS.

6.      Confidentiality Of Client Information:  All information concerning Clients of UBSFS, former clients of UBSFS and prospective clients of UBSFS must be treated as confidential and must not be disclosed to anyone outside UBSFS unless the disclosure is expressly authorized by the client, required by law, rule, regulation or legal process. Employee further expressly agrees that, in the event Employee's employment is terminated for any reason whatsoever, whether voluntarily or involuntarily, Employee may not take any records or information referring or relating to Clients of UBSFS, former clients of UBSFS and prospective clients of UBSFS, whether originals or copies, in hard copy or computerized form.

7.      Other Agreements:  In the event that Employee enters into other agreements with UBSFS or any related entities that contain non-solicitation and/or confidentiality obligations, including, but not limited to, any deferred compensation, equity or other award plans, Offer Letters, Letters of Understanding, Corporate Employee Account Servicing Agreements, Receiving and/or Retiring or Transitioning Financial Advisor Agreements, Financial Advisor Team Agreements, and/or Account Assignment Agreements, the non-solicitation and/or confidentiality provisions of any such agreement

3

shall govern Employee's conduct with respect to the solicitation of clients and use of client information covered by those Agreements.

8.    Remedies:  In the event that any of the provisions contained in the Non-Solicitation of Clients and/or Confidentiality of Client Information paragraphs of this Agreement are breached by Employee, Employee understands that Employee will be liable to UBSFS for any damage and/or injury, including but not limited to reasonable attorney's fees, incurred to enforce the provisions of this Agreement.   Employee also specifically agrees that, in the event of breach of the Non-Solicitation of Clients and/or Confidentiality of Client Information paragraphs of this Agreement, damages alone will be an inadequate remedy and UBSFS will, in addition to damages for breach, be entitled to injunctive or other equitable relief against Employee to enforce the provisions of these paragraphs.

EMPLOYEE FURTHER EXPRESSLY CONSENTS TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER OR A PRELIMINARY INJUNCTION BY ANY COURT OR ARBITRATION PANEL WITH JURISDICTION OVER EMPLOYEE TO PROHIBIT THE BREACH OF ANY PROVISION OF THIS AGREEMENT, OR TO MAINTAIN THE STATUS QUO PENDING THE OUTCOME OF ANY ARBITRATION PROCEEDING THAT MAY BE INITIATED; AND, FURTHER, THAT THE ISSUE OF TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF MAY BE DECIDED BY A COURT AND NOT BY AN ARBITRATION PANEL SHOULD UBSFS IN ITS DISCRETION ELECT TO SEEK SUCH RELIEF.

9.    Assignment:  This Agreement may be assigned by UBSFS and the benefits and obligations hereof shall inure to UBSFS's successors and assigns (and all references herein to UBSFS shall together be deemed to refer to such successors or assigns as the case may be).

10.    Terms And Modifications:  This Agreement contains all of the terms of the agreement between the parties hereto relating to the subject matter hereof and may not be amended, modified or discharged, nor may any provision hereof be waived, orally, by course of dealing or otherwise, unless such amendment, modification, discharge or waiver shall be in writing and duly executed by UBSFS.  The non-exercise by UBSFS of any right or remedy in any particular instance shall not constitute a waiver thereof in that or any other instance. Any provision hereof found to be illegal, invalid or unenforceable for any reason whatsoever shall not affect the validity, legality or enforceability of the remainder hereof.

11.    Not An Employment Contract:   Employee expressly acknowledges that his/her employment with UBSFS is "at will" and that this Agreement is not an employment contract or agreement to employ Employee for a specified period of time or a promise of continued employment with UBSFS for any period whatsoever.  Accordingly, Employee acknowledges that his/her employment may be terminated with or without cause and with or without notice at any time at his/her option or that of UBSFS .

12.    Governing Law:  This Agreement shall be governed by and construed and enforced in accordance with the laws of the state of New Jersey without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, Employee has executed this Agreement as of the date set forth above

EMPLOYEE:

*Phil Fiore*

UBS Financial Services Inc.

By: *Matthew Luutan*

# EXHIBIT D

## DEFERRED CASH AWARD AGREEMENT

This Financial Advisor Award Agreement ("Agreement") is entered into this 24th day of February, 2014, between UBS Financial Services Inc., a Delaware corporation, and its successors and/or assigns, including all affiliates and related entities ("UBSFS") and PHIL FIORE ("Employee").

1.   Award Payments:  Subject to the terms and conditions set forth in this Agreement, on the dates set forth below, UBSFS agrees to pay Employee Award Payments in the amounts set forth immediately below less applicable withholdings for federal, state and local taxes and any offset for defaults, arrearages or past due amounts owed to UBSFS, and all related entities as of the date of such payment(s) and any/all penalties related thereto:

$7,162.33, on Mar 24, 2015
$7,023.69, on Mar 24, 2016
$6,885.05, on Mar 24, 2017
$6,746.41, on Mar 24, 2018
$6,607.78, on Mar 24, 2019
$6,469.13, on Mar 24, 2020

2.   Conditions For Payments:  UBSFS shall have no obligation to make any Award Payment hereunder in the event that Employee's employment with UBSFS is terminated, either voluntarily or involuntarily, by Employee or UBSFS for any reason whatsoever other than as set forth in Paragraphs 3 and 4 herein. Further, UBSFS shall not be obligated to make any Award Payment hereunder unless Employee: (a) has, at all times since the date of this Agreement, remained in the full-time, active employment of UBSFS; (b) has obtained and maintained in full force and effect all licenses and registrations from the Financial Industry Regulatory Authority ("FINRA"), securities exchanges, state securities commissions and other regulatory bodies as UBSFS shall determine is necessary or appropriate in order for Employee to conduct securities or commodities transactions or otherwise perform the functions for which he/she is employed; (c) has generated Trailing 12 months gross commission production of at least 30% of his/her prior year's Trailing 12 months gross commission production (except that this requirement shall not apply to the first Award Payment scheduled to be made pursuant to this Agreement); (d) at UBSFS's option, and subject to applicable law, has opened and maintained a Resource Management Account ("RMA") at UBSFS, and authorized UBSFS to deposit all Award Payments that he or she may be entitled to pursuant to this Agreement into the RMA and further authorizes UBSFS to offset any outstanding obligations to UBSFS from Employee's RMA; and (e) is current on all other outstanding financial obligations to UBSFS and all related entities (except that UBSFS shall have the right to set off any Award Payment by the dollar amount of any defaults, arrearages, penalties or otherwise past due amounts owed to UBSFS and all related entities on any loan or other financial obligation as of the payment date for such Award Payment). For purposes of any applicable wage and hour laws, rules or regulations, Employee hereby acknowledges that the Award Payments are not earned by the Employee until any amounts owed to UBSFS, or any related entity, by the Employee are paid. Employee further acknowledges that he or she will not be entitled to any part-year or pro-rata Award Payment if

his or her employment terminates prior to the date the next Award Payment is due to be made by UBSFS.

Further, Employee's right to receive the Award Payments is also subject to Employee not doing, on or before the payment dates set forth in this Agreement, any of the following, which, in the opinion of UBSFS, is harmful to the interests of UBSFS, UBS AG or any of their subsidiaries or affiliates (collectively, 'UBS Group'):

- Employee's performance is deemed to contribute substantially to the UBS Group or part of the UBS Group incurring significant financial losses; or

- Employee's performance is deemed to contribute substantially to a significant downward restatement of any published results of the UBS Group or any business division of the UBS Group; or

- Employee engages in conduct which results in or contributes substantially to significant reputational harm to the UBS Group; or

- Employee materially breaches or contributes substantially to a material breach of applicable legal and/or regulatory requirements; or

- Employee engages in conduct which results in or contributes substantially to a material breach of UBS Group's applicable internal policies and procedures, including without limitation those policies in respect of risk management, compliance, disciplinary and any applicable supervisory practices;

in which event the amount of Employee's Award Payment(s) shall be reduced by such amount as UBSFS shall in its absolute discretion determine, taking account of any such harmful act(s) and/or omission(s), the circumstances surrounding them, and their consequences and/or potential consequences for Employee and/or any UBS Group entity.

Please note that UBSFS retains the right to amend the terms of this Agreement in the future if necessary to comply with legal or regulatory requirements or any changes in applicable law, rules or regulations or in the interpretation thereof by any regulator, agency or tribunal of competent jurisdiction.

3. Retirement: In the event that Employee's employment with UBSFS terminates as a result of his/her qualified "Retirement" within the meaning of this Paragraph, UBSFS agrees to continue making all of the Award Payments set forth in this Agreement provided that Employee complies at all times with the terms and conditions of this Agreement, For purposes of this Agreement only, a qualified "Retirement" shall mean that: (i) Employee is at least 55 years of age with 10 years of service at UBSFS or at least 65 years of age with at least 5 years of service at UBSFS; (ii) is employed in good standing at the time of such Retirement; and (iii) complies at all times with the post-employment restrictive covenants contained in this Paragraph.

4.    Non-Competition and Non-Solicitation in event of Qualified Retirement.    In consideration of (i) UBSFS's agreement to continue making all the Award Payments to Employee following his/her qualified Retirement; and (ii) Employee's access to confidential, proprietary and trade secret information during his/her employment, Employee agrees as follows:

(a)    Non-Competition.    Employee agrees that, during the Retirement Restricted Period as defined herein, Employee shall not, directly or indirectly obtain or hold a Competitive Position with a Competitor or own greater than a 2% interest in any Competitor as defined herein (i) within 10 miles of any of UBSFS's other branch offices operating as of the date Employee executes this Agreement or (ii) within a one hundred (100) mile radius of the UBSFS office at which Employee was employed at the time of Employee's Retirement from UBSFS,

"Competitor" means any company, firm, partnership, corporation or any other business organization that engages in the same trade or business as UBSFS, including, but not limited to: (i) the sale or trading of securities for the accounts of corporate or individual clients; (ii) proprietary trading, including risk arbitrage; or (iii) asset management.

"Competitive Position" means any employment or service with a Competitor in which Employee will have duties to or will be expected to perform services for such Competitor that: (i) are the same or similar to those services performed while an employee of UBSFS, including, but not limited to the sale or trading of securities for the accounts of corporate or individual clients, proprietary trading (including risk arbitrage) or asset management or (ii) involve servicing (directly or indirectly) or having contact with clients of UBS whom Employee serviced or whose names became known to Employee while in the employ of UBS

(b)    Non-Solicitation of Clients.    Employee agrees, during the Retirement Restricted Period as defined herein, to not solicit, directly or indirectly, any of the clients who maintain accounts at UBSFS ("Clients of UBSFS") whom Employee serviced during his/her employment at UBSFS or other Clients of UBSFS whose names became known to Employee while in the employ of UBSFS.

"Solicit" as set forth in this paragraph means that the Employee will not initiate, whether directly or indirectly, any contact or communication of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client or that may have the effect of inviting, encouraging or requesting a client:

(i)    to transfer his/her UBSFS account(s) to the Employee or his/her new employer; or
(ii)    to open a new account with Employee or his/her new employer; or
(iii)    to otherwise discontinue his/her existing business relationship with UBSFS.

(c)    Non-Solicitation of Employees.    Employee agrees that, for a period of two years from the date of his/her qualified Retirement, Employee shall not induce or attempt to persuade any employee of UBS or any of its affiliates to terminate his or her employment relationship with the Firm.

3

The "Retirement Restricted Period" shall mean the longer of (i) two years from the date of Employee's qualified Retirement as defined herein or (ii) until the last day of the calendar year in which the last payment is due to be made by UBS pursuant to Paragraph 1 of this Agreement.

The activities described in this Paragraph shall be prohibited regardless of whether undertaken by Employee in an individual or representative capacity, and regardless of whether performed for Employee's own account or for the account of an another individual, partnership, firm, corporation or other business organization (other than UBS).

In the event that Employee breaches any of the provisions contained in this Paragraph following his/her qualified Retirement, as determined by UBS in its sole discretion, UBS shall have no further obligation to make any Award Payments hereunder.

   5.   Death Or Disability:  If Employee shall die while a full-time Employee of UBSFS or at any time following his/her qualified Retirement as set forth in Paragraph 3 herein or if Employee shall incur a disability while a full-time employee of UBSFS, then UBSFS shall make a discounted accelerated lump sum payment of the remaining Award Payments (if any) as of the date of the Employee's death or at the time that Employee is terminated by UBSFS due to disability. Such lump sum payment shall be discounted by a rate equal to the mid-term AFR in effect at the time of death or termination due to disability. Payment shall be subject to all applicable withholdings and shall be remitted to Employee (or his/her estate) or, at UBSFS's option, applied to any financial obligation Employee (or his/her estate) has to UBSFS, or any related entity, as soon as administratively feasible following the date that Employee is terminated due to death or disability, but in no event later than March 15 of the calendar year following the year in which such event occurs. For purposes of this Agreement, "disability" shall mean that Employee cannot perform all the material duties of Employee's regular occupation as such term is used in the UBSFS Long Term Disability ("LTD") Plan), provided, however, that if a disability as defined in the LTD Plan does not constitute a "disability" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended, or the regulations promulgated thereunder ("I.R.C. Section 409A"), then disability for purposes of this Agreement shall have the meaning set forth in I.R.C. Section 409A.

