## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UBS FINANCIAL SERVICES INC.,** | ) | **Case No.:** _____ |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **PHIL G. FIORE JR, JEFFREY H.** | ) | |
| **FARRAR, LOUIS GLORIA, and** | ) | |
| **THOMAS M. GAHAN,** | ) | |
| | ) | |
| **Defendants.** | ) | **JUNE 16, 2017** |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION
## FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff UBS Financial Services Inc. ("UBS"), by its attorneys, respectfully submits this Memorandum in support of its Motion for Injunctive and Other Relief.

### I.      Introduction & Nature of Action

Until June 2, 2017, defendants Jeffrey H. Farrar ("Farrar"), Louis Gloria ("Gloria"), and Thomas M. Gahan ("Gahan") were employed as financial advisors by UBS in its Stamford, Connecticut branch office. On that date, Farrar, Gloria, and Gahan resigned from UBS without prior notice and immediately joined UBS competitor Procyon Private Wealth Partners, LLC.[1] Procyon had been recently formed by their former UBS colleague, defendant Phil G. Fiore, Jr. ("Fiore"), who had been terminated by UBS in November 2016.  (Fiore, Farrar, Gloria, and Gahan are referred to herein collectively as "Defendants.")

---

[1] Procyon Partners, LLC, Procyon Private Wealth Partners, LLC, and Procyon Institutional Partners, LLC (collectively, "Procyon") were formed by defendant Fiore in early 2017. Since June 2, 2017, all Defendants have become employed by Procyon in its Shelton, Connecticut office.

At UBS, Defendants had been part of a team of financial advisors, institutional consultants, and support staff known at the FDG Group who managed approximately $8 billion in assets for individual and institutional UBS clients generating approximately $6 million in annual revenue.  As set forth in the accompanying affidavits, almost immediately after Farrar, Gloria, and Gahan joined Procyon, Defendants began aggressively soliciting UBS clients to leave UBS and do business instead with them at Procyon. Moreover, Defendants used confidential UBS client information to accomplish their carefully planned efforts to solicit firm clients. Defendants' solicitation of UBS clients and misuse of confidential UBS client information, which continues unabated, is in direct breach of non-solicitation and non-disclosure agreements they signed at UBS.

Defendants Farrar, Gloria, and Gahan purport to invoke the Protocol for Broker Recruiting (the "Protocol") and claim it allows them to solicit UBS clients and use UBS client information, notwithstanding the contracts they signed.  The Protocol, however, does not permit Farrar, Gloria, and Gahan to solicit and use information regarding clients they did not personally introduce to the team. This includes, importantly, clients introduced by Fiore, who comprise a substantial part of their claimed client list. Fiore himself did not resign under the Protocol and is not entitled to its protections. He claims not to be soliciting, but the evidence shows that he is.

Notably, Defendants' solicitation efforts have included making deliberately misleading statements to clients and the public at large that their former UBS team, the FDG Group, "is now" Procyon, or that Procyon was "formerly known as FDG Group," when in fact Defendants constituted only part of the FDG Group and the other members of the FDG Group – including two founding members – remain at UBS. Defendants' blatant and plainly intentional misrepresentations have caused substantial client confusion and concern.

It also appears Farrar, Gloria, and Gahan, while still employed by UBS, conspired with Fiore after his termination to begin improperly competing with UBS. UBS believes Fiore – with the knowledge and acquiescence of the other defendants – for months had been telling clients about the plan to set-up Procyon and soliciting those clients to move their business to Procyon once the firm was operational. In one instance, the FDG Group received a set of March 2017 board minutes from a UBS client indicating that Fiore had solicited the client, and yet, rather than informing UBS management, one of the defendants stated he was going to ask that the minutes be revised to clarify Fiore had not been at the board meeting.

Defendants' conduct constitutes a breach of the non-solicitation provisions contained in multiple agreements executed during their UBS employment, misappropriation of trade secret, breach of their fiduciary duties and duties of loyalty, and unfair competition. Accordingly, UBS seeks the Court's intervention to secure return of UBS's trade secret and confidential client information, and to otherwise require Defendants to comply with their contractual and legal obligations.

In this action, UBS temporary injunctive relief pending arbitration of this dispute to protect itself from the irreparable harm that it will incur from four former employees' breach of their contractual non-solicitation and non-disclosure obligations, misappropriation of UBS's trade secrets and confidential client information, and unfair competition in violation of their contractual, legal, and fiduciary duties.

UBS is filing, concurrently with the filing of this action, an arbitration against Defendants before FINRA Dispute Resolution on the merits of the dispute seeking damages and permanent injunctive relief.

## II.   Statement of Facts

The following are drawn from the affidavits submitted in this action.

### A.   Defendant Fiore Agreed To Not Solicit UBS's Clients And To Preserve The Confidentiality Of UBS's Confidential Information.

Defendant Fiore was a financial advisor in UBS's Stamford office from April 2009 until UBS terminated his employment on November 30, 2016. Affidavit of Frank Minerva ("Minerva Aff."), ¶¶6, 9, & 20. By virtue of his UBS employment, Fiore had access to confidential UBS information concerning, among other things, the identity of UBS clients he serviced, their names and contact information, their financial circumstances, their investment objectives and account performance reporting, and the assets and securities held by them in their UBS accounts. *Id.*, ¶10.

Throughout his UBS employment, Fiore voluntarily signed various Transition Agreements and Deferred Cash Award Agreements ("DCA Agreements") in which, *inter alia*, in consideration for the payments he was to receive from UBS, he agreed to restrictive covenants pertaining to solicitation of clients and the use and dissemination of confidential information. *Id.*, ¶11. Paragraphs 5 and 6 of the April 2009 Transition Agreement state:

> Non-Solicitation of Clients: In the event Employee's employment with UBSFS is terminated for any reason whatsoever, whether voluntarily or involuntarily, Employee agrees, for a period of one year from the date of termination or until such time that all amounts owed by the Employee to UBSFS and all related entities have been fully repaid, whichever is earlier, to not solicit, directly or indirectly, any of the clients who maintain accounts at UBSFS ("Clients of UBSFS") whom Employee serviced during his/her employment at UBSFS or other Clients of UBSFS whose names became known to Employee while in the employ of UBSFS.
>
> "Solicit" as set forth in this paragraph means that the Employee will not initiate, whether directly or indirectly, any contact or communication of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client or that may have the effect of inviting, encouraging or requesting a client:
>
> (a)   to transfer his/her UBSFS account(s) to the Employee or his/her

new employer; or

(b)   to open a new account with Employee or his/her new employer; or

(c)   to otherwise discontinue his/her existing relationship with UBSFS.