   6.   Arbitration Agreement.

      a.   Binding Mutual Arbitration.  Employee and UBS agree that any Covered Claims (defined below) will be resolved by final and binding arbitration as set forth in this paragraph 6 and its sub-paragraphs a through h (collectively, "Arbitration Agreement"). The Arbitration Agreement shall be governed by and interpreted in accordance with the Federal Arbitration Act ("FAA") and the law of the State of New Jersey to the extent New Jersey law is not inconsistent with the FAA and without regard to conflicts of law principles. This Arbitration Agreement applies with respect to all Covered Claims, whether initiated by Employee or UBS. By entering into this Arbitration Agreement as set forth in this Letter, Employee and UBS each acknowledge and agree that, to the fullest extent permitted by law, Employee and UBS are giving up their rights to a jury trial of Covered Claims.

4

b. Covered Claims. Except for the Excluded Claims (defined below), and to the fullest extent permitted by law, Covered Claims include any and all claims or disputes between Employee and UBS, or UBS's parents, subsidiaries, affiliates, partners, predecessors, and successor corporations and business entities, and its and their officers, directors, employees, and agents, including but not limited to all claims and disputes arising out of or in any way relating to Employee's employment, compensation, benefits and terms and conditions of employment with UBS or any of UBS's current, former or future parents, subsidiaries, affiliates, partners, predecessors, or successor or affiliated or related corporations or business entities, including without limitation UBS AG and UBS International, Inc. ("UBS business entities"), or the termination thereof, including but not limited to contract, tort, defamation, breach of fiduciary duty and other common law claims, wage and hour claims, statutory discrimination, harassment and retaliation claims, and claims arising under or relating to any federal, state or local constitution, statute or regulation, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Employee Retirement Income Security Act ("ERISA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and any other federal, state or local wage and hour, compensation, benefits, or discrimination law, and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized.

c. Excluded Claims. The following claims and disputes are not subject to this Arbitration Agreement: (i) applications by either party for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims for workers' compensation benefits, but not retaliation claims arising out of or relating to claims for workers' compensation benefits, (iii) claims for unemployment compensation benefits, (iv) claims under the National Labor Relations Act, as amended, within the exclusive jurisdiction of the National Labor Relations Board, and (v) any claim that is expressly precluded from arbitration by a federal statute or regulation. Nothing in this Arbitration Agreement shall prohibit Employee from filing a charge or complaint with the U.S. Equal Employment Opportunity Commission, the National Labor Relations Board, the U.S. Department of Labor, the Occupational Safety and Health Commission, or any other federal, state, or local administrative agency. Employee also has the right to challenge the validity of the terms and conditions of this Arbitration Agreement on any grounds that may exist in law and equity, and UBS shall not discipline, discharge, or engage in any retaliatory actions against Employee in the event Employee chooses to do so or engage in other protected legal activity. UBS, however, reserves the right to enforce the terms and conditions of this Arbitration Agreement in any appropriate forum.

d. **WAIVERS. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EMPLOYEE AND UBS AGREE THAT NO COVERED CLAIMS MAY BE INITIATED, MAINTAINED, HEARD, OR DETERMINED ON A CLASS ACTION BASIS, COLLECTIVE ACTION BASIS, OR REPRESENTATIVE**

5

**ACTION BASIS EITHER IN COURT OR IN ARBITRATION, AND THAT EMPLOYEE IS NOT ENTITLED TO SERVE OR PARTICIPATE AS A CLASS ACTION MEMBER OR REPRESENTATIVE, COLLECTIVE ACTION MEMBER OR REPRESENTATIVE, OR REPRESENTATIVE ACTION MEMBER OR REPRESENTATIVE, OR RECEIVE ANY RECOVERY FROM A CLASS, COLLECTIVE, OR REPRESENTATIVE ACTION INVOLVING COVERED CLAIMS EITHER IN COURT OR IN ARBITRATION.** Employee further agrees that if he/she is included within any class action, collective action, or representative action in court or in arbitration involving a Covered Claim, he/she will take all steps necessary to opt-out of the action or refrain from opting in, as the case may be. Any issue concerning the validity or enforceability of any of the class action, collective action, or representative action Waivers contained in this Arbitration Agreement shall be decided only by a court of competent jurisdiction. Any issue concerning arbitrability of a particular issue or claim pursuant to the Arbitration Agreement (except for issues concerning the validity or enforceability of the class action, collective action, and representative action Waivers) must be resolved by the arbitrator, not the court. Nothing in this Arbitration Agreement shall preclude Employee from pursuing or participating in a class action, collective action, or representative action in court where his/her claim is based solely on his/her status as a customer or an investor and does not arise out of or in any way relate to Employee's employment relationship with UBS.

e. Selection and Rules. Except as specified herein, the applicable arbitration rules will be the rules of the selected arbitration forum as indicated below, or any successor rules or, if none exist, the rules most applicable to employment claims and disputes and, if the forum no longer exists, the successor forum. Except as specified herein, any arbitration of a Covered Claim will be conducted under the auspices and rules of the Financial Industry Regulatory Authority ("FINRA") in accordance with the FINRA Code of Arbitration Procedure for Industry Disputes ("FINRA Arbitration Rules"). Information about FINRA, including its FINRA Arbitration Rules, can be found at www.finra.org. If a Covered Claim may not be arbitrated before FINRA or is otherwise excluded from or not subject to arbitration before FINRA, then such Covered Claim will be resolved by final and binding arbitration conducted under the auspices and rules of JAMS in accordance with and subject to the JAMS Employment Arbitration Rules and Procedures and the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("JAMS Arbitration Rules"), except as specified herein, and shall be conducted before a single arbitrator unless all parties to the arbitration agree otherwise in writing. Information about JAMS, including its JAMS Arbitration Rules, can be found at www.jamsadr.com. In addition, Employee may elect to arbitrate discrimination claims under any federal, state or local law (including claims of harassment and retaliation under those laws) before JAMS in accordance with and subject to the JAMS Arbitration Rules, and any such arbitration shall be conducted before a single arbitrator unless all parties to the arbitration agree otherwise in writing. Arbitration shall be held in the county in which Employee worked or works at the time the claim arose or, if not possible, in the county closest to Employee's principal place of employment at the time the claim arose where the arbitration can be held. To the extent any of the terms, conditions or requirements of

6

this Arbitration Agreement conflict with the JAMS Arbitration Rules or FINRA Arbitration Rules, the terms, conditions or requirements of this Arbitration Agreement shall govern. Arbitrators are required to issue a written award, and their awards shall be final and binding, and any judgment or award issued by an arbitrator may be entered in any court of competent jurisdiction. No arbitration award or decision will have any preclusive effect as to any issues or claims in any other arbitration or court proceeding unless each of the parties in such proceeding was also a named party in the arbitration.

f.  Remedies. Subject to the parties' right to appeal or seek vacatur under applicable law, Employee and UBS agree that the decision of the arbitrator(s) will be final and binding on the parties and that the arbitrator(s) is authorized to award any party the full remedies that would be available to such party if the Covered Claim had been filed in a court of competent jurisdiction, including attorneys' fees and costs. As part of his/her costs, Employee may recover expert fees incurred to the same extent as Employee could in court.

g.  Additional Provisions Applicable to Arbitration of Statutory Claims. Subject to any applicable fee-shifting provisions, if Employee initiates arbitration of statutory claims with FINRA or JAMS, Employee shall be responsible for the filing fee required to initiate arbitration of such claims up to the amount of the filing fee Employee would have incurred had he/she filed such claims in federal district court, and UBS shall be responsible for all additional arbitration filing fees, forum fees, and other fees and costs assessed by FINRA or JAMS in any such arbitration.

h.  Additional Provisions Applicable to Arbitration Before JAMS. In any arbitration before JAMS, the parties may file and the arbitrator shall hear and decide at any point in the proceedings any motion permitted by the Federal Rules of Civil Procedure, including but not limited to motions to compel discovery, motions for protective orders, motions to dismiss, motions for summary judgment, and motions in limine.

The provisions of this Agreement shall be severable and, if any provisions hereof shall be determined to be legally unenforceable or void, such unenforceable or void provision shall not affect the legality, validity or enforceability of the remaining provisions hereof and may be severed from the remaining provisions as appropriate, to the extent permitted by law, except that, in the event any of the Waivers set forth in Paragraph 6.d are determined to be invalid, unenforceable or void with respect to any Covered Claim, that Covered Claim and only that Covered Claim shall proceed in court and the Waivers set forth in Paragraph 6.d shall remain effective and enforceable with respect to all other Covered Claims. If a court of competent jurisdiction determines that a particular provision of this Agreement is in conflict with a mandatory provision of applicable law in a particular jurisdiction, such provision will not be enforced in that jurisdiction but shall remain effective and enforceable in all other jurisdictions. Insofar as any Covered Claim is permitted to proceed on a class, collective or representative action basis, it may do so only in a court of competent jurisdiction and not in arbitration.

7.  <u>Non-Solicitation Of Clients</u>:  Subject to applicable law and Paragraph 8 of this Agreement, in the event Employee's employment with UBSFS is terminated for any reason whatsoever, whether voluntarily or involuntarily, Employee agrees, for a period of one year from

the date of termination or until such time that all amounts owed by the Employee to UBSFS and all related entities have been fully repaid, whichever is earlier, to not solicit, directly or indirectly, any of the clients who maintain accounts at UBSFS ("Clients of UBSFS") whom Employee serviced during his/her employment at UBSFS or other Clients of UBSFS whose names became known to Employee while in the employ of UBSFS.

"Solicit" as set forth in this paragraph means that the Employee will not initiate, whether directly or indirectly, any contact or communication of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client or that may have the effect of inviting, encouraging or requesting a client:

    (a)    to transfer his/her UBSFS account(s) to the Employee or his/her new employer; or

    (b)    to open a new account with Employee or his/her new employer; or

    (c)    to otherwise discontinue his/her existing business relationship with UBSFS.

8.    <u>Confidentiality Of Client Information</u>:  All information concerning Clients of UBSFS, former clients of UBSFS and prospective clients of UBSFS must be treated as confidential and must not be disclosed to anyone outside UBSFS unless the disclosure is expressly authorized by the client, required by law, rule, regulation or legal process.  Employee further expressly agrees that, in the event Employee's employment is terminated for any reason whatsoever, whether voluntarily or involuntarily, Employee may not take any records or information referring or relating to Clients of UBSFS, former clients of UBSFS and prospective clients of UBSFS, whether originals or copies, in hard copy or computerized form.

9.    <u>Other Agreements</u>:  In the event that Employee enters into other agreements with UBSFS or any of its related entities that contain non-solicitation and/or confidentiality obligations, including, but not limited to, any deferred compensation, equity or other award plans, Offer Letters, Letters of Understanding, Corporate Employee Account Servicing Agreements, Receiving and/or Retiring or Transitioning Financial Advisor Agreements, Financial Advisor Team Agreements, and/or Account Assignment Agreements, the non-solicitation and/or confidentiality provisions of any such agreement shall govern Employee's conduct with respect to the solicitation of clients and use of client information covered by those Agreements.

10.    <u>Remedies</u>:  In the event that any of the provisions contained in Paragraphs 7 or 8 are breached by Employee, Employee understands that Employee will be liable to UBSFS for any damage and/or injury, including but not limited to reasonable attorney's fees, incurred to enforce the provisions of this Agreement.  Employee also specifically agrees that, in the event of breach of the Non-Solicitation of Clients and/or Confidentiality of Client Information paragraphs of this Agreement, damages alone will be an inadequate remedy and UBSFS will, in addition to damages for breach, be entitled to injunctive or other equitable relief against Employee to enforce the provisions of these paragraphs.

EMPLOYEE FURTHER EXPRESSLY CONSENTS TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER OR A PRELIMINARY INJUNCTION BY ANY COURT OR ARBITRATION PANEL WITH JURISDICTION OVER EMPLOYEE TO

PROHIBIT THE BREACH OF ANY PROVISION OF THIS AGREEMENT, OR TO MAINTAIN THE STATUS QUO PENDING THE OUTCOME OF ANY ARBITRATION PROCEEDING THAT MAY BE INITIATED; AND, FURTHER, THAT THE ISSUE OF TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF MAY BE DECIDED BY A COURT AND NOT BY AN ARBITRATION PANEL SHOULD UBSFS IN ITS DISCRETION ELECT TO SEEK SUCH RELIEF.

11. <u>Assignment</u>:   This Agreement may be assigned by UBSFS and the benefits and obligations hereof shall inure to UBSFS's successors and assigns (and all references herein to UBSFS shall together be deemed to refer to such successors or assigns as the case may be).

12. <u>Terms And Modifications</u>:  This Agreement contains all of the terms of the agreement between the parties hereto relating to the subject matter hereof and may not be amended, modified or discharged, nor may any provision hereof be waived, orally, by course of dealing or otherwise, unless such amendment, modification, discharge or waiver shall be in writing and duly executed by UBSFS. The non-exercise by UBSFS of any right or remedy in any particular instance shall not constitute a waiver thereof in that or any other instance. Any provision hereof found to be illegal, invalid or unenforceable for any reason whatsoever shall not affect the validity, legality or enforceability of the remainder hereof.

13. <u>Not An Employment Contract</u>:   Employee expressly acknowledges that his/her employment with UBSFS is "at will" and that this Agreement is not an employment contract or agreement to employ Employee for a specified period of time or a promise of continued employment with UBSFS for any period whatsoever.  Accordingly, Employee acknowledges that his/her employment may be terminated with or without cause and with or without notice at any time at his/her option or that of UBSFS.

14. <u>Governing Law</u>:  This Agreement shall be governed by and construed and enforced in accordance with the laws of the state of New Jersey without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, Employee has executed this Agreement as of the date set forth above

EMPLOYEE:

*Phil Fiore*

UBS Financial Services Inc.