<u>Confidentiality of Client Information:</u> All information concerning Clients of UBSFS, former clients of UBSFS and prospective clients of UBSFS must be treated as confidential and must not be disclosed to anyone outside of UBSFS unless the disclosure is expressly authorized by the client, required by law, rule, regulation or legal process. Employee further expressly agrees that, in the event Employee's employment is terminated for any reason whatsoever, whether voluntarily or involuntarily, Employee may not take any records or information referring or relating to Clients of UBSFS, former clients of UBSFS and prospective clients of UBSFS, whether originals or copies, in hard copy or computerized form.

Exhibit A (2009 Transition Agreement) to the Complaint ("Compl. Ex.").[2]

While at UBS, Fiore was a member of a financial advisor and institutional consulting team with defendants Farrar, Gloria, and Gahan, as well as UBS financial advisors Steve DesRochers ("DesRochers") and Dean Gaugler ("Gaugler"), among others. Minerva Aff., ¶12. Fiore, DesRochers and Gaugler were the founding members of the FDG Group. *Id.* The FDG Group was also supported by a number of non-producing staff employees who played important roles in communicating with and otherwise servicing the UBS clients of the team. *Id.*, ¶14.

In February 2016, Fiore executed a Financial Advisor Team Agreement with the other financial advisors in the FDG Group (the "February 2016 Team Agreement," Compl. Ex. G). Minerva Aff., ¶15. In that Agreement, Fiore expressly agreed that, upon the termination of his employment with UBS, he would be prohibited from soliciting any clients of UBS serviced by the FDG Group:

Upon termination of employment of any Team Member or former Team Member,

---

[2] Fiore executed similar agreements in 2011, 2012, 2014, 2015, and 2016, each of which contained comparable post-employment restrictions on solicitation of clients and non-disclosure of client information. Minerva Aff., ¶11; *see* Compl. Ex. B (2011 Transition Agreement), at p. 3, ¶¶5 & 6; Compl. Ex. C (2012 Transition Agreement), at p. 3, ¶¶5 & 6; Compl. Ex. D (2014 DCA Agreement), at pp. 7-8, ¶¶7 & 8; Compl. Ex. E (2015 DCA Agreement), at pp. 5-6, ¶¶4 & 5; Compl. Ex. F (2016 DCA Agreement), at pp. 7-8, ¶¶7 & 8.

the departing Team Member or former Team Member agrees that, in addition to any other non-solicitation obligations he/she may have in any other agreement with UBS or its predecessors, including but not limited to those contained in:

...
   • Employee Transition [Agreement]
...

he/she will not solicit, for a period of one year from the date of termination of the departing Team Member's employment, any clients of [UBS] serviced by the Team.

Compl. Ex. G, at p. 5, ¶11(A).

The February 2016 Team Agreement further provided that the non-solicit in that Agreement would not "apply to client accounts the departing Team Member introduced to the Team either at its inception or during its existence" unless the such solicitation was "prohibited by a non-solicitation provision in another agreement...." Compl. Ex. G, at p. 5, ¶11(B). The Transition Agreements and DCA Agreements constitute other agreements that prohibit solicitation of all UBS accounts.

As a financial advisor, Fiore was also provided, and was required to read and comply, with all firm policies and procedures, including the UBS Financial Services, Inc. Code of Conduct and Investment Advisor Code of Ethics (the "Code of Conduct"). Minerva Aff., ¶18. In the Code of Conduct, Fiore agreed, among other things:

> [A]ll information concerning Firm clients, former clients and prospective clients must be treated as confidential and must not be disclosed to anyone outside the Firm unless the disclosure is expressly authorized by the client; required by law, rule, regulation or legal process; or specifically allowed by the Firm's privacy policies...

*Id*. Fiore also agreed:

> Upon the termination of your [UBS] employment, you may not retain or take with you any Firm property or assets, including any writings, files, documents or other records that contain client information, including information maintained electronically, such as disks, e-mail, computer databases, video, microfiche and tape recordings, or any other Firm confidential information.

*Id*. In connection with his employment at UBS, Fiore agreed to be bound by the Code of

Conduct, agreed to maintain the confidentiality of UBS's Confidential Information and acknowledged that he would not be permitted to retain, disclose or utilize any of UBS's Confidential Information after the termination of his UBS employment. *Id.*, ¶19.

### B. Farrar, Gloria, And Gahan Agreed To Not Solicit UBS's Clients They Did Not Introduce To The FDG Group And To Preserve The Confidentiality Of UBS's Confidential Information

Until June 2, 2017, defendants Farrar, Gloria, and Gahan were also employed as UBS financial advisors in the Stamford office. *Id.*, ¶33. During their UBS employment, Farrar, Gloria, and Gahan worked as members of the FDG Group. *Id.*, ¶22.

Following Fiore's termination from UBS in November 2016, Farrar, Gloria, and Gahan signed a new Financial Advisor Team Agreement with DesRochers and Gaugler[3] in December 2016 (the "December 2016 Team Agreement", Compl. Ex. H). Minerva Aff., ¶23. The December 2016 Team Agreement governed the pool of accounts serviced by the remaining members of the FDG Group, allowing each team member to earn a split percentage of commissions and revenue generated on the combined team book. *See* Minerva Aff., ¶24.

In the December 2016 Team Agreement, Farrar, Gloria, and Gahan expressly agreed that, upon the termination of their employment with UBS, they would be prohibited from soliciting any clients of UBS serviced by the FDG Group, unless they introduced the client to the team:

> If the employment of any Team Member (current or former) terminates for any reason, that Team Member will not, for a period of one year from the employment termination date, solicit any clients that were serviced by the Team. **This provision does not apply to client accounts the departing Team Member introduced to the Team, either at its inception or during its existence.** Nothing in this Non-Solicitation provision limits any rights UBS or any Team Member may have under the Protocol for Broker Recruiting ("Protocol").

---

[3] UBS is not party to the December 2016 Team Agreement, but is expressly identified as a third-party beneficiary with the right to enforce the agreement's non-solicitation covenant. Compl. Ex. H (December 2016 Team Agreement), at p. 2, ¶7.