By: *Matthew Lauerman*

9

# EXHIBIT E

## DEFERRED CASH AWARD AGREEMENT

This Financial Advisor Award Agreement ("Agreement") is entered into this 19th day of February, 2015, between UBS Financial Services Inc., a Delaware corporation, and its successors and/or assigns, including all affiliates and related entities ("UBSFS") and PHIL FIORE ("Employee").

1.    Award Payments:  Subject to the terms and conditions set forth in this Agreement, on the dates set forth below, UBSFS agrees to pay Employee Award Payments in the amounts set forth immediately below less applicable withholdings for federal, state and local taxes and any offset for defaults, arrearages or past due amounts (and any/all penalties related thereto) owed to UBSFS, and all related entities as of the date of such payment(s):

> $11,946.34, on or before the last day of Mar, 2016
> $11,731.11, on or before the last day of Mar, 2017
> $11,515.88, on or before the last day of Mar, 2018
> $11,300.65, on or before the last day of Mar, 2019
> $11,085.42, on or before the last day of Mar, 2020
> $10,870.16, on or before the last day of Mar, 2021

2.    Conditions For Payments:  UBSFS shall have no obligation to make any Award Payment hereunder in the event that Employee's employment with UBSFS is terminated, either voluntarily or involuntarily, by Employee or UBSFS for any reason whatsoever.  Further, UBSFS shall not be obligated to make any Award Payment hereunder unless Employee: (a) has, at all times since the date of this Agreement, remained in the full-time, active employment of UBSFS;  (b) has obtained and maintained in full force and effect all licenses and registrations from the Financial Industry Regulatory Authority ("FINRA"), securities exchanges, state securities commissions and other regulatory bodies as UBSFS shall determine is necessary or appropriate in order for Employee to conduct securities or commodities transactions or otherwise perform the functions for which he/she is employed; (c) has generated Trailing 12 months gross production of at least 30% of his/her prior year's Trailing 12 months gross commission production (except that this requirement shall not apply to the first Award Payment scheduled to be made pursuant to this Agreement); (d) at UBSFS's option, and subject to applicable law, has opened and maintained a Resource Management Account ("RMA") at UBSFS, and authorized UBSFS to deposit all Award Payments that he or she may be entitled to pursuant to this Agreement into the RMA and further authorizes UBSFS to offset any outstanding obligations to UBSFS from Employee's RMA; and (e) is current on all other outstanding financial obligations to UBSFS and all related entities (except that UBSFS shall have the right to set off any Award Payment by the dollar amount of any defaults, arrearages, penalties or otherwise past due amounts owed to UBSFS and all related entities on any loan or other financial obligation as of the payment date for such Award Payment).  For purposes of any applicable wage and hour laws, rules or regulations, Employee hereby acknowledges that the Award Payments are not earned by the Employee until any amounts owed to UBSFS, or any related entity, by the Employee are paid.  Employee further acknowledges that he or she will not be entitled to any part-year or pro-rata Award Payment if his or her employment terminates prior to the date the next Award Payment is due to be made by UBSFS.

Further, Employee's right to receive the Award Payments is also subject to Employee not doing, on or before the payment dates set forth in this Agreement, any of the following, which, in the opinion of UBSFS, is harmful to the interests of UBSFS, UBS AG or any of their subsidiaries or affiliates (collectively, 'UBS Group'):

- Employee's performance is deemed to contribute substantially to the UBS Group or part of the UBS Group incurring significant financial losses; or

- Employee's performance is deemed to contribute substantially to a significant downward restatement of any published results of the UBS Group or any business division of the UBS Group; or

- Employee engages in conduct which results in or contributes substantially to significant reputational harm to the UBS Group; or

- Employee materially breaches or contributes substantially to a material breach of applicable legal and/or regulatory requirements; or

- Employee engages in conduct which results in or contributes substantially to a material breach of UBS Group's applicable internal policies and procedures, including without limitation those policies in respect of risk management, compliance, disciplinary and any applicable supervisory practices;

in which event the amount of Employee's Award Payment(s) shall be reduced by such amount as UBSFS shall in its absolute discretion determine, taking account of any such harmful act(s) and/or omission(s), the circumstances surrounding them, and their consequences and/or potential consequences for Employee and/or any UBS Group entity.

Please note that UBSFS retains the right to amend the terms of this Agreement in the future if necessary to comply with legal or regulatory requirements or any changes in applicable law, rules or regulations or in the interpretation thereof by any regulator, agency or tribunal of competent jurisdiction.

3.   Arbitration Agreement.

   a.   Binding Mutual Arbitration.   Employee and UBS agree that any Covered Claims (defined below) will be resolved by final and binding arbitration as set forth in this paragraph 3 and its sub-paragraphs a through h (collectively, "Arbitration Agreement"). The Arbitration Agreement shall be governed by and interpreted in accordance with the Federal Arbitration Act ("FAA") and the law of the State of New Jersey to the extent New Jersey law is not inconsistent with the FAA and without regard to conflicts of law principles. This Arbitration Agreement applies with respect to all Covered Claims, whether initiated by Employee or UBS. By entering into this Arbitration Agreement, Employee and UBS each acknowledge and agree that, to the fullest extent permitted by law, Employee and UBS are giving up their rights to a jury trial of Covered Claims.

Page 2 of 7

b. Covered Claims.  Except for the Excluded Claims (defined below), and to the fullest extent permitted by law, Covered Claims include any and all claims or disputes between Employee and UBS, or UBS's parents, subsidiaries, affiliates, partners, predecessors, and successor corporations and business entities, and its and their officers, directors, employees, and agents, including but not limited to all claims and disputes arising out of or in any way relating to Employee's employment, compensation, benefits and terms and conditions of employment with UBS or any of UBS's current, former or future parents, subsidiaries, affiliates, partners, predecessors, or successor or affiliated or related corporations or business entities, including without limitation UBS AG and UBS International, Inc. ("UBS business entities"), or the termination thereof, including but not limited to contract, tort, defamation, breach of fiduciary duty and other common law claims, wage and hour claims, statutory discrimination, harassment and retaliation claims, and claims arising under or relating to any federal, state or local constitution, statute or regulation, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Employee Retirement Income Security Act ("ERISA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and any other federal, state or local wage and hour, compensation, benefits, or discrimination law, and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized.

c. Excluded Claims.   The following claims and disputes are not subject to this Arbitration Agreement: (i) applications by either party for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims for workers' compensation benefits, but not retaliation claims arising out of or relating to claims for workers' compensation benefits, (iii) claims for unemployment compensation benefits, (iv) claims under the National Labor Relations Act, as amended, within the exclusive jurisdiction of the National Labor Relations Board, and (v) any claim that is expressly precluded from arbitration by a federal statute or regulation. Nothing in this Arbitration Agreement shall prohibit Employee from filing a charge or complaint with the U.S. Equal Employment Opportunity Commission, the National Labor Relations Board, the U.S. Department of Labor, the Occupational Safety and Health Commission, or any other federal, state, or local administrative agency.  Employee also has the right to challenge the validity of the terms and conditions of this Arbitration Agreement on any grounds that may exist in law and equity, and UBS shall not discipline, discharge, or engage in any retaliatory actions against Employee in the event Employee chooses to do so or engage in other protected legal activity.  UBS, however, reserves the right to enforce the terms and conditions of this Arbitration Agreement in any appropriate forum.

d. **WAIVERS.  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EMPLOYEE AND UBS AGREE THAT NO COVERED CLAIMS MAY BE INITIATED, MAINTAINED, HEARD, OR DETERMINED ON A CLASS ACTION BASIS, COLLECTIVE ACTION BASIS, OR REPRESENTATIVE**

**ACTION BASIS EITHER IN COURT OR IN ARBITRATION, AND THAT EMPLOYEE IS NOT ENTITLED TO SERVE OR PARTICIPATE AS A CLASS ACTION MEMBER OR REPRESENTATIVE, COLLECTIVE ACTION MEMBER OR REPRESENTATIVE, OR REPRESENTATIVE ACTION MEMBER OR REPRESENTATIVE, OR RECEIVE ANY RECOVERY FROM A CLASS, COLLECTIVE, OR REPRESENTATIVE ACTION INVOLVING COVERED CLAIMS EITHER IN COURT OR IN ARBITRATION.** Employee further agrees that if he/she is included within any class action, collective action, or representative action in court or in arbitration involving a Covered Claim, he/she will take all steps necessary to opt-out of the action or refrain from opting in, as the case may be.   Any issue concerning the validity or enforceability of any of the class action, collective action, or representative action Waivers contained in this Arbitration Agreement shall be decided only by a court of competent jurisdiction.   Any issue concerning arbitrability of a particular issue or claim pursuant to the Arbitration Agreement (except for issues concerning the validity or enforceability of the class action, collective action, and representative action Waivers) must be resolved by the arbitrator, not the court.   Nothing in this Arbitration Agreement shall preclude Employee from pursuing or participating in a class action, collective action, or representative action in court where his/her claim is based solely on his/her status as a customer or an investor and does not arise out of or in any way relate to Employee's employment relationship with UBS.

e.   Selection and Rules.   Except as specified herein, the applicable arbitration rules will be the rules of the selected arbitration forum as indicated below, or any successor rules or, if none exist, the rules most applicable to employment claims and disputes and, if the forum no longer exists, the successor forum.   Except as specified herein, any arbitration of a Covered Claim will be conducted under the auspices and rules of the Financial Industry Regulatory Authority ("FINRA") in accordance with the FINRA Code of Arbitration Procedure for Industry Disputes ("FINRA Arbitration Rules").   Information about FINRA, including its FINRA Arbitration Rules, can be found at www.finra.org.   If a Covered Claim may not be arbitrated before FINRA or is otherwise excluded from or not subject to arbitration before FINRA, then such Covered Claim will be resolved by final and binding arbitration conducted under the auspices and rules of JAMS in accordance with and subject to the JAMS Employment Arbitration Rules and Procedures and the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("JAMS Arbitration Rules"), except as specified herein, and shall be conducted before a single arbitrator unless all parties to the arbitration agree otherwise in writing.   Information about JAMS, including its JAMS Arbitration Rules, can be found at www.jamsadr.com.   In addition, Employee may elect to arbitrate discrimination claims under any federal, state or local law (including claims of harassment and retaliation under those laws) before JAMS in accordance with and subject to the JAMS Arbitration Rules, and any such arbitration shall be conducted before a single arbitrator unless all parties to the arbitration agree otherwise in writing.   Arbitration shall be held in the county in which Employee worked or works at the time the claim arose or, if not possible, in the county closest to Employee's principal place of employment at the time the claim arose where the arbitration can be held.   To the extent any of the terms, conditions or requirements of

this Arbitration Agreement conflict with the JAMS Arbitration Rules or FINRA Arbitration Rules, the terms, conditions or requirements of this Arbitration Agreement shall govern. Arbitrators are required to issue a written award, and their awards shall be final and binding, and any judgment or award issued by an arbitrator may be entered in any court of competent jurisdiction. No arbitration award or decision will have any preclusive effect as to any issues or claims in any other arbitration or court proceeding unless each of the parties in such proceeding was also a named party in the arbitration.

f.  Remedies. Subject to the parties' right to appeal or seek vacatur under applicable law, Employee and UBS agree that the decision of the arbitrator(s) will be final and binding on the parties and that the arbitrator(s) is authorized to award any party the full remedies that would be available to such party if the Covered Claim had been filed in a court of competent jurisdiction, including attorneys' fees and costs. As part of his/her costs, Employee may recover expert fees incurred to the same extent as Employee could in court.

g.  Additional Provisions Applicable to Arbitration of Statutory Claims. Subject to any applicable fee-shifting provisions, if Employee initiates arbitration of statutory claims with FINRA or JAMS, Employee shall be responsible for the filing fee required to initiate arbitration of such claims up to the amount of the filing fee Employee would have incurred had he/she filed such claims in federal district court, and UBS shall be responsible for all additional arbitration filing fees, forum fees, and other fees and costs assessed by FINRA or JAMS in any such arbitration.

h.  Additional Provisions Applicable to Arbitration Before JAMS. In any arbitration before JAMS, the parties may file and the arbitrator shall hear and decide at any point in the proceedings any motion permitted by the Federal Rules of Civil Procedure, including but not limited to motions to compel discovery, motions for protective orders, motions to dismiss, motions for summary judgment, and motions in limine.

The provisions of this Agreement shall be severable and, if any provisions hereof shall be determined to be legally unenforceable or void, such unenforceable or void provision shall not affect the legality, validity or enforceability of the remaining provisions hereof and may be severed from the remaining provisions as appropriate, to the extent permitted by law, except that, in the event any of the Waivers set forth in Paragraph 3.d are determined to be invalid, unenforceable or void with respect to any Covered Claim, that Covered Claim and only that Covered Claim shall proceed in court and the Waivers set forth in Paragraph 3.d shall remain effective and enforceable with respect to all other Covered Claims. If a court of competent jurisdiction determines that a particular provision of this Agreement is in conflict with a mandatory provision of applicable law in a particular jurisdiction, such provision will not be enforced in that jurisdiction but shall remain effective and enforceable in all other jurisdictions. Insofar as any Covered Claim is permitted to proceed on a class, collective or representative action basis, it may do so only in a court of competent jurisdiction and not in arbitration.