Compl. Ex. H, at p. 2, ¶5 (emphasis in original).

Throughout their UBS employment, Farrar, Gloria, and Gahan also repeatedly certified to UBS that they would comply with UBS's Code of Conduct, by which they agreed, among other things, that they would maintain as confidential all UBS client information and business information; and that they would not retain, disclose, or any UBS confidential or proprietary information after the termination of their UBS employment. Minerva Aff., ¶¶26-27; *see also id.*, ¶18.

### C.  Defendants' Wrongful Conduct

Defendant Fiore was terminated by UBS on November 30, 2016. Defendants Farrar, Gloria and Gahan resigned from UBS on June 2, 2017 to join Fiore at Procyon.

As set forth in detail below, almost immediately after Farrar, Gloria, and Gahan joined Procyon, Defendants, using confidential UBS client information, began aggressively soliciting UBS clients to leave UBS and do business instead with them at Procyon. Defendants' solicitation of UBS clients and use of confidential UBS client information breached their agreements with UBS.  In addition, it appears Defendants began competing against UBS during the six-month period between defendant Fiore's termination and when defendants Farrar, Gloria and Gahan resigned.

### 1.  Defendants' Wrongful Conduct During November 30, 2016 – June 2, 2017

Without the benefit of discovery at this point in this litigation, UBS's evidence of Defendants' pre-resignation conduct is necessarily limited. Nonetheless, UBS has obtained some evidence suggesting that Fiore was violating his non-solicitation obligations during this interim period, having preliminary discussions with clients so that they would be ready to move as soon as the others resigned. UBS has also obtained evidence suggesting that defendants Farrar, Gloria

and Gahan were aware of Fiore's activities and coordinated with him with respect to such preliminary discussions with clients even though they were still UBS employees.

UBS has obtained a copy of the minutes of the March 20, 2017 semi-annual meeting of one of the FDG Group's foundation clients. Affidavit of Lisa Giordano ("Giordano Aff."),  ¶4. The minutes reflect that Fiore had been in contact with the board to advise them of his departure from UBS and plan to form a new firm:

- "Phil Fiore was absent as a financial advisor, having departed from UBS and is in the process of opening a new firm."

- "[T]he meeting was adjourned after the Chairman remarked that he would be in touch with the Secretary to establish a date for the October meeting when he had a chance to talk further with Mr. Fiore since the spirit of the Board was to continue with Mr. Fiore no matter where he goes to conduct his business."

*Id.*, ¶¶5-6; Minerva Aff., ¶51. In addition, the minutes also reflect that the Board had received "a package that had been provided by Phil Fiore, through UBS." Minerva Aff., ¶52. The minutes then proceed to recount the "gist of the report from Mr. Fiore." *Id.*

The board minutes were emailed by the foundation's attorneys to UBS in care of Fiore at his former UBS work address. *See* Giordano Aff., Ex. A. Giordano also received a copy of the email attaching the minutes. *Id.*, ¶4. After reading the minutes, and becoming concerned that it appeared Fiore was attendance at the board meeting, Giordano printed the minutes and brought a copy to defendant Farrar. *Id.*, ¶¶5 & 7.

Giordano watched as Farrar read the minutes. *Id.*, ¶7. She then told him that it seemed to her that Fiore was at the meeting. *Id.*, ¶8. Farrar told Giordano that Fiore was not at the meeting and that she shouldn't believe rumors about what Fiore was doing. *Id.*, ¶¶8 & 10. Farrar then told Giordano that he was going to contact the law firm and have them change the minutes to reflect that Fiore was not present at the board meeting. *Id.*, ¶9.

Defendant Farrar did not inform UBS management of the contents of the minutes or Fiore's apparent breach of his non-solicitation obligations or that the client apparently had already decided to follow him. Minerva Aff., ¶53. Instead, upon information and belief, Farrar contacted the client and asked that the reference to Fiore being at the meeting be deleted and the minutes reissued.

In addition, defendants Farrar, Gloria, and Gahan, on information had been planning their departure from UBS for several months and coordinated with Fiore in setting up Procyon. *See id.*, ¶55. Farrar, Gloria and Gahan hid their plans from their teammates DesRochers and Gaugler.

To that end, on June 1, 2017, the day before their mass departure from UBS, Farrar, Gloria, and Gahan informed the FDG Group staff members that they would be having a team bowling event. *Id..* However, rather than taking the staff out bowling, Farrar, Gloria, and Gahan instead brought them to Procyon's office and proceeded to solicit them to join the advisors at their new employer. *Id.* This sort of action makes clear that Farrar, Gloria and Gahan had been working for months with Fiore (during a time in which he was improperly soliciting UBS clients) to blindside UBS in an effort to lift out $6 million in annual revenue.  Along with Farrar, Gloria, and Gahan's resignation from UBS on June 2, 2017, FDG Group support staff Christopher Foster, Robert Ossers, and Richard Appaluccio resigned from UBS to join Procyon. *Id.*, ¶56.

### 2.   Defendants' Wrongful Conduct After June 2, 2017

On June 2, 2017, Defendants Farrar, Gloria, and Gahan resigned from UBS without prior notice and immediately began working for Procyon. *Id.*, ¶¶33-34.

<u>Misappropriation Of UBS's Confidential Information</u>. Along with their resignation letters, Farrar, Gloria, and Gahan submitted to their UBS branch manager lists of UBS clients

that they planned to solicit, which included the UBS confidential and proprietary information of clients' names, addresses, phone numbers, email addresses and account titles.[4] *Id.*, ¶¶36 & 38. One list was comprised of various institutional consulting clients serviced by the FDG Group; the other list was comprised of various private wealth clients serviced by the FDG Group. *Id.*, ¶37. Defendants Farrar, Gloria and Gahan, on information and belief, retained a copy of the client lists they submitted with their resignation letters.

Despite the December 2016 Team Agreement's clear prohibition on solicitation, by any FDG Group member, of UBS clients that member did not introduce to the team, many of the clients identified on the list were not introduced to the FDG Group by Farrar, Gloria, and/or Gahan. *Id.*, ¶¶39-40. Instead, they are clients Farrar, Gloria, and Gahan came to know through their participation in the FDG Group. *Id.* As such, Farrar, Gloria, and Gahan are not entitled to have in their possession following their resignation the proprietary contact and other confidential information relating to these UBS clients.