4.  <u>Non-Solicitation Of Clients</u>: Subject to applicable law and Paragraph 6 of this Agreement, in the event Employee's employment with UBSFS is terminated for any reason whatsoever, whether voluntarily or involuntarily, Employee agrees, for a period of one year from

the date of termination or until such time that all amounts owed by the Employee to UBSFS and all related entities have been fully repaid, whichever is earlier, to not solicit, directly or indirectly, any of the clients who maintain accounts at UBSFS ("Clients of UBSFS") whom Employee serviced during his/her employment at UBSFS or other Clients of UBSFS whose names became known to Employee while in the employ of UBSFS.

"Solicit" as set forth in this paragraph means that the Employee will not initiate, whether directly or indirectly, any contact or communication of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client or that may have the effect of inviting, encouraging or requesting a client:

    (a)    to transfer his/her UBSFS account(s) to the Employee or his/her new employer; or

    (b)    to open a new account with Employee or his/her new employer; or

    (c)    to otherwise discontinue his/her existing business relationship with UBSFS.

5.    Confidentiality Of Client Information:  All information concerning Clients of UBSFS, former clients of UBSFS and prospective clients of UBSFS must be treated as confidential and must not be disclosed to anyone outside UBSFS unless the disclosure is expressly authorized by the client, required by law, rule, regulation or legal process. Employee further expressly agrees that, in the event Employee's employment is terminated for any reason whatsoever, whether voluntarily or involuntarily, Employee may not take any records or information referring or relating to Clients of UBSFS, former clients of UBSFS and prospective clients of UBSFS, whether originals or copies, in hard copy or computerized form.

6.    Other Agreements:  In the event that Employee enters into other agreements with UBSFS or any of its related entities that contain non-solicitation and/or confidentiality obligations, including, but not limited to, any deferred compensation, equity or other award plans, Offer Letters, Letters of Understanding, Corporate Employee Account Servicing Agreements, Receiving and/or Retiring or Transitioning Financial Advisor Agreements, Financial Advisor Team Agreements, and/or Account Assignment Agreements, the non-solicitation and/or confidentiality provisions of any such agreement shall govern Employee's conduct with respect to the solicitation of clients and use of client information covered by those Agreements.

7.    Remedies:  In the event that any of the provisions contained in the Non-Solicitation of Clients and/or Confidentiality of Client Information paragraphs of this Agreement are breached by Employee, Employee understands that Employee will be liable to UBSFS for any damage and/or injury, including but not limited to reasonable attorney's fees, incurred to enforce the provisions of this Agreement. Employee also specifically agrees that, in the event of breach of the Non-Solicitation of Clients and/or Confidentiality of Client Information paragraphs of this Agreement, damages alone will be an inadequate remedy and UBSFS will, in addition to damages for breach, be entitled to injunctive or other equitable relief against Employee to enforce the provisions of these paragraphs.

EMPLOYEE FURTHER EXPRESSLY CONSENTS TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER OR A PRELIMINARY INJUNCTION BY ANY COURT OR ARBITRATION PANEL WITH JURISDICTION OVER EMPLOYEE TO

PROHIBIT THE BREACH OF ANY PROVISION OF THIS AGREEMENT, OR TO MAINTAIN THE STATUS QUO PENDING THE OUTCOME OF ANY ARBITRATION PROCEEDING THAT MAY BE INITIATED; AND, FURTHER, THAT THE ISSUE OF TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF MAY BE DECIDED BY A COURT AND NOT BY AN ARBITRATION PANEL SHOULD UBSFS IN ITS DISCRETION ELECT TO SEEK SUCH RELIEF.

8.    Assignment:  This Agreement may be assigned by UBSFS and the benefits and obligations hereof shall inure to UBSFS's successors and assigns (and all references herein to UBSFS shall together be deemed to refer to such successors or assigns as the case may be).

9.    Terms And Modifications:  This Agreement contains all of the terms of the agreement between the parties hereto relating to the subject matter hereof and may not be amended, modified or discharged, nor may any provision hereof be waived, orally, by course of dealing or otherwise, unless such amendment, modification, discharge or waiver shall be in writing and duly executed by UBSFS. The non-exercise by UBSFS of any right or remedy in any particular instance shall not constitute a waiver thereof in that or any other instance. Any provision hereof found to be illegal, invalid or unenforceable for any reason whatsoever shall not affect the validity, legality or enforceability of the remainder hereof.

10.    Not An Employment Contract:  Employee expressly acknowledges that his/her employment with UBSFS is "at will" and that this Agreement is not an employment contract or agreement to employ Employee for a specified period of time or a promise of continued employment with UBSFS for any period whatsoever. Accordingly, Employee acknowledges that his/her employment may be terminated with or without cause and with or without notice at any time at his/her option or that of UBSFS .

11.    Governing Law:  This Agreement shall be governed by and construed and enforced in accordance with the laws of the state of New Jersey without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, Employee has executed this Agreement as of the date set forth above

EMPLOYEE:

*PHIL FIORE*

UBS Financial Services Inc.

By: *Matthew Luritan*

# EXHIBIT F

## DEFERRED CASH AWARD AGREEMENT

This Financial Advisor Award Agreement ("Agreement") is entered into this 22nd day of February, 2016, between UBS Financial Services Inc., a Delaware corporation, and its successors and/or assigns, including all affiliates and related entities ("UBSFS") and PHIL FIORE ("Employee").

    1.    <u>Award Payments</u>: Subject to the terms and conditions set forth in this Agreement, on the dates set forth below, UBSFS agrees to pay Employee Award Payments in the amounts set forth immediately below less applicable withholdings for federal, state and local taxes and any offset for defaults, arrearages or past due amounts (and any/all penalties related thereto) owed to UBSFS, and all related entities as of the date of such payment(s):

> $19,190.55, on or before the last day of Mar, 2017
> $18,823.59, on or before the last day of Mar, 2018
> $18,456.63, on or before the last day of Mar, 2019
> $18,089.67, on or before the last day of Mar, 2020
> $17,722.72, on or before the last day of Mar, 2021
> $17,355.73, on or before the last day of Mar, 2022

    2.    <u>Conditions For Payments</u>: UBSFS shall have no obligation to make any Award Payment hereunder in the event that Employee's employment with UBSFS is terminated, either voluntarily or involuntarily, by Employee or UBSFS for any reason whatsoever other than as set forth in Paragraphs 3 and 4 herein. Further, UBSFS shall not be obligated to make any Award Payment hereunder unless Employee: (a) has, at all times since the date of this Agreement, remained in the full-time, active employment of UBSFS; (b) has obtained and maintained in full force and effect all licenses and registrations from the Financial Industry Regulatory Authority ("FINRA"), securities exchanges, state securities commissions and other regulatory bodies as UBSFS shall determine is necessary or appropriate in order for Employee to conduct securities or commodities transactions or otherwise perform the functions for which he/she is employed; (c) has generated Trailing 12 months gross commission production of at least 30% of his/her prior year's Trailing 12 months gross commission production (except that this requirement shall not apply to the first Award Payment scheduled to be made pursuant to this Agreement nor shall it apply if the Employee has entered into the Aspiring Legacy Financial Advisor Program as a Legacy Advisor, Transitioning Financial Advisor Program as a Transitioning Advisor or UBS's then-current successor retirement program for the purpose of transitioning Employee's client relationships to another advisor); (d) at UBSFS's option, and subject to applicable law, has opened and maintained a Resource Management Account ("RMA") at UBSFS, and authorized UBSFS to deposit all Award Payments that he or she may be entitled to pursuant to this Agreement into the RMA and further authorizes UBSFS to offset any outstanding obligations to UBSFS from Employee's RMA; and (e) is current on all other outstanding financial obligations to UBSFS and all related entities (except that UBSFS shall have the right to set off any Award Payment by the dollar amount of any defaults, arrearages, penalties or otherwise past due amounts owed to UBSFS and all related entities on any loan or other financial obligation as of the payment date for such Award Payment). For purposes of any applicable wage and hour laws, rules or regulations, Employee hereby acknowledges that the Award Payments are not earned by

the Employee until any amounts owed to UBSFS, or any related entity, by the Employee are paid.  Employee further acknowledges that he or she will not be entitled to any part-year or pro-rata Award Payment if his or her employment terminates prior to the date the next Award Payment is due to be made by UBSFS.

Further, Employee's right to receive the Award Payments is also subject to Employee not doing, on or before the payment dates set forth in this Agreement, any of the following, which, in the opinion of UBSFS, is harmful to the interests of UBSFS, UBS AG or any of their subsidiaries or affiliates (collectively, 'UBS Group'):

- Employee's performance is deemed to contribute substantially to the UBS Group or part of the UBS Group incurring significant financial losses; or

- Employee's performance is deemed to contribute substantially to a significant downward restatement of any published results of the UBS Group or any business division of the UBS Group; or

- Employee engages in conduct which results in or contributes substantially to significant reputational harm to the UBS Group; or

- Employee materially breaches or contributes substantially to a material breach of applicable legal and/or regulatory requirements; or

- Employee engages in conduct which results in or contributes substantially to a material breach of UBS Group's applicable internal policies and procedures, including without limitation those policies in respect of risk management, compliance, disciplinary and any applicable supervisory practices;

in which event the amount of Employee's Award Payment(s) shall be reduced by such amount as UBSFS shall in its absolute discretion determine, taking account of any such harmful act(s) and/or omission(s), the circumstances surrounding them, and their consequences and/or potential consequences for Employee and/or any UBS Group entity.

Please note that UBSFS retains the right to amend the terms of this Agreement in the future if necessary to comply with legal or regulatory requirements or any changes in applicable law, rules or regulations or in the interpretation thereof by any regulator, agency or tribunal of competent jurisdiction.

3.   Retirement;  In the event that Employee's employment with UBSFS terminates as a result of his/her qualified "Retirement" within the meaning of this Paragraph, UBSFS agrees to continue making all of the Award Payments set forth in this Agreement provided that Employee complies at all times with the terms and conditions of this Agreement,  For purposes of this Agreement only, a qualified "Retirement" shall mean that: (i) Employee is at least 55 years of age with 10 years of service at UBSFS or at least 65 years of age with at least 5 years of service at UBSFS; (ii) is employed in good standing at the time of such Retirement; and (iii) complies at all times with the post-employment restrictive covenants contained in this Paragraph.

4.   Non-Competition and Non-Solicitation in event of Qualified Retirement.   In consideration of (i) UBSFS's agreement to continue making all the Award Payments to Employee following his/her qualified Retirement; and (ii) Employee's access to confidential, proprietary and trade secret information during his/her employment, Employee agrees as follows:

(a)   Non-Competition.   Employee agrees that, during the Retirement Restricted Period as defined herein, Employee shall not, directly or indirectly obtain or hold a Competitive Position with a Competitor or own greater than a 2% interest in any Competitor as defined herein (i) within 10 miles of any of UBSFS's other branch offices operating as of the date Employee executes this Agreement or (ii) within a one hundred (100) mile radius of the UBSFS office at which Employee was employed at the time of Employee's Retirement from UBSFS,

"Competitor" means any company, firm, partnership, corporation or any other business organization that engages in the same trade or business as UBSFS, including, but not limited to: (i) the sale or trading of securities for the accounts of corporate or individual clients; (ii) proprietary trading, including risk arbitrage; or (iii) asset management.

"Competitive Position" means any employment or service with a Competitor in which Employee will have duties to or will be expected to perform services for such Competitor that: (i) are the same or similar to those services performed while an employee of UBSFS, including, but not limited to the sale or trading of securities for the accounts of corporate or individual clients, proprietary trading (including risk arbitrage) or asset management or (ii) involve servicing (directly or indirectly) or having contact with clients of UBS whom Employee serviced or whose names became known to Employee while in the employ of UBS

(b)   Non-Solicitation of Clients.   Employee agrees, during the Retirement Restricted Period as defined herein, to not solicit, directly or indirectly, any of the clients who maintain accounts at UBSFS ("Clients of UBSFS") whom Employee serviced during his/her employment at UBSFS or other Clients of UBSFS whose names became known to Employee while in the employ of UBSFS.

"Solicit" as set forth in this paragraph means that the Employee will not initiate, whether directly or indirectly, any contact or communication of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client or that may have the effect of inviting, encouraging or requesting a client:

(i)    to transfer his/her UBSFS account(s) to the Employee or his/her new employer; or
(ii)   to open a new account with Employee or his/her new employer; or
(iii)  to otherwise discontinue his/her existing business relationship with UBSFS.

(c)   Non-Solicitation of Employees.   Employee agrees that, for a period of two years from the date of his/her qualified Retirement, Employee shall not induce or attempt to persuade any employee of UBS or any of its affiliates to terminate his or her employment relationship with the Firm.

The "Retirement Restricted Period" shall mean the longer of (i) two years from the date of Employee's qualified Retirement as defined herein or (ii) until the last day of the calendar year in which the last payment is due to be made by UBS pursuant to Paragraph 1 of this Agreement.

The activities described in this Paragraph shall be prohibited regardless of whether undertaken by Employee in an individual or representative capacity, and regardless of whether performed for Employee's own account or for the account of an another individual, partnership, firm, corporation or other business organization (other than UBS).

In the event that Employee breaches any of the provisions contained in this Paragraph following his/her qualified Retirement, as determined by UBS in its sole discretion, UBS shall have no further obligation to make any Award Payments hereunder.