Improper Solicitation Of UBS Clients. Almost immediately after defendants Farrar, Gloria and Gahan joined Procyon, Defendants, in violation of the agreements they executed during their UBS employment, began soliciting UBS clients, including FDG Group clients that defendants Farrar, Gloria and Gahan did not introduce to the team, to leave UBS and do business instead with Defendants at Procyon. *See id.*, ¶¶41-43.

That same day – i.e., June 2, 2017 – Defendants sent a blast email (the "June 2 Blast

---

[4] In their resignation letters, Defendants Farrar, Gloria and Gahan purported to invoke the "Protocol for Broker Recruiting" (the "Protocol"), to which both UBS and Procyon are signatories.  Under the Protocol, signatory firms agree not to enforce their rights regarding non-solicitation of clients if the conditions of the Protocol are met, allowing brokers moving from one Protocol firm to another to take the "client name, address, phone number, email address, and account title of the clients that they serviced while at the firm."  However, the Protocol expressly carves out from its application accounts serviced under written financial advisor team agreements.  Those agreements, even under the Protocol, are controlled by their own terms with respect to designating what clients may and may not be solicited upon a financial advisor's departure. A copy of the Protocol is attached to the Complaint as Exhibit I.

Email," Compl. Ex. J) to UBS clients informing the clients of their new affiliation with Procyon and stating "[o]ur team will be reaching out to you in the coming days to discuss any questions you may have about this change, including the details about the smooth transition of your accounts to your new custodian partner…." *Id*.; Minerva Aff., ¶¶40-41.

In addition to the June 2 Blast Email, defendant Fiore also sent a June 4, 2017 email (the "June 4 Fiore Email") to a UBS client relationship in which he states: "As you can see I have officially set up our own independent RIA – called Procyon Partners.  The team resigned on Friday from UBS and we are open for business!  We have spoken with [client representative] and he would like the [client] to stay under my guidance at our new firm.  I have sent him the paperwork to that affect…." Minerva Aff., ¶45(a).

UBS was also forwarded a chain of emails that includes an email from a board member of a UBS client, dated June 5, 2017 (the "June 5 Chain Email"), that states as follows: "The FDG Group has left UBS which manages the endowment account.  I believe we came in through Richard Bell but Jeff Farrar is part of FDG and has left UBS.  I received an email from one of his partners, Phil Fiore." *Id*., ¶45(b).

In addition to these client emails, Defendants have made phone calls to UBS clients, including multiple FDG Group clients defendants Farrar, Gloria and Gahan did not introduce, soliciting the clients to move their business to Procyon. *Id*., ¶43

Misleading And Deceptive Communications With UBS Clients.  Defendants' communications not only unlawfully used confidential information, but have also misled the UBS clients to whom they were made as to the nature of Farrar, Gloria, and Gahan's departure from UBS.  Specifically, Defendants have sought to give clients the impression that the entire FDG Group has moved to Procyon, including by stating in the June 2 Blast Email that "The

Team of FDG Group is Now Procyon Partners," by stating on their LinkedIn biographies that "Formerly known as the FDG Group, Procyon Partners made their move to independence in June of 2017," and by telling clients during phone calls that the entire team had moved. Minerva Aff., ¶¶41-43, 46; *see also* Compl. Ex. J.

Similarly, the June 4 Fiore Email and June 5 Chain Email further underscore the pervasiveness of Defendants' misleading communications. *See* Minerva Aff., ¶¶45(a)-(b); *see also* Minerva Aff., Ex. 2 (June 4 Fiore Email)("The team resigned on Friday from UBS...."); Minerva Aff., Ex. 3 (June 5 Chain Email)("The FDG Group has left UBS which manages the endowment account....").

These transparently intentional attempts at deceiving clients succeeded. Since June 2, 2017, UBS clients have reported to UBS that they have been confused and misled to believe that the entire FDG Group left UBS to join Procyon. Minerva Aff., ¶¶46-48. UBS clients have also expressed concern over who is managing and servicing their assets at UBS due to their mistaken belief that the entire FDG Group has left UBS. *Id.* In truth, the FDG Group, including founding members DesRochers and Gaugler, continues to exist at UBS and continues to service the team's clients. *Id.*, ¶47.

### D. **UBS's Efforts To Ensure Voluntary Compliance**

UBS has made multiple attempts to secure voluntary return of its confidential and trade secret information and compliance by Defendants of their duties, but these attempts have been hindered through Defendants' misrepresentations as well as at times rebuffed.

Shortly after the resignation of Farrar, Gloria, and Gahan, UBS, through its counsel, sent a letter demanding, among other things, that (a) Fiore immediately cease from soliciting, directly or indirectly, any and UBS clients; (b) Farrar, Gloria, and Gahan immediately cease from

soliciting any and UBS clients that they did not introduce to UBS; and (c) Defendants return any and all UBS confidential and propriety information. Affidavit of James L. Komie ("Komie Aff."), ¶¶3-4.

In response to UBS's demands regarding Fiore's solicitation of UBS clients, Defendants' counsel stated: "Mr. Fiore has not solicited and has no intention to solicit any clients in violation of any of his agreements with UBS." *Id.*, ¶6. In a subsequent communication, Defendants' counsel again stated that "[r]egarding the allegations of Mr. Fiore soliciting clients, he is not reaching out to clients or otherwise soliciting." *Id.*, ¶11.

Further, in response to UBS's demand for Farrar, Gloria, and Gahan to cease their solicitation of UBS clients they did not introduce to UBS and their return of UBS confidential and propriety information relating to those same clients, Defendants, through their counsel, have persisted in asserting their alleged right to solicit clients that they did not introduce to UBS and to have in their possession confidential UBS client information. *Id.*, ¶7. To date, Farrar, Gloria, and Gahan have refused to comply with UBS's demand to immediately cease solicitation of UBS clients they did not introduce to the FDG Group.

## III.   <u>Legal Argument</u>

The clients at issue are subject to the restrictive covenants contained in the agreements executed by Defendants during their UBS employment. By Farrar's, Gloria's, and Gahan's unlawful misappropriation of UBS's confidential and trade secret client records, soliciting of UBS clients they did not introduce to the FDG Group to transfer their accounts to Procyon, and deceptive and misleading communications with UBS clients, Farrar, Gloria, and Gahan have deliberately and openly violated their contractual provisions, fiduciary duties to UBS, and applicable Connecticut law. Further, by defendant Fiore's solicitation of UBS clients, deceptive

and misleading communications with UBS clients, and possession of UBS's confidential and trade secret client records, Fiore has also violated his contractual provisions with UBS and applicable Connecticut law as well as engaged in unfair competition.