5. <u>Death Or Disability</u>: If Employee shall die while a full-time Employee of UBSFS or at any time following his/her qualified Retirement as set forth in Paragraph 3 herein or if Employee shall incur a disability while a full-time employee of UBSFS, then UBSFS shall make a discounted accelerated lump sum payment of the remaining Award Payments (if any) as of the date of the Employee's death or at the time that Employee is terminated by UBSFS due to disability. Such lump sum payment shall be discounted by a rate equal to the mid-term AFR in effect at the time of death or termination due to disability. Payment shall be subject to all applicable withholdings and shall be remitted to Employee (or his/her estate) or, at UBSFS's option, applied to any financial obligation Employee (or his/her estate) has to UBSFS, or any related entity, as soon as administratively feasible following the date that Employee is terminated due to death or disability, but in no event later than March 15 of the calendar year following the year in which such event occurs. For purposes of this Agreement, "disability" shall mean that Employee cannot perform all the material duties of Employee's regular occupation as such term is used in the UBSFS Long Term Disability ("LTD") Plan), <u>provided, however,</u> that if a disability as defined in the LTD Plan does not constitute a "disability" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended, or the regulations promulgated thereunder ("I.R.C. Section 409A"), then disability for purposes of this Agreement shall have the meaning set forth in I.R.C. Section 409A.

6. <u>Arbitration Agreement</u>.

    a. Binding Mutual Arbitration. Employee and UBS agree that any Covered Claims (defined below) will be resolved by final and binding arbitration as set forth in this paragraph 6 and its sub-paragraphs a through h (collectively, "Arbitration Agreement"). The Arbitration Agreement shall be governed by and interpreted in accordance with the Federal Arbitration Act ("FAA") and the law of the State of New Jersey to the extent New Jersey law is not inconsistent with the FAA and without regard to conflicts of law principles. This Arbitration Agreement applies with respect to all Covered Claims, whether initiated by Employee or UBS. By entering into this Arbitration Agreement, Employee and UBS each acknowledge and agree that, to the fullest extent permitted by law, Employee and UBS are giving up their rights to a jury trial of Covered Claims.

b. Covered Claims.  Except for the Excluded Claims (defined below), and to the fullest extent permitted by law, Covered Claims include any and all claims or disputes between Employee and UBS, or UBS's parents, subsidiaries, affiliates, partners, predecessors, and successor corporations and business entities, and its and their officers, directors, employees, and agents, including but not limited to all claims and disputes arising out of or in any way relating to Employee's employment, compensation, benefits and terms and conditions of employment with UBS or any of UBS's current, former or future parents, subsidiaries, affiliates, partners, predecessors, or successor or affiliated or related corporations or business entities, including without limitation UBS AG and UBS International, Inc. ("UBS business entities"), or the termination thereof, including but not limited to contract, tort, defamation, breach of fiduciary duty and other common law claims, wage and hour claims, statutory discrimination, harassment and retaliation claims, and claims arising under or relating to any federal, state or local constitution, statute or regulation, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Employee Retirement Income Security Act ("ERISA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and any other federal, state or local wage and hour, compensation, benefits, or discrimination law, and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized.

c. Excluded Claims.  The following claims and disputes are not subject to this Arbitration Agreement:  (i) applications by either party for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims for workers' compensation benefits, but not retaliation claims arising out of or relating to claims for workers' compensation benefits, (iii) claims for unemployment compensation benefits, (iv) claims under the National Labor Relations Act, as amended, within the exclusive jurisdiction of the National Labor Relations Board, and (v) any claim that is expressly precluded from arbitration by a federal statute or regulation. Nothing in this Arbitration Agreement shall prohibit Employee from filing a charge or complaint with the U.S. Equal Employment Opportunity Commission, the National Labor Relations Board, the U.S. Department of Labor, the Occupational Safety and Health Commission, or any other federal, state, or local administrative agency.  Employee also has the right to challenge the validity of the terms and conditions of this Arbitration Agreement on any grounds that may exist in law and equity, and UBS shall not discipline, discharge, or engage in any retaliatory actions against Employee in the event Employee chooses to do so or engage in other protected legal activity.  UBS, however, reserves the right to enforce the terms and conditions of this Arbitration Agreement in any appropriate forum.

d. **WAIVERS.  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EMPLOYEE AND UBS AGREE THAT NO COVERED CLAIMS MAY BE INITIATED, MAINTAINED, HEARD, OR DETERMINED ON A CLASS ACTION BASIS, COLLECTIVE ACTION BASIS, OR REPRESENTATIVE**

**ACTION BASIS EITHER IN COURT OR IN ARBITRATION, AND THAT EMPLOYEE IS NOT ENTITLED TO SERVE OR PARTICIPATE AS A CLASS ACTION MEMBER OR REPRESENTATIVE, COLLECTIVE ACTION MEMBER OR REPRESENTATIVE, OR REPRESENTATIVE ACTION MEMBER OR REPRESENTATIVE, OR RECEIVE ANY RECOVERY FROM A CLASS, COLLECTIVE, OR REPRESENTATIVE ACTION INVOLVING COVERED CLAIMS EITHER IN COURT OR IN ARBITRATION.** Employee further agrees that if he/she is included within any class action, collective action, or representative action in court or in arbitration involving a Covered Claim, he/she will take all steps necessary to opt-out of the action or refrain from opting in, as the case may be.  Any issue concerning the validity or enforceability of any of the class action, collective action, or representative action Waivers contained in this Arbitration Agreement shall be decided only by a court of competent jurisdiction.  Any issue concerning arbitrability of a particular issue or claim pursuant to the Arbitration Agreement (except for issues concerning the validity or enforceability of the class action, collective action, and representative action Waivers) must be resolved by the arbitrator, not the court.  Nothing in this Arbitration Agreement shall preclude Employee from pursuing or participating in a class action, collective action, or representative action in court where his/her claim is based solely on his/her status as a customer or an investor and does not arise out of or in any way relate to Employee's employment relationship with UBS.

e.  Selection and Rules.  Except as specified herein, the applicable arbitration rules will be the rules of the selected arbitration forum as indicated below, or any successor rules or, if none exist, the rules most applicable to employment claims and disputes and, if the forum no longer exists, the successor forum.  Except as specified herein, any arbitration of a Covered Claim will be conducted under the auspices and rules of the Financial Industry Regulatory Authority ("FINRA") in accordance with the FINRA Code of Arbitration Procedure for Industry Disputes ("FINRA Arbitration Rules").  Information about FINRA, including its FINRA Arbitration Rules, can be found at www.finra.org.  If a Covered Claim may not be arbitrated before FINRA or is otherwise excluded from or not subject to arbitration before FINRA, then such Covered Claim will be resolved by final and binding arbitration conducted under the auspices and rules of JAMS in accordance with and subject to the JAMS Employment Arbitration Rules and Procedures and the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("JAMS Arbitration Rules"), except as specified herein, and shall be conducted before a single arbitrator unless all parties to the arbitration agree otherwise in writing.  Information about JAMS, including its JAMS Arbitration Rules, can be found at www.jamsadr.com.  In addition, Employee may elect to arbitrate discrimination claims under any federal, state or local law (including claims of harassment and retaliation under those laws) before JAMS in accordance with and subject to the JAMS Arbitration Rules, and any such arbitration shall be conducted before a single arbitrator unless all parties to the arbitration agree otherwise in writing.  Arbitration shall be held in the county in which Employee worked or works at the time the claim arose or, if not possible, in the county closest to Employee's principal place of employment at the time the claim arose where the arbitration can be held.  To the extent any of the terms, conditions or requirements of

this Arbitration Agreement conflict with the JAMS Arbitration Rules or FINRA Arbitration Rules, the terms, conditions or requirements of this Arbitration Agreement shall govern. Arbitrators are required to issue a written award, and their awards shall be final and binding, and any judgment or award issued by an arbitrator may be entered in any court of competent jurisdiction. No arbitration award or decision will have any preclusive effect as to any issues or claims in any other arbitration or court proceeding unless each of the parties in such proceeding was also a named party in the arbitration.

f.  Remedies. Subject to the parties' right to appeal or seek vacatur under applicable law, Employee and UBS agree that the decision of the arbitrator(s) will be final and binding on the parties and that the arbitrator(s) is authorized to award any party the full remedies that would be available to such party if the Covered Claim had been filed in a court of competent jurisdiction, including attorneys' fees and costs. As part of his/her costs, Employee may recover expert fees incurred to the same extent as Employee could in court.

g.  Additional Provisions Applicable to Arbitration of Statutory Claims. Subject to any applicable fee-shifting provisions, if Employee initiates arbitration of statutory claims with FINRA or JAMS, Employee shall be responsible for the filing fee required to initiate arbitration of such claims up to the amount of the filing fee Employee would have incurred had he/she filed such claims in federal district court, and UBS shall be responsible for all additional arbitration filing fees, forum fees, and other fees and costs assessed by FINRA or JAMS in any such arbitration.

h.  Additional Provisions Applicable to Arbitration Before JAMS. In any arbitration before JAMS, the parties may file and the arbitrator shall hear and decide at any point in the proceedings any motion permitted by the Federal Rules of Civil Procedure, including but not limited to motions to compel discovery, motions for protective orders, motions to dismiss, motions for summary judgment, and motions in limine.

The provisions of this Agreement shall be severable and, if any provisions hereof shall be determined to be legally unenforceable or void, such unenforceable or void provision shall not affect the legality, validity or enforceability of the remaining provisions hereof and may be severed from the remaining provisions as appropriate, to the extent permitted by law, except that, in the event any of the Waivers set forth in Paragraph 6.d are determined to be invalid, unenforceable or void with respect to any Covered Claim, that Covered Claim and only that Covered Claim shall proceed in court and the Waivers set forth in Paragraph 6.d shall remain effective and enforceable with respect to all other Covered Claims. If a court of competent jurisdiction determines that a particular provision of this Agreement is in conflict with a mandatory provision of applicable law in a particular jurisdiction, such provision will not be enforced in that jurisdiction but shall remain effective and enforceable in all other jurisdictions. Insofar as any Covered Claim is permitted to proceed on a class, collective or representative action basis, it may do so only in a court of competent jurisdiction and not in arbitration.

7.  Non-Solicitation Of Clients: Subject to applicable law and Paragraph 8 of this Agreement, in the event Employee's employment with UBSFS is terminated for any reason whatsoever, whether voluntarily or involuntarily, Employee agrees, for a period of one year from

the date of termination or until such time that all amounts owed by the Employee to UBSFS and all related entities have been fully repaid, whichever is earlier, to not solicit, directly or indirectly, any of the clients who maintain accounts at UBSFS ("Clients of UBSFS") whom Employee serviced during his/her employment at UBSFS or other Clients of UBSFS whose names became known to Employee while in the employ of UBSFS.

"Solicit" as set forth in this paragraph means that the Employee will not initiate, whether directly or indirectly, any contact or communication of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client or that may have the effect of inviting, encouraging or requesting a client:

(a)     to transfer his/her UBSFS account(s) to the Employee or his/her new employer; or
(b)     to open a new account with Employee or his/her new employer; or
(c)     to otherwise discontinue his/her existing business relationship with UBSFS.

8.     Confidentiality Of Client Information:  All information concerning Clients of UBSFS, former clients of UBSFS and prospective clients of UBSFS must be treated as confidential and must not be disclosed to anyone outside UBSFS unless the disclosure is expressly authorized by the client, required by law, rule, regulation or legal process.  Employee further expressly agrees that, in the event Employee's employment is terminated for any reason whatsoever, whether voluntarily or involuntarily, Employee may not take any records or information referring or relating to Clients of UBSFS, former clients of UBSFS and prospective clients of UBSFS, whether originals or copies, in hard copy or computerized form.

9.     Other Agreements:  In the event that Employee enters into other agreements with UBSFS or any of its related entities that contain non-solicitation and/or confidentiality obligations, including, but not limited to, any deferred compensation, equity or other award plans, Offer Letters, Letters of Understanding, Corporate Employee Account Servicing Agreements, Receiving and/or Retiring or Transitioning Financial Advisor Agreements, Financial Advisor Team Agreements, and/or Account Assignment Agreements, the non-solicitation and/or confidentiality provisions of any such agreement shall govern Employee's conduct with respect to the solicitation of clients and use of client information covered by those Agreements.

10.     Remedies:  In the event that any of the provisions contained in Paragraphs 7 or 8 are breached by Employee, Employee understands that Employee will be liable to UBSFS for any damage and/or injury, including but not limited to reasonable attorney's fees, incurred to enforce the provisions of this Agreement.  Employee also specifically agrees that, in the event of breach of the Non-Solicitation of Clients and/or Confidentiality of Client Information paragraphs of this Agreement, damages alone will be an inadequate remedy and UBSFS will, in addition to damages for breach, be entitled to injunctive or other equitable relief against Employee to enforce the provisions of these paragraphs.

EMPLOYEE FURTHER EXPRESSLY CONSENTS TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER OR A PRELIMINARY INJUNCTION BY ANY COURT OR ARBITRATION PANEL WITH JURISDICTION OVER EMPLOYEE TO

PROHIBIT THE BREACH OF ANY PROVISION OF THIS AGREEMENT, OR TO MAINTAIN THE STATUS QUO PENDING THE OUTCOME OF ANY ARBITRATION PROCEEDING THAT MAY BE INITIATED; AND, FURTHER, THAT THE ISSUE OF TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF MAY BE DECIDED BY A COURT AND NOT BY AN ARBITRATION PANEL SHOULD UBSFS IN ITS DISCRETION ELECT TO SEEK SUCH RELIEF.

11.   Assignment:   This Agreement may be assigned by UBSFS and the benefits and obligations hereof shall inure to UBSFS's successors and assigns (and all references herein to UBSFS shall together be deemed to refer to such successors or assigns as the case may be).