UBS has been and continues to be irreparably damaged by the actual and threatened loss of client goodwill and loss of revenue caused by the Defendants' actions. UBS has provided the Defendants with numerous opportunities to comply, and they have failed to comply voluntarily. Accordingly, UBS seeks the Court's assistance in securing and protecting UBS's trade secret and confidential client information and stopping the Defendants' knowing and intentional wrongful conduct.

### A. Numerous Courts Have Recognized The Right To Injunctive Relief Under Closely Analogous Circumstances

Numerous courts applying Connecticut law have granted injunctive relief to securities firms to restrain individual registered representatives from violating applicable state law as well as non-solicitation and confidentiality provisions of the agreements that they have entered into with securities brokerage firms. *See, e.g.*, *Morgan Stanley Smith Barney LLC v. O'Brien*, No. 3:13cv1597, 2013 WL 5962103 (D. Conn. Nov. 6, 2013); *UBS Fin. Servs. Inc. v. Junggren*, No. 3:11cv437, 2011 WL 1831587 (D. Conn. Mar. 30, 2011); *Smith Barney Div. of CitiGroup Global Mkts. Inc. v. Smith*, No. 3:09cv597 (JCH) (D. Conn. Apr. 16, 2009)(directing return of customer information and enjoining solicitation pending FINRA arbitration); *MacDermid, Inc. v. Raymond Selle & Cookson Group PLC*, 535 F. Supp. 2d 308 (D. Conn. 2008)(granting a preliminary injunction enforcing a 12-month customer non-solicitation provision and finding that the restraint was reasonable); *United Rentals, Inc. v. Bastanzi*, No. 3:05cv596, 2005 WL 5543590 (D. Conn. Dec. 22, 2005)("The restrictive covenant provides a fair degree of protection

to the employer. Given the nature of the plaintiff's customer-driven business, it is reasonable for it to be concerned that an employee with extensive relationships with its customers, such as the plaintiff, might be in a position to threaten its business if the employee works for a competitor.").

The right to injunctive relief under such circumstances has also been upheld in a plethora of decisions by federal circuit and district courts across the country. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. McClafferty*, 287 F. Supp. 2d 1244, 1250-51 (D. Haw. 2003); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dunn*, 191 F. Supp. 2d 1346, 1352 (M.D. Fla. 2002); *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 80-81 (D.D.C. 2001); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Napolitano*, 85 F. Supp. 2d 491, 499-500 (E.D. Pa. 2000); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rahn*, 73 F. Supp. 2d 425, 429-30 (S.D.N.Y. 1999).

In view of the consistency with which federal courts in Connecticut and elsewhere have enforced essentially identical contracts, UBS's right to such relief is clear.

### B. UBS Satisfies All The Requisites For Injunctive Relief And Is Entitled To The Relief Sought

Preliminary injunctive relief is justified where the moving party can demonstrate: "(1) either likelihood of success on merits or sufficiently serious questions going to merits to make them fair ground for litigation and balance of hardships tipping decidedly in movant's favor, and (2) irreparable harm in absence of injunction." *Genworth Fin. Wealth Mgmt., Inc. v. McMullan*, 721 F. Supp. 2d 122, 125 (D. Conn. 2010)(granting plaintiff investment advisor's request for injunctive relief prohibiting individual defendant former-employees from among other things utilizing misappropriated client information, lists and data).

The standard for granting a temporary restraining order is identical to the standard for granting a preliminary injunction, although the contours of the order itself will differ. *United Rentals, Inc. v. Myers*, No. 03-cv-589, 2003 WL 23507021, at *3 (D. Conn. Apr. 22, 2003) ("standard for TRO is the same as preliminary injunction standard") (*citing Local 1814 Int'l Longshoremen's Assoc. AFL-CIO v. New York Shipping Assoc., Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992)). Temporary restraining orders are issued where, like here, there is a "likelihood that harm will result before there is an opportunity to hold a hearing on a motion for a preliminary injunction." *Amirault v. Shaughnessy*, No. H-84-113, 1984 WL 49161 19644 (D. Conn. Feb. 8, 1984; *see also* 1A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §2950, at 274 (3d ed. 2013).

As set forth below, UBS can satisfy these requirements and, therefore, should be granted the injunctive and other relief sought.

### 1.   UBS Is Likely To Succeed On The Merits

UBS has brought claims against Defendants for breach of the non-solicitation and non-disclosure provisions contained in multiple agreements they executed during their UBS employment, misappropriation of trade secrets in violation of the Connecticut Uniform Trade Secrets Act ("CUTSA"), violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), breach of fiduciary duty, and unfair competition. UBS has a sufficient likelihood of success on the merits of these claims to warrant, at minimum, the temporary restraints sought.

### (i)   Defendants Breached Their Respective Agreements At Issue

UBS is entitled, under well-settled principles of Connecticut law[5], to the issuance of a

---

[5] The agreements signed by Fiore specify that New Jersey law will govern their enforcement. The Transition Agreements and DCA Agreements at issue have an express New Jersey choice of law provision. In New Jersey, an employee's covenant "will be given effect if it is reasonable under all of the circumstances of its particular case."

temporary injunction to enforce the restrictive covenants contained in the agreements executed by Defendants to preserve the *status quo* and prevent the irreparable injury which would result from their continued breach of their obligations.

Connecticut courts have enforced confidentiality and non-solicitation agreements under similar circumstances to protect an employer's legitimate interest in its customer relationships. *See, e.g., CitiGroup Global*, No. 3:09cv597 (D. Conn. Apr. 16, 2009)(directing return of customer information and enjoining solicitation pending FINRA arbitration); *MacDermid*, 535 F. Supp. 2d at 316 (granting a preliminary injunction enforcing a 12-month customer non-solicitation provision and finding that the restraint was reasonable); *see also New Haven Tobacco Co. v. Perrelli*, 559 A.2d 715 (Conn. App. Ct. 1989)(finding non-solicitation and confidentiality agreements inherently more reasonable than traditional non-compete agreements and, therefore, they are treated more leniently under the law). Unquestionably, the non-solicitation covenants contained in the various agreements signed by the Defendants are enforceable under Connecticut law.