12.   Terms And Modifications:   This Agreement contains all of the terms of the agreement between the parties hereto relating to the subject matter hereof and may not be amended, modified or discharged, nor may any provision hereof be waived, orally, by course of dealing or otherwise, unless such amendment, modification, discharge or waiver shall be in writing and duly executed by UBSFS.  The non-exercise by UBSFS of any right or remedy in any particular instance shall not constitute a waiver thereof in that or any other instance. Any provision hereof found to be illegal, invalid or unenforceable for any reason whatsoever shall not affect the validity, legality or enforceability of the remainder hereof.

13.   Not An Employment Contract:   Employee expressly acknowledges that his/her employment with UBSFS is "at will" and that this Agreement is not an employment contract or agreement to employ Employee for a specified period of time or a promise of continued employment with UBSFS for any period whatsoever.  Accordingly, Employee acknowledges that his/her employment may be terminated with or without cause and with or without notice at any time at his/her option or that of UBSFS.

14.   Governing Law:   This Agreement shall be governed by and construed and enforced in accordance with the laws of the state of New Jersey without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, Employee has executed this Agreement as of the date set forth above

EMPLOYEE:

*Phil Fiore*

UBS Financial Services Inc.

By: _Dana Potyewan_

# EXHIBIT G

To: UBS          From: UBS          Fax: UBS          at: 06-MAY-2016-09:47   Doc: 632   Page: 001



## UBS

# UBS Financial Services Inc.

# Financial Advisor Team Agreement

The Financial Advisors named below enter into this Agreement:

**Note: Please print legibly. If changes to this agreement are desired, please contact the Teaming Group (sh-wmus-Teams)**

**Note: Entering into this Agreement does NOT automatically entitle the Team Members to the resources provided on the UBS Teaming Platform. For details on how to gain access to the UBS Teaming Platform, please send an email to sh-wmus-teams@ubs.com.**

Financial Advisor / FAID

Financial Advisor / FAID

Financial Advisor / FAID

Financial Advisor / FAID

Financial Advisor / FAID

Financial Advisor / FAID

If additional Financial Advisors will be entering into this Agreement, please identify them on a separate sheet annexed hereto.

In consideration of the mutual promises expressed in this Agreement, the parties agree as follows:

1. **Purpose of Agreement.** The Financial Advisors identified above shall be collectively referred to as "Team Member(s)" for the purposes of this Agreement and have agreed to work together in providing financial services to clients of UBS Financial Services Inc. The purpose of this Agreement is to set forth the rights and obligations of the Team Members, but it is not intended to create a partnership, joint venture or any other legal entity. With respect to UBS Financial Services Inc. (the "Firm"), the Team Members acknowledge and agree that the Firm is not a party to this Agreement but rather a third party beneficiary of this Agreement with the exclusive right to enforce the provisions of Paragraphs 9C, 11, 21 and 22.

To:UBS          From:UBS          Fax:UBS          at:06-MAY-2016-09:47  Doc:632  Page:002

2.      **Employment by UBS Financial Services Inc.**  This Agreement does not in any respect alter or amend any Team Member's rights and obligations as a licensed Financial Advisor and employee of UBS Financial Services Inc.   This Agreement does not create any contract of employment for any fixed term or duration among the parties or between any Team Member and UBS Financial Services Inc., and thus, the Team Members remain employed at-will by the Firm.  As such, a Team Member's employment can be terminated with or without cause, reason or notice at any time, at the option of the Team Member or the Firm.

   A. **Adherence to Firm Policies and Procedures.**  As Firm employees, Team Member(s) are reminded that at all times they are required to adhere to and follow all UBS Financial Services Inc. polices and procedures, including those set forth in the UBS Financial Services Inc. Code of Conduct and Investment Advisor Code of Ethics ("Code of Conduct"), Employee Handbook and any updates or amendments, applicable to each Team Members' business unit and position at the Firm.

3.      **New Financial Advisors ("NFA(s)").**   For use if the NFA is subject to the Wealth Management Compensation Plan for New Financial Advisors in the Development Program:  In exchange for the efforts of the NFA(s) _____, the remaining Team Members guarantee that the NFA(s) will achieve Production Level 2 or higher, as such terms are defined in the " Wealth Management Compensation Plan for New Financial Advisors in the Development Program."   The Team Members providing this guarantee shall make appropriate changes to the allocation of compensation referenced in Paragraph 4 to ensure that the NFA(s) will achieve the production levels cited above.


4.      **Compensation.**  All revenue, asset gathering, productivity, length of service awards and business expenses from the Team Members' activities will be allocated among the Team Members according to the following grid [schedule or attachment]:

5.      **Term.**  This Agreement shall commence on the date of the signing of this Agreement and end when terminated as provided in Paragraph 9.


6.      **Identification of Accounts Subject to Team Agreement.**  Immediately upon signing the Agreement, the Team Members shall identify the FA Number(s) to which the client accounts that will be subject to the terms and conditions of the Agreement will be assigned.  The clients accounts contained in the FA Number(s) shall be collectively referred to in this Agreement as the "Accounts." The Team Members further acknowledge and agree that none of them have a proprietary interest in any Account and that nothing in this Agreement limits or affects the Firm's ability to make changes in the assignment of any Accounts and compensation with respect thereto at any time as management may deem appropriate at its sole and absolute discretion.

7.      **Registration and Licensing Requirements.**  Each Team Member acknowledges that, consistent with the Firm's Registration policies and practices, in order to be compensated for transactions attributable to the Accounts, each Team Member shall maintain identical relevant Self Regulatory Organization (SRO), insurance and commodity licenses as well as identical state agent and investment advisor registrations in those states where the Accounts are domiciled. Accordingly, each Team Member acknowledges that he/she may not be entitled to receive compensation attributable to transactions in the Accounts for which the Team Member, or any of the other Team Members, does not maintain the appropriate relevant SRO, insurance (state licenses and carrier appointments) or commodity license or state registrations.

8.      **Customer Complaints.**  Each Team Member agrees and acknowledges that in certain circumstances customer complaints may be required to be reported on the Forms U-4 and/or U-5 of

some or all members of a team even if the complaining customer was serviced primarily, or even exclusively, by other Team Members.

9.    **Termination of Agreement/Withdrawal from Agreement.**

A.    **Voluntary Termination/Voluntary Withdrawal.**    Where there are only two Team Members to this Agreement, either Team Member may terminate this Agreement on at least sixty (60) days written notice to the other Team Member simultaneously with a copy to the UBS Financial Services Inc. Branch Office Manager.  This termination notice must specify the termination date, which must be the last day of a monthly commission period.  Upon the voluntary termination of this Agreement, the Accounts will be reassigned pursuant to Paragraph 9E.

**Where there are three or more Team Members to this Agreement, any Team Member(s) may withdraw from this Agreement on at least sixty (60) days written notice to the other Team Member(s) simultaneously with a copy to the UBS Financial Services Inc. Branch Office Manager.  This withdrawal notice must specify the withdrawal date, which must be the last day of a monthly commission period. The Agreement will continue in full force and effect as to the remaining parties, subject to the reassignment of Accounts as described in Paragraph 9E and to any adjustment made, in writing, by the remaining parties to the grid [schedule or attachment] referred to in Paragraph 4.**

B.    **Automatic Termination/Automatic Withdrawal.**    Where there are only two Team Members to this Agreement, this Agreement will automatically terminate on the occurrence of any of the following events:

1)    Death of any Team Member;
2)    Disability (as defined in Paragraph 10) of any Team Member;
3)    Removal of FA _____ from the New Financial Advisor Development Program
4)    Loss of necessary licenses by any Team Member;
5)    Termination of employment for any reason, whether voluntary or involuntary;
6)    Transfer of a Team Member to a non-producing position at UBS Financial Services; or
7)    The inability of the Team Member to amicably resolve any dispute regarding the terms of this Agreement, as determined by management in its sole and absolute discretion.

**Where there are three or more Team Members to this Agreement, a Team Member will be deemed to have automatically withdrawn from the Agreement upon the occurrence of any of the events enumerated in Paragraph 9B (1-7) above, and the Agreement will continue in full force and effect as to the remaining Team Members, subject to the reassignment of accounts as described in Paragraph 9E and to any adjustment made, in writing, by the remaining Team Members to the grid [schedule or attachment] referred to in Paragraph 4.**

C.    **UBS Financial Services Inc.'s Termination of the Agreement and Team.**  UBS Financial Services Inc. has the right to terminate this Agreement at any time in its sole and absolute discretion and such termination shall be final and binding upon all Team Members.  Upon UBS Financial Services Inc.'s termination of the Agreement, the Accounts will be reassigned pursuant to Paragraph 9E.

D. **NFA Treatment.** Upon the termination of this Agreement or the withdrawal of one or more parties to this Agreement, but where no Financial Advisor has departed from production, if any Team Member is still a participant in the New Financial Advisor Development Program (the "NFA"), management shall use its sole and absolute discretion to address how the NFA is treated upon the dissolution with respect to the reassignment of Accounts and assets. In so doing, management retains the sole and absolute discretion to deviate from the performance level set forth in Paragraph 3, and any such decision shall be final and binding upon the Team Members. In making this determination, management may consider various factors, including but not limited to, the NFA's demonstrated servicing of various Accounts, the level of contact between the NFA and clients serviced by the Team, and the NFA's overall contribution to the Team.

E. **Reassignment of Accounts in the event of Termination of Agreement.**

(i) In the event this Agreement is terminated and all the former Team Members remain employed in production at UBS Financial Services Inc., the Accounts will be reassigned with mutual agreement among the Team Members subject to UBS' approval. In the event mutual agreement among the Team Members cannot be reached, management shall use its sole and absolute discretion to reassign the Accounts (as well as any production and/or asset splits it deems appropriate). The Team Members acknowledge and agree that any such decisions by management shall be final and binding..

(ii) In the event this Agreement is terminated by virtue of one or more Financial Advisor(s) departing from production at UBS Financial Services Inc., the reassignment of Accounts will be governed by the Account Reassignment Policy then in effect.

The Team Members acknowledge that they have been provided with a copy of the Account Reassignment Policy currently in place and understand that it may be amended in the future at the Firm's sole and absolute discretion.

Only Financial Advisors and New Financial Advisors, as specifically set forth in the Account Reassignment Policy, are eligible to receive reassigned Accounts.

Notwithstanding any to the contrary in this Paragraph 9E (or elsewhere in this Agreement), nothing in this Agreement shall be deemed to limit or restrict in any way management's inherent right to reassign any Account to anyone.

F. **Financial Advisor Conduct Following Notice of Termination or Withdrawal.** At all times, the Team Members shall be required to follow and comply with UBS Financial Services Inc.'s policies and procedures, including the Code of Conduct and Employee Handbook, and shall act in the best interests of the Firm's clients. Following notice of termination of the Agreement or withdrawal of a Team Member from the Agreement, the Team Members shall promptly meet with their Branch Office Manager to discuss reassignment of the Accounts and appropriate conduct for the parties until the termination or withdrawal has become effective (the "Dissolution Period"). During the Dissolution Period, the Team Members shall refrain from any act or omission that, directly or indirectly, (i) harms or potentially harms the client accounts subject to this Agreement or (ii) adversely affects or potentially adversely affects the rights and interests of the other Team Members Such prohibited conduct includes, but is not limited to, the following:

1) Diverting accounts, assets and/or commissions away from the Team without the

knowledge and agreement of the other parties and management;

2) Lobbying or otherwise pressuring a client in any way to influence the account reassignment process;

3) Disparaging, or otherwise attempting to undermine the reputation of UBS Financial Services Inc. or any Team Member to the Agreement;

4) Failing to properly service an account, or work together as a Team, during the Dissolution Process;

5) Altering or destroying the Firm's books and records, including client information; or

6) Otherwise acting in a manner inconsistent with the best interests of the clients.

All inappropriate conduct, as determined by UBS Financial Services Inc. in its sole discretion, will be subject to disciplinary action and may disqualify a Team Member from receiving reassigned Accounts.

10.    **Disability.**  The definition of "total disability" contained in UBS Financial Services Inc.'s Long Term Disability ("LTD") Plan will be used to determine when a Team Member shall be considered disabled under Paragraph 9B of this Agreement. If any Team Member goes on Short Term Disability ("STD") leave during the term of this Agreement, any changes to the allocation of compensation under the split number(s) subject to this Agreement shall be made at the sole and absolute discretion of management.

11.    **Non-Solicitation.**

A. Upon the termination of employment of any Team Member or former Team Member, the departing Team Member or former Team Member agrees that, in addition to any other non-solicitation obligations he/she may have in any other agreement with UBS or its predecessors, including but not limited to those contained in:

- Agreement for Financial Advisors in the Development Program or similar training agreement;
- Employee Forgivable Loan;
- Employee Transition Payment;
- Corporate Employee Financial Services Program agreements (an account servicing agreement between a Team Member and UBS and any services agreement between UBS and the company sponsoring the stock benefit plan);
- Agreements signed in connection with the UBSFS Retirement Enhancement Program and/or Transitioning Financial Advisor Program;

he/she will not solicit, for a period of one year from the date of termination of the departing Team Member's employment, any clients of UBS Financial Services Inc. serviced by the Team.

B. Notwithstanding the preceding Paragraph, the Team Members agree and acknowledge that unless otherwise prohibited by a non-solicitation provision in another agreement, this provision does not apply to client accounts the departing Team Member introduced to the Team either at its inception or during its existence.