The evidence amply demonstrates that Defendants have already violated both their covenant not to solicit UBS's clients as well as their contractual confidentiality obligations, and will continue to do so unless otherwise enjoined. While Fiore, through his attorney, has claimed he has not and will not be soliciting UBS clients in violation of his agreements (Komie Aff., ¶¶6 &11), based on UBS's subsequent discussions with UBS clients, it is evident that Fiore already

---

*Whitmyer Bros. v. Doyle*, 274 A.2d 577, 581 (NJ 1971); *see also Solari Indus., Inc., v. Malady*, 264 A.2d 53 (NJ 1970); *Karlin v. Weinberg*, 390 A.2d 1161 (1978). Under *Solari* and its progeny, the courts have developed a three-part test to determine the reasonableness of a restrictive employment covenant: (a) the covenant must be no more restrictive than is necessary to protect the legitimate business interests of the employer; (b) it must impose no undue hardship on the employee; and (c) it must not be injurious to the public interest. *See Mailman, Ross, etc. v. Edelson*, 444 A.2d 75, 77 (NJ Super 1982). When tested against these criteria, the restrictive provisions in the Transition Agreements and DCA Agreements are reasonable and enforceable.

has contacted some of them to transfer their accounts to Procyon, his new firm (Minerva Aff., ¶¶41-43, 45). Further, those communications with UBS clients show Farrar, Gloria, and Gahan, or staff working on their behalf, have been contacting FDG Group clients whom Farrar, Gloria, and/or Gahan did not introduce to the team in order to solicit them to transfer their accounts. Defendants' actions constitute an unequivocal breach of the contractual promises at issue.

Defendants Farrar, Gloria, and Gahan purport to invoke the Protocol and claim it allows them to solicit UBS clients and use UBS client information, notwithstanding the contracts they signed. The Protocol, however, does not permit Farrar, Gloria, and Gahan to solicit and use information regarding clients they did not personally introduce to the team. This includes, importantly, clients introduced by Fiore, who comprise a substantial part of their claimed client list. Fiore himself did not resign under the Protocol and is not entitled to its protections. He claims not to be soliciting, but the evidence shows that he is.

In short, Defendants agreed to comply with valid non-disclosure and non-solicitation provisions, and they have failed to do so. In light of their misconduct, UBS is likely to prevail on its breach of contract claim.

### (ii)  Defendants Have Misappropriated UBS's Trade Secrets

Defendants Farrar, Gloria, and Gahan have admittedly misappropriated UBS's trade secret information and provided it to Procyon, and they are using it to improperly solicit UBS's clients. To establish misappropriate of a trade secret, a plaintiff must prove: "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person ... (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was ... (ii) acquired under circumstances giving rise

to a duty to maintain its secrecy or limit its use... ."  Conn. Gen. Stat. §35-51(b).  Under

Connecticut law, a trade secret includes

> a compilation, program, method, technique, process, drawing, cost data or
> customer list that: (1) Derives independent economic value, actual or
> potential, from not being generally known to, and not being readily
> ascertainable by proper means by, other persons who can obtain economic
> value from its disclosure or use, and (2) is the subject of efforts that are
> reasonable under the circumstances to maintain its secrecy.

Conn. Gen. Stat. §35-51(d).

In determining whether a trade secret exists, the Connecticut Supreme Court has

stated:

> Some of the factors to be considered in determining whether given information
> is a trade secret are:  (1) the extent to which the information is known outside
> the business; (2) the extent to which it is known by employees and others
> involved in the business; (3) the extent of measures taken by the employer to
> guard the secrecy of the information; (4) the value of the information to the
> employer and to his competitors; (5) the amount of effort or money expended by
> the employer in developing the information; (6) the ease or difficulty with
> which the information could be properly acquired or duplicated by others.

*Town & Country House & Homes Services, Inc. v. Evans*, 150 Conn. 314, 319 (1963).

In this case, UBS's customer records and information qualify for trade secret protection

as both a "customer list" and as a "compilation" of information.  UBS's internal records and

proprietary databases contain (among other information) the names of actual and potential

customers, addresses, and unique investment characteristics and financial data pertaining to its

individual and institutional customers.  The information contained in UBS's records is not

readily available to the general public or UBS's competitors from a telephone book, library,

professional directory or other publicly available resource. Although UBS's competitors could

independently assemble the bits and pieces of the information compiled by UBS, competitors do

not have access to and cannot independently obtain without a substantial expenditure of time,

money, and effort the totality of that information. *See Dreamcatcher Software Dev., LLC v. Pop Warner Little Scholars, Inc.*, 298 F. Supp. 2d 276, 282 (D. Conn. 2004) (*citing Elm City Cheese Co. v. Federico*, 752 A.2d 1037, 1047 (Conn. 1999).[6]

As detailed in the Minerva Affidavit, UBS employs reasonable efforts to maintain the confidentiality of its customer information. Minerva Aff., ¶¶28-31. UBS employees, including Defendants, agree to be bound by firm-wide confidentiality policies set forth in the Code of Conduct, which require employees to not utilize or exploit UBS's customer records other than in the normal course of UBS's business. Minerva Aff., ¶¶18 & 26.

Connecticut has consistently afforded trade secret protection to an employer's confidential customer and proprietary information contained in databases within its internal computer system which are misappropriated by a former employee for his own personal benefit. *See, e.g.*, *Blue Cross Blue Shield of Conn., Inc. v. DiMartino*, No. 30 06 42, 1991 WL 127094 at *1-4 (Conn. Sup. Ct. July 2, 1991); *Weseley Software Dev. Corp. v. Burdette*, 977 F. Supp. 137, 145-46 (D. Conn. 1997). The protections afforded in these cases to data maintained in an employer's secured proprietary databases mirror the protections necessary to protect UBS's trade secrets in this case and prevent irreparable harm to UBS by their competitive use.