C. For purposes of this non-solicitation provision, "solicit" means that the departing Team Member will not initiate, whether directly or indirectly, any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client, or that

may have the effect of inviting, encouraging or requesting a client: (a) to transfer his or her UBS Financial Services Inc. account(s) to the departing Team Member or his or her new employer; or (b) to open a new account with the departing Team Member or his or her new employer; or (c) to otherwise discontinue his or her existing business relationship with UBS Financial Services Inc.

12.     **Rights on Death.**  If a Team Member dies, nothing in this Agreement entitles the deceased Team Member's estate to any payments, compensation, or benefits from the Team or the other Team Members, except what may be provided by applicable law.  Nothing in this provision shall prevent the Team Members from participating in any other Firm-provided program providing benefits to a deceased Team Member or his/her estate.

13.     **Notices.**  Any notices provided for in this Agreement shall be in writing and shall be deemed duly given when personally delivered to the Team Member to whom they are addressed (with a written acknowledgement of receipt) or, in lieu of personal delivery, when deposited in the United States mail, postage prepaid, certified, addressed to the Financial Advisor or Investment Associate at the offices of the joint effort.  A copy of any notice shall be hand delivered to the UBS Financial Services Inc. Branch Office Manager.

14.     **Amendments.**  No amendment to this Agreement shall be valid unless made in writing and signed by all Team Members and approved in writing by a member of management.

15.     **Prior Agreements Superseded.**  This Agreement supersedes any prior oral or written understandings or agreements between the Team Members respecting the subject matter of this Agreement.  However, nothing herein shall be construed to alter or modify any of UBS Financial Services Inc.'s policies and procedures or any agreements between any Team Member and UBS Financial Services Inc., including but not limited to Letters of Understandings, Promissory Notes and Transition Agreements.

16.     **Arbitration of Disputes Arising From This Agreement.**  All controversies or claims arising out of or relating to this Agreement, or the construction, performance or breach thereof, shall be brought before the Arbitration facility provided by the Financial Industry Regulatory Authority (FINRA) to the exclusion of all others, and judgment upon the award rendered by the Arbitrator(s) may be entered in any Court having jurisdiction thereof.  Nothing in this paragraph shall be deemed a waiver of UBS Financial Services Inc.'s right to injunctive relief as provided for in Paragraph 22 of this Agreement.

17.     **Severability of Provisions of Agreement.**  The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If a court or arbitrator finds that any provision of this Agreement is overly broad in terms of time or scope, the court or arbitrator may alter or modify the provision in order to render it enforceable.

18.     **Counterparts.**  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

19.     **Waivers.**  No waiver of any provision hereof shall be effective unless evidenced by a writing signed by the Team Member against whom it is sought to be enforced.  No waiver of any breach of any term hereof shall be construed as a waiver of any subsequent breach of such term or as a waiver of any other term hereof.

20.   **Confidential Information.** Each Team Member hereby agrees not to disclose to any person any Confidential Information relating to UBS Financial Services Inc. except in the course of carrying out his or her duties for UBS Financial Services Inc. or as required by law or governmental agency with jurisdiction. For purposes of this paragraph, "Confidential Information" means any nonpublic information concerning UBS Financial Services Inc.'s financial data, strategic business plans, product development, customer lists, customer financial information, marketing plans, and any other proprietary information; except for specific items that have become publicly available other than through a breach by you of this Paragraph 20 or any other confidentiality agreement. All parties to this Agreement will give immediate written notice to UBS Financial Services Inc. (Attention: General Counsel's Office, 1000 Harbor Boulevard, 8th Floor, Weehawken, New Jersey 07086) of any disclosure requirement by a court or government agency in order to allow UBS Financial Services Inc. an opportunity to respond to such a request. Notwithstanding the foregoing, nothing in this Agreement (including, without limitation, this section) or any other agreement or document prohibits any Team Member from voluntarily communicating, without notice to or approval by UBS Financial Services Inc., with any federal government agency or self-regulatory organization (SRO) about a potential violation of a federal law or regulation or SRO regulation.   .

21.   **Remedies.**   In the event any Team Member breaches any of the promises concerning "Non-Solicitation" or "Confidential Information" contained in this Agreement, each agrees that UBS Financial Services Inc. will be entitled to injunctive relief.   All Team Members recognize that UBS Financial Services Inc. will suffer immediate and irreparable harm and that money damages will not be adequate to compensate UBS Financial Services Inc. or to protect and preserve the status quo pending arbitration as provided for under this Agreement.   Therefore, each Team Member expressly consents to the issuance of a temporary restraining order or a preliminary injunction by any court or arbitration panel with jurisdiction over him/her to prohibit the breach of any provision of this agreement, or to maintain the status quo pending the outcome of any proceeding which may be initiated; and, further, that the issue of temporary and preliminary injunctive relief will be decided by a court and not by an arbitration panel should UBS Financial Services Inc. in its sole discretion elect to seek such relief.

In the event of a breach by any Team Member, UBS Financial Services Inc., in addition to being entitled to exercise all rights granted by law, including recovery of damages, will be entitled to specific performance of its rights under this Agreement.   Each Team Member agrees that monetary damages would not be adequate compensation for any loss incurred by reason of a breach of any of the confidentiality and Non-Solicitation provisions of this Agreement and hereby further agrees that, in the event of any proceeding for specific performance in respect of such breach, he or she shall waive, and hereby does waive, the defense that a remedy at law would be adequate.

22.   **Attorney's Fees.** Each Team Member further agrees that UBS Financial Services Inc. and its affiliates shall be entitled to recover all reasonable costs and expenses (including attorney's fees) incurred in connection with the enforcement of UBS Financial Services Inc.'s rights under this Agreement in the defense of any claim by any Team Member.   .

23.   **Survival of Provisions of this Agreement.**   In the event this Agreement expires or terminates for any reason, the following Paragraphs shall survive the termination and shall remain in full force and effect: "11", "12", "13", "17", "18", "20", "21" and "22".


THE TEAM MEMBERS TO THIS AGREEMENT HEREBY ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTAND THE AGREEMENT AND CONSENT AND AGREE TO BE BOUND BY ALL OF THE TERMS AND CONDITIONS THEREOF.  EACH TEAM MEMBER FURTHER ACKNOWLEDGES THAT

HE/SHE HAS READ THE AGREEMENT PRIOR TO ACCEPTING ANY ASSIGNED ACCOUNTS FROM THIS DATE FORWARD AND HAS HAD AN OPPORTUNITY TO REVIEW IT WITH UBS FINANCIAL SERVICES INC. REPRESENTATIVES AND PERSONS OR LEGAL REPRESENTATIVES OF THE EMPLOYEE'S OWN CHOOSING AND UNDERSTANDS ITS TERMS AND EFFECTS.

**THE TEAM MEMBERS SPECIFICALLY ACKNOWLEDGE THAT TO THE EXTENT UBS FINANCIAL SERVICES INC.'S IN-HOUSE COUNSEL HAS PROVIDED ANY ASSISTANCE WITH THE DRAFTING OF THIS AGREEMENT, THE UBS FINANCIAL SERVICES INC. COUNSEL DID SO ON BEHALF OF UBS FINANCIAL SERVICES INC. AND DOES NOT REPRESENT ANY OF THE PARTIES TO THIS AGREEMENT AND DID NOT PROVIDE ANY LEGAL ADVICE TO ANY OF THE PARTIES IN CONNECTION WITH THIS AGREEMENT OR ITS TERMS AND CONDITIONS.**

The original of this Agreement signed by the Team Members (including counterpart signature pages if any) shall be provided to the UBS Financial Services Inc. Branch Office Manager. The UBS Financial Services Inc. Branch Office Manager should provide a copy of the executed Agreement to each of the Team Members to the Agreement and is to maintain the original. Failure of the UBS Financial Services Inc. Branch Office Manager to perform any of the items identified in this Paragraph shall not affect the validity or enforceability of this Agreement.

This Agreement is effective as of _____ 02/25 , 20 16 .

_____   02/25/2016
Financial Advisor                        Date

_____   02/28/2016
Financial Advisor                        Date

SORY - we
signd at first
prt.

_____   _____
Financial Advisor                        Date

_____   _____
Financial Advisor                        Date

_____   _____
Financial Advisor                        Date

_____   _____
Financial Advisor                        Date

Approved:   _____   5/5/16
Member of Management                     Date

The original signed copy or counterparts should be retained by the Branch Office Manager with photocopies provided to the Team Members.

An additional copy should be faxed to Teams Compensation at 201.442.3827.

# EXHIBIT H

 **UBS**

Wire Code: _BW_

# Financial Advisor Team Agreement

Congratulations on making the decision to form or join a Team. Being part of a Team can help you expand your reach among clients, enhance the services you can offer by tapping into the expertise of colleagues, and support you in building a business that has the potential to span generations.

This document outlines the terms and conditions for your Team.

## 1. Purpose of Agreement

The Team Members named below have agreed to work together in providing services to clients of the Firm. They have voluntarily entered into this Agreement to set forth terms and conditions regarding their working together as a Team.

## 2. Accounts/Allocations

### Identification of Accounts and FA Number(s)

Immediately upon signing this Agreement, the Team Members will collectively provide the following information to Management:

- FA Number(s) to which all client accounts (Accounts) subject to this Agreement will be assigned; and a list of Accounts that each Team Member introduced to the Team ('Introducing Financial Advisor Account List').

No later than 180 days after the Team Members sign this Agreement, and no later than each one-year interval thereafter, the Team Members shall collectively submit to Management a list of any new Accounts subject to the Agreement. The list must identify the Introducing FA for each such Account.

### Allocation Schedule

Production credits and assets from Team Members' activities will be allocated among Team Members as set forth on the attached document, which has been agreed upon by Team Members as set forth in the attached (Allocation Schedule). Team Members seeking to qualify for any available Team-related payout rates and/or other benefits should refer to the underlying documents governing those rates and benefits to ensure they structure their Team appropriately in order to comply with underlying requirements.

### New Financial Advisors (NFAs)

If any Team Member is a New Financial Advisor (NFA) subject to a then-applicable NFA Compensation Plan, the other non-NFA Team Member(s) agree to ensure that the NFA(s) will achieve at least Production Level 2 (as such term is set forth in the applicable NFA Compensation Plan) for each month the NFA is a Team Member and in the NFA Program.

## 3. Termination/Withdrawal

Team Members recognize and agree that the Team relationship among some or all Team Members may end under the following circumstances:

### Voluntarily

If there are **only two Team Members**:

- Either Team Member may terminate this Agreement by providing written notice to the other Team Member and Management at least 60 days in advance of the intended termination date, which must be the last day of a monthly commission period. Upon voluntary termination, Accounts will be reassigned in accordance with this Agreement.

If there are **more than two Team Members**:

- Any Team Member may withdraw from this Agreement by providing written notice to the other Team Members and Management at least 60 days in advance of the intended withdrawal date, which must be the last day of a monthly commission period. All other Team Members' participation on the Team will remain unaffected, subject to reassignment of Accounts in accordance with this Agreement and any adjustment made, in writing, by the remaining Team Members to the Allocation Schedule.

### Automatically

If there are **only two Team Members**, this Agreement will automatically terminate if one of the Team Members:

- Dies or experiences a Total Disability;
- Loses a necessary license;
- Moves to a non-producing role; or
- Experiences termination of employment for any reason whatsoever.

If there are **more than two Team Members**:

- A Team Member will be considered to have automatically withdrawn from the Team upon the occurrence of any of the above automatic termination events. All other Team Members' participation on the Team will remain unaffected, subject to the reassignment of Accounts in accordance with this Agreement and any adjustments made, in writing, by the remaining Team Members to the Allocation Schedule.

### 4. Account Reassignment/Team Issues

- If the Team relationship is terminated and all the former Team Members remain employed in production, Accounts will be reassigned with mutual agreement among Team Members, subject to the Firm's approval and any applicable Firm policies

- The Team Members acknowledge and agree that it is their (and the Firm's) expectation that they will be able to amicably resolve on their own the details of any issues between the Team Members that may arise, including account reassignment and the way forward with respect to the termination of the Team relationship. If the Team Members have a dispute which they are unable to resolve on their own, UBS may seek in its discretion to take steps to bring the matter to resolution, including, for example, the possibility of seeking a third party mediator (at the Team Members' expense) to make recommendations for resolution. If the Team Members have a dispute regarding account reassignment various factors for resolving the dispute may be considered, including, without limitation, the Introducing Financial Advisor Account List referenced in Section 2.

### 5. Team Non-Solicitation Rules

If the employment of any Team Member (current or former) terminates for any reason, that Team Member will not, for a period of one year from the employment termination date, solicit any clients that were serviced by the Team. **This provision does not apply to client accounts the departing Team Member introduced to the Team, either at its inception or during its existence.** Nothing in this Non-Solicitation provision limits any rights UBS or any Team Member may have under the Protocol for Broker Recruiting ("Protocol").

### 6. Death/Total Disability of a Team Member

If a Team Member dies or experiences a Total Disability, nothing in this Agreement entitles his/her estate or beneficiaries to any payments, compensation, or benefits from UBS or other Team Members. This provision does not affect any death, disability or other benefit or compensation offered under other Firm programs (e.g., ALFA Core (and its predecessor programs such as the TFAP), Long Term Disability Plan and FA Survivor Benefit Plan). The terms of those programs control and are unaffected by this Agreement.