### (iii) <u>Defendants Have Engaged in Statutory and Common-Law Unfair Competition</u>

Defendants' actions also clearly violate the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §42-110 *et seq.* ("CUTPA"). CUTPA prohibits defendants from "engag[ing] in

---

[6] Numerous decisions have accorded trade secret status to customer information maintained by brokerage firms. *See Dunn*, 191 F.Supp.2d at 1350-51 (S.D. Fla. 2002)(enjoining departed brokers from disclosing customer information and soliciting Merrill Lynch customers even without a restrictive covenant contract finding customer lists and information contained therein to be protectable trade secrets); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Zimmerman*, No. 96-2412-JWL, 1996 WL 707107 at *2 (D. Kan. Oct. 1, 1996)("the Court concludes that the Documents improperly taken by the defendant constitute a compilation within the meaning of V.A.M.S. § 417.453(4) . . . . As a result, the Court concludes that . . . the Documents constitutes a trade secret").

unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. §42-110b. Courts analyze the following criteria in determining whether conduct violates CUTPA:

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness;

> (2) Whether it is immoral, unethical, oppressive or unscrupulous;

> (3) Whether it causes substantial injury to consumers, competitors or other businessmen.

*Am. Car Rental, Inc. v. Comm'r of Consumer Prot.,* 869 A.2d 1198, 1205 (Conn. 2005)(internal quotations and citations omitted). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* at 306; *see also Henderson v. Wells Fargo Bank, N.A.,* No. 3:13CV378 (JBA), 2017 WL 731780, at *7 (D. Conn. Feb. 21, 2017).

Defendants' deliberate misstatements that the entire FDG Group has moved to Procyon constitute an unfair trade practice. Their blast email states "The Team of the FDG Group is Now Procyon Partners." Their LinkedIn profiles similarly recited "Formerly known as the FDG Group, Procyon Partner made their move to independence…." Komie Aff., Ex. 3. Defendant have also used the same tactic in their conversations with clients. Minerva Aff. at ¶48. As result, clients are confused about whether the FDG Group continues at UBS and are worried about who is managing their money. *Id.* This deliberate tactic to mislead UBS clients is an unfair trade practice and a form of unfair competition.

In addition, Connecticut courts have consistently found that the misappropriation of confidential information violates CUTPA. *See Dumore & Assoc., Ltd. v. D'Allessio*, 2000 Conn. Super. LEXIS 114 at *44 (2000)(holding that defendant violated CUTPA because the defendant's taking of the plaintiff's documents containing its trade secrets without permission and using them in his business for competitive advantage satisfies the criteria for determining whether a practice is unfair under CUTPA); *see also Coria v. Libert*, 1997 Conn. Super. LEXIS 1847 at *9 (1997)(*citing Williams Ford, Inc. v. Hartford Courant, Co.*, 657 A.2d 212 (Conn. 1995) and *Conaway v. Prestia*, 464 A.2d 847 (Conn. 1983)).

Such conduct also gives rise to a claim of unfair competition under Connecticut common law. *See Schreyer v. Casco Products Corp.*, 97 F. Supp. 159, 167 (D. Conn. 1951), *aff'd in relevant part at* 190 F.2d 921 (2d Cir. 951), *cert. denied* 72 S. Ct. 360, 342 U.S. 913, 96 L. Ed. 683 (1951)(holding that the essential elements of a cause of action for unfair competition are a disclosure in confidence, of something novel, that defendant appropriated for his own use).

Here, Farrar, Gloria, and Gahan (at the very least) took UBS's trade secret protected confidential information, have provided it to Procyon, their new employer, and have used it to solicit UBS's clients to transfer their business from UBS to Procyon. Further, Defendants have misrepresented the nature of their transition in that they deliberately gave UBS clients the impression that the entire FDG Group had left UBS for Procyon. *See* Minerva Aff., at ¶¶41-43, 45-48. Defendants' conduct is a clear violation of CUTPA and Connecticut's common law of unfair competition.

### (iv)  Farrar, Gloria, And Gahan Breached Their Duties of Loyalty to UBS

During the time that Farrar, Gloria, and Gahan were UBS employees, they owed UBS a fiduciary duty of loyalty that required them to act only in UBS's best interests. *See, e.g., Town &*

*Country*, 150 Conn. at 392-93; *Triangle Sheet Metal Works, Inc. v. Silver*, 222 A.2d 220, 224 (1966). Fundamental to an employer-employee relationship is the proposition that an employee is required to be loyal to his employer. *Id.* The employee is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties. *Id.*

The evidence suggests that Farrar, Gloria, and Gahan, began competing against UBS during the six-month period between Fiore's termination in November 2016 and when Farrar, Gloria, and Gahan resigned on June 2, 2017 to join Fiore at Procyon – *i.e.*, while they were still on the UBS payroll. In addition to their own actions taken in furtherance of their future employment with Procyon, Farrar, Gloria, and Gahan were also aware of Fiore's contact with at least one UBS client – and likely other clients – and yet failed to inform UBS management. This means that at least Farrar, Gloria, and Gahan likely breached their duty of loyalty to UBS when they planned their resignation. Moreover, Farrar, Gloria, and Gahan also breached their duties owed to UBS and when they misappropriated and unlawfully retained UBS's confidential information and used that information to solicit UBS clients to move their accounts to Procyon. In light of their misconduct, UBS is likely to prevail on its breach of fiduciary duties claim.

In summary, UBS has made a sufficient showing to establish a likelihood of its ultimate success. Accordingly, UBS has amply satisfied that requisite of injunctive relief.

### 2. UBS Is Threatened By Immediate And Irreparable Harm, And The Lack Of An Adequate Remedy At Law

Defendants continued use of UBS's client information and solicitation of UBS's clients, conduct expressly prohibited by the agreements discussed above, threatens UBS with continued irreparable harm if an injunction does not issue. Without an injunction, the continued use of

UBS's confidential information and solicitation of UBS's clients will result in the loss of client relationships and customer goodwill.

As a general principle, irreparable harm is presumed where a trade secret has been misappropriated and there is a danger that the misappropriator "will disseminate those secrets to a wider audience." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118-119 (2d Cir. 2009).  This is because "[a] trade secret once lost is, of course, lost forever" and as a result, such a loss "cannot be measured in money damages." *Weseley Software,* 977 F. Supp. at 145-146 (finding disclosure of trade secrets either intentionally or inadvertently to be inevitable in defendant's capacity as a competitor with his former employer); *North Atlantic Instruments, Inc. v. Haber,* 188 F.3d 38, 49 (2d Cir. 1999)(*quoting FMC Corp. v. Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir. 1984)).