### 7. Other Terms and Conditions

Team Members acknowledge and agree as follows:

- The Firm is not a party to this Agreement. Given, however, the highly regulated nature of the Firm's business and its obligations to the clients serviced by the Team Members, the Firm may in its sole discretion terminate or modify the Team relationship and Account assignments and resolving Team Member disputes as it deems necessary and appropriate. The Firm is a third party beneficiary of this Agreement with the exclusive right to enforce Section 5 (Non-Solicitation).

- Nothing in this Agreement modifies or alters any Firm policies, including, without limitation, the Employee Handbook, Account Reassignment Policy and Code of Conduct. Team Members' employment with UBS remains 'at will,' which means that their employment may be terminated at any time and for any reason by them or UBS.

- No amendment to this Agreement, or waiver of any provision, is valid unless provided in writing, signed by all Team Members, and approved in writing by Management. No waiver of any

breach of any term will be construed as a waiver of any subsequent breach of such term or as a waiver of any other term.

- Section 5 (Non-solicitation) survives any termination of this Agreement.

- This Agreement supersedes any prior oral or written understandings or agreements between Team Members regarding the subject matter of this Agreement. This Agreement, however, does not supersede any agreements between UBS and a Team Member relating to his/her employment (including, but not limited to, non-solicitation agreements). If there is a conflict between a provision in this Agreement and a provision in any other agreement between a Team Member and UBS, the provision that gives the greater protection to the Firm will control.

- This Agreement is not intended to create a legal partnership, joint venture or any other legal entity.

- The provisions of this Agreement are severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions. If a court or arbitrator finds that any provision of this Agreement is overly broad in terms of time or scope, the provision may be altered or modified so that it is enforceable.

- All controversies or claims arising out of or relating to this Agreement, or its construction, performance or breach, shall be brought before the Arbitration facility provided by the Financial Industry Regulatory Authority (FINRA) in accordance with the FINRA Code of Arbitration Procedure for Industry Disputes.

### 8. Definitions

The below terms from this Agreement have the following definitions:

- "Agreement" means this "Financial Advisor Team Agreement."

- "Team Member" means each Financial Advisor/NFA identified individually below and "Team Members" means all of the Financial Advisors/NFAs identified below.

- "Total Disability" has the meaning given the term "Disability" in UBS Financial Services Inc.'s Long Term Disability Plan.

- "Solicit" means initiating (directly or indirectly) any kind of contact or communication for the purpose (or effect) of inviting, encouraging or requesting a client: (i) to transfer account(s) from the Firm or any other UBS entity; or (ii) to open a new account with another entity; or (iii) to otherwise discontinue the client's existing business relationship with the Firm or any other UBS entity.

- "UBS" and "the Firm" means UBS Financial Services Inc.

**Important notes:**

- Entering into this Team Agreement does NOT automatically entitle Team Members to enhanced payout rates or other Team-related benefits or resources provided on the UBS Teaming Platform. Eligibility for enhanced payout rates or other Team-related benefits is determined by the underlying program documents setting forth those rates/benefits.

- For access to the UBS Teaming Platform, please email sh-wmus-teams@ubs.com or visit goto/teamingplatform.

2

This Agreement is effective as of

_____, 20_____.

_____        _____
BW-82                                    BW91
Financial Advisor / FAID                 Financial Advisor / FAID

_____  12/13/2016   _____  12/13/16
Financial Advisor Signature      Date          Financial Advisor Signature      Date

_____        _____
BW 92                                    BW 83
Financial Advisor / FAID                 Financial Advisor / FAID

_____  12/13/16     _____  12/15/16
Financial Advisor Signature      Date          Financial Advisor Signature      Date

_____        _____
BW-T6                                    Financial Advisor / FAID
Financial Advisor / FAID

_____  12/17/16     _____
Financial Advisor Signature      Date          Financial Advisor Signature      Date


Approved:

_____
Member of Management             Date

The original signed copy should be retained by Management
with photocopies provided to the Team Members.

An additional copy should be faxed to Teams Compensation at
**201-442-3827.**

3

# EXHIBIT I

## PROTOCOL FOR BROKER RECRUITING

The principal goal of the following protocol is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ("RRs") between firms  If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability to the firm that the RR left by reason of the RR taking the information identified below or the solicitation of the clients serviced by the RR at his or her prior firm, provided, however, that this protocol does not bar or otherwise affect the ability of the prior firm to bring an action against the new firm for "raiding"  The signatories to this protocol agree to implement and adhere to it in good faith

When RRs move from one firm to another and both firms are signatories to this protocol, they may take only the following account information  client name, address, phone number, email address, and account title of the clients that they serviced while at the firm ("the Client Information") and are prohibited from taking any other documents or information  Resignations will be in writing delivered to local branch management and shall include a copy of the Client Information that the RR is taking with him or her  The RR list delivered to the branch also shall include the account numbers for the clients serviced by the RR  The local branch management will send the information to the firm's back office  In the event that the firm does not agree with the RR's list of clients, the RR will nonetheless be deemed in compliance with this protocol so long as the RR exercised good faith in assembling the list and substantially complied with the requirement that only Client Information related to clients he or she serviced while at the firm be taken with him or her

To ensure compliance with GLB and SEC Regulation SP, the new firm will limit the use of the Client Information to the solicitation by the RR of his or her former clients and will not permit the use of the Client Information by any other RR or for any other purpose  If a former client indicates to the new firm that he/she would like the prior firm to provide account number(s) and/or account information to the new firm, the former client will be asked to sign a standardized form authorizing the release of the account number(s) and/or account information to the new firm before any such account number(s) or account information are provided

The prior firm will forward to the new firm the client's account number(s) and/or most recent account statement(s) or information concerning the account's current positions within one business day, if possible, but, in any event, within two business days, of its receipt of the signed authorization  This information will be transmitted electronically or by fax, and the
requests will be processed by the central back office rather than the branch where the RR was employed  A client who wants to transfer his/her account need only sign an ACAT form

RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms   A firm would continue to be free to enforce whatever contractual, statutory or common law restrictions exist on the solicitation of customers to move their accounts by a departing RR before he or she has left the firm

The RR's former firm is required to preserve the documents associated with each account as required by SEC regulations or firm record retention requirements

It shall not be a violation of this protocol for an RR, prior to his or her resignation, to provide another firm with information related to the RR's business, other than account statements, so long as that information does not reveal client identity

Accounts subject to a services agreement for stock benefits management services between the  firm and the company sponsoring the stock benefit plan that the account holder participates in (such as with stock option programs) would still be subject to (a) the provisions of that agreement as well as to (b) the provisions of any account servicing agreement between the RR and the firm   Also, accounts subject to a participation agreement in connection with prospecting IRA rollover business would still be subject to the provisions of that agreement

If an RR is a member of a team or partnership, and where the entire team/partnership does not move together to another firm, the terms of the team/partnership agreement will govern for which clients the departing team members or partners may take Client Information and which clients the departing team members or partners can solicit   In no event, however, shall a team/partnership agreement be construed or enforced to preclude an RR from taking the Client Information for those clients whom he or she introduced to the team or partnership or from soliciting such clients

In the absence of a team or partnership written agreement on this point, the following terms shall govern where the entire team is not moving   (1) If the departing team member or partner has been a member of the team or partnership in a producing capacity for four years or more, the departing team member or partner may take the Client Information for all clients serviced by the team or partnership and may solicit those clients to move their accounts to the new firm without fear of litigation from the RR's former firm with respect to such information and solicitations, (2) If the departing team member or partner has been a member of the team or partnership in a producing capacity for less than four years, the departing team member or partner will be free from litigation from the RR's former firm with respect to client solicitations and the Client Information only for those clients that he or she introduced to the team or partnership

If accounts serviced by the departing RR were transferred to the departing RR pursuant to a retirement program that pays a retiring RR trailing commissions on the accounts in return for certain assistance provided by the retiring RR prior to his or her retirement in transitioning the accounts to the departing RR, the departing RR s ability to take Client Information related to those accounts and the departing RR's right to solicit those ac-

counts shall be governed by the terms of the contract between the retiring RR, the departing RR, and the firm with which both were affiliated

A signatory to this protocol may withdraw from the protocol at any time and shall endeavor to provide 10 days' prior written notice of its withdrawal to all other signatories hereto  A signatory who has withdrawn from the protocol shall cease to be bound by the protocol and the protocol shall be of no further force or effect with respect to the signatory  The protocol will remain in full force and effect with respect to those signatories who have not withdrawn

Citigroup Global Markets Inc  ("Smith Barney")

By _____

Name   Kevin McManus

Title   Managing Director and Chief
        Administrative Officer, Private
        Client Branch System


Merrill Lynch, Pierce, Fenner & Smith Incorporated

By _____

Name   Phil Sieg

Title   Managing Director, Head of Strategic
        Leadership and Development


UBS Financial Services Inc

By _____  EVP

Name   Barry Buchsbaum

Title   Director of Strategic Development
        **Executive Vice President**


- 3 -

<u>JOINDER AGREEMENT FOR BROKER PROTOCOL</u>

In consideration of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned company hereby joins and becomes a party to the Protocol for Broker Recruiting and agrees to be bound by the terms of, and perform its obligations under, the Protocol for Broker Recruiting.

Dated as of the 25th day of May, 2017.

PROCYON PRIVATE WEALTH PARTNERS, LLC

By:

Corey S. Kupfer
Corporate Counsel

JOINDER AGREEMENT FOR BROKER PROTOCOL

In consideration of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned company hereby joins and becomes a party to the Protocol for Broker Recruiting and agrees to be bound by the terms of, and perform its obligations under, the Protocol for Broker Recruiting.

Dated as of the 25th day of May, 2017.

PROCYON INSTITUTIONAL PARTNERS, LLC

By:

Corey S. Kupfer
Corporate Counsel

# EXHIBIT J

**From:** "Phil Fiore" <pfiore@procyonnpartners.net>
**Date:** June 2, 2017 at 1:01:05 PM EDT
**To**

**Subject: Exciting News: The Team of FDG Group is Now Procyon Partners**



Dear Clients, Friends and Family,

We're writing to share the exciting news about the launch of our new firm, **Procyon Partners**. We are now an independent, employee-owned financial advisory firm registered with the SEC. Drawing upon our years of experience and broad expertise, we will continue to serve our clients through a dual focus on:

- \* \* \* Helping affluent individuals, families and business owners effectively fulfill their dreams through sensible financial planning, investment and risk management.

- \* \* \* Assisting institutions in prudently managing the retirement plans, endowments and foundations under their stewardship.

As you know, we are passionately devoted to providing you with the knowledge, experience and support you need to make confident, informed decisions.

You will be interested to learn that our firm's name was inspired by the navigational star Procyon, which is actually two stars closely orbiting each other in the constellation Canis Minor. With our firm's two complementary practices, the name Procyon perfectly reflects the long, proud tradition of our founding partners who have helped people along their financial journey for more than 20 years.

Our rationale behind the move to independence is simple. What's best for our clients? We knew that as an independent registered investment advisory firm, we would be in a

better position to help all of our clients through broader access to unrestricted, conflict-free strategic advice. We are embracing our fiduciary status and our singular goal is to enhance our ability to help you navigate your financial life and achieve your goals by providing more in-depth solutions.

**How can we do this?**

Similar to our investment approach, we've selected best-in-class strategic partners to provide a broad range of industry-leading resources to our clients. Specifically, we've engaged Dynasty Financial Partners to leverage their scale to retain a variety of independent reporting, research and planning solutions that will allow us to deliver the very best technology and thought leadership available in the marketplace today.

Our team will be reaching out to you in the coming days to discuss any questions you may have about this change, including details about the smooth transition of your accounts to our new custodian partner, Schwab Advisor Services, if applicable.

While this is a significant change for our firm, what's most important is what won't be changing: our passionate commitment to serving you. We remain dedicated to helping you navigate the most effective approach to achieving your goals and dreams. We are fond of saying "You set the goals, we'll set the course" because we're confident that our advice and service will deliver an exceptional experience for you. And that's what Procyon Partners stands for.

Please visit our new website, www.procyonpartners.net, to learn more about our firm. We look forward to our continued partnership.

Sincerely,

| Phil Fiore | Jeff Farrar | Thomas Gahan | Louis Gloria Jr. | Christopher Foster |
|---|---|---|---|---|
| Chief Executive Officer | Chief Operating Officer | Managing Director | Managing Director | Chief Compliance Officer |
| Executive | Executive | | | Managing Director |
| Managing Director | Managing Director | | | |
| (475) 232-2700 | (475) 232-2701 | (475) 232-2702 | (475) 232-2703 | (475) 232-2704 |
| pfiore@procyonpartners.net | jfarrar@procyonpartners.net | tgahan@procyonpartners.net | lgloria@procyonpartners.net | cfoster@procyonpartners.net |

One Corporate Drive • Suite 225 • Shelton, CT 06484 • (844) PROCYON • www.procyonpartners.net

# Visit Our New Website!



Procyonpartners.net

**Read Story** ⊕

If you have received this email in error, please click here to unsubscribe.

Procyon Private Wealth partners, LLC and Procyon Institutional Partners, LLC are registered investment advisors.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of June, 2017, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.

Additionally, on June 16, 2017, a copy of the foregoing was served via e-mail and U.S. mail, first class, postage prepaid, to counsel for the Defendants as follows:

Corey Kupfer, Esq.
Kupfer & Associates, PLLC
5 Columbus Circle, Suite 800
New York, NY 10019
ckupfer@kupferlaw.com

*/s/ Stephen P. Rosenberg*
Stephen P. Rosenberg (CT26601)