Moreover, a breach of a restrictive covenant has been found sufficient in and of itself to justify the presumption of irreparable harm under Connecticut law. *See, e.g., Bastanzi*, 2005 WL 5543590 at *8 ("A number of Connecticut courts and courts in this district have held that irreparable harm may be assumed in cases where the plaintiff alleges a breach of a restrictive covenant."); *Weseley Software,* 977 F. Supp. At 144 ("Enforcement of the restrictive covenant is necessary to prevent irreparable harm. Loss of trade secrets is not measurable in money damages and is thus considered 'irreparable harm.'").

Indeed, Defendants recognized that under the UBS Code of Conduct, UBS would not have an adequate legal remedy for the taking and use of confidential client information. Defendants therefore expressly agreed that such activity would be enforceable by means of an injunction. Minerva Aff., ¶18. Moreover, Fiore further agreed that UBS would not have adequate legal remedy for a breach of the confidentiality and non-solicitation provisions of the agreements

he signed and that those covenants would be enforceable by means of an injunction. *See, e.g.,* Compl. Ex. A, at p. 4, ¶8.

Defendants assent to UBS's Code of Conduct, and Fiore's assent to the Transition Agreements, DCA Agreements, and February 2016 Team Agreement, demonstrates their knowledge and agreement of the severity of a breach of the restrictive covenants to which they agreed. *See North Atlantic Instruments, Inc.*, 188 F.3d at 48-49 (granting temporary injunction and enforcing restrictive covenant in employment contract where "Haber acknowledged in his Employment Agreement that a breach of the confidentiality clause would cause 'irreparable injury' to North Atlantic.").

UBS has already found compelling evidence indicating that Defendants breached the non-solicitation and non-disclosure covenants contained in their respective agreements. In this matter, Farrar, Gloria, and Gahan are not just using UBS's confidential and trade secret information solely for their own gain. They have given UBS's confidential and trade secret information to Fiore and Procyon and are, still to this day, jointly using that information to entice UBS's clients to transition their business to Procyon.

In view of the relevant contractual and other provisions, and under the applicable law discussed above, UBS has more than adequately established that it is exposed to irreparable harm and that it lacks an adequate remedy at law.

### 3. Balancing Of The Relative Hardships And The Public Interest Tips In UBS's Favor

The balance of equities tips decidedly in favor of UBS based on the harm it has suffered and will suffer. Defendants have breached their contractual non-solicitation and non-disclosure obligations, misappropriated UBS's trade secrets and confidential client information, and have

engaged in unfair competition with UBS in violation of their contractual, legal, and fiduciary duties. In response, UBS seeks from this Court nothing more than the return of the UBS's confidential client information they took and an injunction enforcing their non-solicitation agreements.

The balance is not shifted by any harm to Defendants resulting from an injunction, because there is no such harm (or, if any exists, it is minimal). To the contrary, an injunction would simply require Defendants to adhere to their contractual obligations. Merely requiring Defendants to live up to the promises that they made in exchange for adequate consideration is not any form of "harm" or "hardship."

Moreover, the restrictions on Defendants' activities as a result of an injunction are by no means severe. UBS is not seeking to foreclose Farrar, Gloria, or Gahan from competing with UBS, nor is it seeking to foreclose Defendants from making a living as financial advisors. Where, as here, a court is called upon to enforce a non-solicitation covenant, the slight restrictions such provisions impose on Defendants have routinely been held to be insufficient to preclude an injunction.

Finally, under the circumstances present here, the entry of an injunction will promote the public interest by upholding the sanctity of contracts, by protecting the confidentiality of information provided by customers in confidence, and by ensuring that competition in the securities industry is both vigorous and fair.

### 4.   UBS Is Entitled To Injunctive Relief Pending Arbitration On The Merits

The merits of the parties' dispute are to be determined in arbitration. Arbitration is required both by the parties respective agreements and pursuant to Rule 13804 of FINRA's Code of Arbitration Procedure. However, under Rule 13804, parties seeking temporary injunctive

relief must seek such relief in court. After the issuance of temporary injunctive relief, an expedited arbitration and hearing on the merits will be scheduled to commence within 15 days.

It is well-settled that courts can, and under appropriate circumstances must, grant injunctive relief to maintain the *status quo* pending arbitration of the controversy. The Second Circuit held that where a FINRA member elects to seek injunctive relief from a Court – as UBS has here – the Court is duty-bound to rule on the issue of injunctive relief, and cannot relegate the parties to the FINRA arbitration process. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Thorley*, 147 F.3d 229, 231-232 (2d Cir. 1998).

Simply put, UBS has the express right, both under the law and under the express terms of FINRA's Code of Arbitration Procedure, to seek injunctive relief in court pending arbitration. For all the foregoing reasons, UBS's application for a temporary restraining order and a preliminary injunction should be granted in its entirety.

### V.  <u>Conclusion</u>

For all the reasons discussed above, UBS has established all of the requisites for a temporary restraining order and a preliminary injunction.  A temporary restraining order should be issued on the terms set for specifically in UBS's Motion and Proposed Order, which is attached as Exhibits 1 and 2.  By providing this relief, this Court would merely be granting UBS the same relief that has been provided by innumerable courts throughout the country under essentially identical circumstances.

Dated at New Haven, Connecticut this 16th day of June, 2017.

Respectfully submitted,

PLAINTIFF, UBS FINANCIAL SERVICES INC.

*/s/ Stephen P. Rosenberg*
Stephen P. Rosenberg (CT26601)
LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street, Suite 300
New Haven, CT  06510
Telephone: 203.974.8700
Facsimile: 203.974.8799
sprosenberg@littler.com

James L. Komie (*pro hac vice pending*)
Michael D. Lee (*pro hac vice pending*)
HOWARD & HOWARD ATTORNEYS PLLC
200 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: 312.372.4000
Facsimile: 312.939.5617
jkomie@howardandhoward.com
mlee@howardandhoward.com

Its Attorneys

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of June, 2017, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.

Additionally, on June 16, 2017, a copy of the foregoing was served via e-mail and U.S. mail, first class, postage prepaid, to counsel for the Defendants as follows:

Corey Kupfer, Esq.
Kupfer & Associates, PLLC
5 Columbus Circle, Suite 800
New York, NY 10019
<u>ckupfer@kupferlaw.com</u>

/s/ Stephen P. Rosenberg
Stephen P. Rosenberg (CT26601)