**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UBS FINANCIAL SERVICES INC.,<br>        Plaintiff,<br><br>        v.<br><br>PHIL G. FIORE, JR., JEFFREY H. FARRAR,<br>et al.,<br>        Defendants. | No. 17-cv-993 (VAB) |

## ORDER ON MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

UBS Financial Services Inc. ("UBS" or "Plaintiff") brings this action against Phil G.

Fiore Jr., Jeffrey H. Farrar, Louis Gloria, and Thomas M. Gahan (collectively, "Defendants"),

alleging breach of contract, misappropriation of trade secrets under the Connecticut Uniform

Trade Secrets Act ("CUTSA"), violations of the Connecticut Unfair Trade Practices Act, Conn.

Gen. Stat. § 42-110a, *et. seq.* ("CUTPA"), breach of fiduciary duties owed to UBS, and unfair

competition.  ECF No. 1.  Pending before the Court is Plaintiff's motion for a temporary

restraining order and a preliminary injunction against the Defendants, dated June 16, 2017,

which the Court construes as a motion for preliminary injunction.  ECF No. 3.

Following a telephonic status conference held on June 20, 2017, ECF No. 21, the Court

set a briefing schedule and hearing date.  ECF No. 22.  Defendants filed their response to the

motion for a preliminary injunction on July 10, 2017.  ECF No. 53. The Court held a preliminary

injunction hearing and heard evidence on July 17, 2017.

For the reasons that follow, the Court **DENIES** Plaintiff's motion for a preliminary

injunction in its entirety.

1

## I.    FACTUAL FINDINGS

UBS is a Delaware corporation with its principal place of business in New Jersey.

Compl. ¶ 9, ECF No. 1.  UBS also transacts business from its offices in Stamford, Connecticut

("Stamford Office").  *Id.*  Defendants are individuals who were formerly employed by UBS as

financial advisors in the Stamford office.  *Id.* ¶ 10.  While at UBS, Defendants worked as part of

a financial advisor team (the "FDG Group") with Steve DesRochers and Dean Gaugler, among

others.  *Id.* ¶ 15.  Some of the FDG Group's clients were introduced to them by "UBS financial

advisors outside of their team," *id.* ¶ 17, while others were brought to the FDG Group and UBS

by Mr. Fiore and his team, which included Mr, Farrar, Mr. Gloria, Mr. DesRochers, and Mr.

Gaugler, when they joined UBS in 2009.  Fiore Decl. ¶ 9.

In 2016, the FDG Group serviced client accounts with approximately $8 billion in assets

under management, generating nearly $6 million in annual gross revenue.  Compl. ¶ 16.  The

type of work done by the FDG Group and by Defendants' includes institutional consulting, on

behalf of "institutional clients – often ERISA plan sponsors, such as pension or 401(k) plans of a

company, municipality, charity or professional practice."  Fiore Decl ¶ 4, ECF no. 51.  The FDG

Group and some of the Defendants, as well as Mr. DesRocher and Mr. Gaugler, also work on

"private wealth management" on behalf of private clients.  *Id.* ¶¶ 6, 12.

The FDG Group typically collected fees from its institutional client consulting business

as a "percentage of assets under management" or as a "hard dollar figure established by contract.

Fiore Decl. ¶ 11, ECF no. 51.  Fees from the private wealth management side of the business

were "generally based on a percentage of assets under management, although some clients

engage in commission-based business."  *Id.*; *see also* Minerva Dep. 33:19-34:15 (containing

UBS representative's testimony)[1].

UBS terminated Mr. Fiore's employment in November of 2016.  Compl. ¶ 1.  Mr. Fiore

subsequently founded Procyon Private Wealth Partners, LLC ("Procyon").  *Id.*  Mr. Fiore

launched Procyon on June 2, 2017.  Fiore Decl. ¶ 16, ECF No. 51.  Mr. Farrar, Mr. Gloria, and

Mr. Gahan resigned from UBS on June 2, 2017 and immediately joined Procyon.  Compl. ¶ 1.

This case concerns Plaintiff's allegations that Defendants have been soliciting UBS clients and

misusing UBS client information.  The parties agree that this dispute is subject to FINRA

arbitration.  *See* Def.'s Br. at 29, ECF No. 53; Pl.'s Br. at 27-28, ECF No. 4.

### A.      Relevant Contractual Provisions

#### 1.      Protocol for Broker Recruiting

UBS and Procyon are signatories to the Protocol for Broker Recruiting ("Protocol").

Compl. ¶ 33 n. 3.  In relevant part, the Protocol provides that, if certain conditions are met,

signatory firms agree not to enforce their rights regarding non-solicitation of clients against

financial advisors that depart their firms for other signatory firms.  *See id.*; Def.'s Br. at 2.

Specifically the Protocol provides that:

> If departing [financial advisors] and their new firm follow this protocol, neither
> the departing [financial advisor] nor the firm that he or she joins would have any

---

[1] Q: And, you know, again, are you able to determine the revenues that each institutional consulting client generated at UBS?
A: Yes.
Q: And you would be able to get that broken down by client; is that correct?
A: Yes.
Q: And if, let's say, an institutional consulting client left UBS and joined – or began to work with Procyon, would you be able to calculate the amount of revenues that client generated for the FDG Group when it was a client of UBS?
A: For the entire group, yes.
Q: So you could go back – let's say that an institutional account left to join Procyon, to work with Procyon, and that client came to UBS in 2010. You would be able to figure out all the revenues that that client generated for UBS from the time they joined UBS – the time the client began working at UBS in 2010 through the time that it left UBS; is that correct?
A: Yes.

monetary or other liability to the firm that the [financial advisor] left by reason of the [financial advisor] taking the information identified below or the solicitation of the clients serviced by the [financial advisor] at his or her prior firm, <u>provided</u>, however, that this protocol does not bar or otherwise affect the ability of the prior firm to bring an action against the new firm for "raiding."

Protocol at 1, Farrar Decl. Ex. A, ECF No. 46 (emphasis in original).

Under the Protocol, departing financial advisors are permitted to take certain client

information:

When [financial advisors] move from one firm to another and both firms are signatories to this protocol, they may take only the following account information: client name, address, phone number, email address, and account title of the clients that they serviced while at the firm ("the Client Information") and are prohibited from taking any other documents or information. Resignations will be in writing delivered to local branch management and shall include a copy of the Client Information that the [financial advisor] is taking with him or her."

*Id.* Thus, when a financial advisor resigns under the Protocol, they are obligated to provide their

former firm with a resignation letter and attach a list that includes all of the Client Information

they intend to take (a "Protocol list"). *See id.* The Protocol further provides that:

In the event that the [original] firm does not agree with the [departing financial advisor's] list of clients, the [financial advisor] will nonetheless be deemed in compliance with this protocol so long as the [financial advisor] exercised good faith in assembling the list and substantially complied with the requirement that only Client Information related to clients he or she serviced while at the firm be taken with him or her.

*Id.*

As for the departing financial advisor and their new firm's use of the relevant client

information, the Protocol states that:

[T]he new firm will limit the use of the Client Information to the solicitation by the [financial advisor] of his or her former clients and will not permit the use of the Client Information by any other [financial advisor] or for any other purpose.

*Id.* Additionally, the Protocol also provides that:

4

> [Financial advisors] that comply with this protocol would be free to solicit
> customers that they serviced while at their former firms, but only after they have
> joined their new firms. A firm would continue to be free to enforce whatever
> contractual, statutory or common law restrictions exist on the solicitation of
> customers to move their accounts by a departing [financial advisor] before he or
> she has left the [former] firm.

*Id.* at 2.[2]

## 2.    Mr. Fiore

UBS employed Mr. Fiore from April 24, 2009 through November 30, 2016.  Compl. ¶

13.  On or around April 24, 2009, Mr. Fiore signed a transition agreement with UBS, which

contained certain post-employment restrictions.  *Id.* ¶ 14.  Specifically, the agreement provided

that:

> In the event Employee's  employment with [UBS] is terminated for any reason
> whatsoever, whether voluntarily or involuntarily, Employee agrees, for a period
> of one year from the date of termination or until such time that all amounts owed
> by Employee to [UBS] and all related entities have been fully repaid, whichever is
> earlier, to not solicit, directly or indirectly, any of the clients who maintain
> accounts at [UBS] . . . whom Employee serviced during his/her employment at
> [UBS] or other [clients of UBS] whose names became known to Employee while
> in the employ of [UBS].

Fiore Trans. Agr. ¶ 5, ECF No. 1 Ex. A.  The agreement defined "solicit" as communicating in

any way with a client that "may have the effect of inviting, encouraging or requesting a client" to

---

[2] UBS argues that the Protocol "expressly carves out from its application accounts serviced under written financial advisor team agreements" and that "[t]hose agreements, even under the Protocol, are controlled by their own terms with respect to designating what clients may and may not be solicited upon a financial advisor's departure."  Pl.'s Br. at 11 n.4, ECF No. 4.  UBS appears to be referring to the following provision:

> If a[] [financial advisor] is a member of a team or partnership, and where the entire
> team/partnership does not move together to another firm, the terms of the team/partnership
> agreement will govern for which clients the departing team members or partners may take Client
> Information and which clients the departing team members or partners can solicit. In no event,
> however shall a team/partnership agreement be construed or enforced to preclude a[] [financial
> advisor] from taking the Client Information for those clients whom he or she introduced to the
> team or partnership or from soliciting such clients.

Protocol at 2.  UBS's team agreements with the various Defendants therefore allegedly displace the provision of the protocol that allows departing financial advisors to take the Client Information of all "clients that they serviced while at the firm," *id.* at 1, with the provisions of the team agreements, which allow Defendants to solicit clients they introduced to UBS.  *See* Feb. 2016 Team Agr. ¶ 11(B), ECF No. 1 Ex. G (governing Mr. Fiore); Dec. 2016 Team Agr. ¶ 5, ECF No. 1 Ex. H (governing other Defendants).

(a) "transfer his/her [UBS] accounts to [Mr. Fiore] or his/her new employer", (b) "open a new account with [Mr. Fiore] or his/her new employer", or (c) "otherwise discontinue his/her existing business relationship with [UBS]." *Id.* The agreement also contained the following provision regarding the confidentiality of client information:

> Employee further expressly agrees that, in the event Employee's employment is terminated for any reason whatsoever, whether voluntarily or involuntarily, Employee may not take any records or information referring or relating to Clients of [UBS], former clients of [UBS] and prospective clients of [UBS], whether originals or copies, in hard copy or computerized form.

*Id.* ¶ 6. Mr. Fiore's April 2009 transition agreement with UBS also included the following provision:

> In the event that Employee enters into other agreements with [UBS] that contain non-solicitation and/or confidentiality obligations . . . the non-solicitation and/or confidentiality provisions of any such agreement shall govern Employee's conduct with respect to the solicitation of clients and use of client information covered by those agreements.

*Id.* ¶ 7.

During his time at UBS, Mr. Fiore also executed other transition agreements and deferred cash award ("DCA") agreements with UBS, which included comparable post-employment restrictions on solicitation of clients and use of client information. Compl. ¶ 14. More recently, in February 2016, members of the FDG Group, including Mr. Fiore, signed a financial advisor team agreement ("February 2016 Team Agreement") governing their servicing of team accounts. Compl. ¶ 18. This team agreement provided that:

> Upon the termination of employment of any Team Member or former Team Member, the departing Team Member or former Team Member agrees that, in addition to any other non-solicitation obligations he/she may have in any other agreement with UBS or its predecessors . . . he/she will not solicit, for a period of one year from the date of termination of the departing Team Member's employment, any clients of [UBS] serviced by the Team.

Feb. 2016 Team Agr. ¶ 11(A), ECF No. 1 Ex. G. It further provides, in the next paragraph that:

Notwithstanding the preceding Paragraph, the Team Members agree and
acknowledge that unless otherwise prohibited by a non-solicitation provision in
another agreement, this provision does not apply to client accounts the departing
Team Member introduced to the team either at its inception or during its
existence.

*Id.* ¶ 11(B).  This team agreement also contains a provision governing confidentiality and non-

disclosure:

Each Team Member hereby agrees not to disclose to any person any Confidential
Information relating to [UBS] except in the course of carrying out his or her
duties for [UBS] or as required by law or governmental agency with jurisdiction.
For purposes of this paragraph, "Confidential Information" means any nonpublic
information concerning [UBS's] . . . customer lists, customer financial
information . .  and any other proprietary information; except for specific items
that have become publicly available other than through a breach by you of this
Paragraph 20 or any other confidentiality agreement.

*Id.* ¶ 20.

As with the other Defendants, Mr. Fiore agreed to be bound by a code of conduct, and

agreed to maintain the confidentiality of UBS's confidential information.  Minerva Aff.  ¶ 19,

ECF No. 6.

### 3.    Protocol Defendants

Mr. Garrar, Mr. Gloria, and Mr. Gahan (collectively, the "Protocol Defendants") worked

at UBS until June 2, 2017.  Compl. ¶ 22.  Throughout their employment at UBS, the Protocol

Defendants also executed transition agreements and DCA agreements with UBS, which also

contained post-employment restrictions on solicitation of clients and non-disclosure of client

information as in Mr. Fiore's April 2009 transition agreement, discussed above.  *Id.* ¶ 24 n. 2.

After UBS terminated Mr. Fiore in November 2016, the Protocol Defendants signed a new team

agreement with Mr. DesRochers and Mr. Gaugler (the "December 2016 Team Agreement").  *Id.*

¶ 23.  This team agreement contained the following provision regarding non-solicitation:

> If the employment of any Team Member (current or former) terminates for any reason, that Team Member will not, for a period of one year from the employment termination date, solicit any clients that were serviced by the Team. This provision does not apply to client accounts the departing Team Member introduced to the Team, either at its inception or during its existence. Nothing in this Non-Solicitiation provision limits any rights UBS or any Team Member may have under the Protocol for Broker Recruiting.

Dec. 2016 Team Agr. ¶ 5, ECF No. 1 Ex. H.

Throughout their employment at UBS, the Protocol Defendants were also required to read and comply with firm policies and procedures. Compl. ¶ 25. These policies and procedures, including UBS's Code of Conduct and Investment Advisor Code of Ethics ("Code of Conduct"), included provisions "designed to ensure the confidentiality and security of UBS's confidential client and business information." *Id.* The Code of Conduct includes an agreement that departing employees "would not be permitted to retain, disclose or utilize any of UBS's Confidential Information after the termination of their UBS employment." *Id.* ¶ 26.

### B.     Events Prior to Defendants' Employment at UBS

At the Preliminary Injunction hearing, Mr. Fiore testified as to the history of the FDG Group, which he had built, initially under another name, prior to the group joining UBS. Mr. Fiore worked in the financial services business in Connecticut since 1994, beginning his career at Prudential Securities, Incorporated ("Prudential"). Fiore Decl. ¶ 4. Mr. Fiore testified that he began focusing on institutional client consulting in 1997. While at Prudential, Mr. Fiore formed the Fiore Consulting Group.[3] *Id.* ¶ 5. In or around 2003, Prudential eventually "sold its retail securities business to Wachovia Securities" ("Wachovia"), at which point Mr. Fiore's team went to Wachovia.[4] *Id.* While Mr. Fiore and his group were at Wachovia, his group merged with that of a Mr. Monaghan, whose work focused on religious institution clients, and became the Fiore-

---

[3] Mr. Fiore's team at Prudential hired Mr. DesRochers. Fiore Decl. ¶ 6.
[4] Mr. Gaugler was a financial advisor "who focused on the private wealth management business" at Wachovia, who then also joined Mr. Fiore at Merrill Lynch. Fiore Decl. ¶ 6.

Monaghan Consulting Group, until Mr. Monaghan retired before Mr. Fiore's group moved to Merrill Lynch.

In or around October of 2005, Mr. Fiore moved his business to Merrill Lynch, Pierce, Fenner and Smith ("Merrill Lynch"). *Id.* ¶ 6. There, Mr. Fiore formed an "FDG Group" (the "MLPFS FDG Group") that included Mr. Farrar, Mr. Floria, Mr. DesRochers, and Mr. Gaugler. *Id.* ¶ 6. Mr. Farrar and Mr. Gloria had been financial advisors at Merrill Lynch before Mr. Fiore's arrival in October 2005. Fiore Decl. ¶ 6. By 2009, the MLPFS FDG Group had built a business with approximately $1.8 billion in assets under management and approximately $2 million in annual revenue.[5] *Id.* ¶ 7. Mr. Fiore maintains that he developed many of the institutional consulting relationships by himself, or with Mr. Farrar and Mr. Gloria, and that Mr. DesRochers and Mr. Gaugler introduced very few, if any, new institutional consulting relationships to the MLPFS FDG Group. *Id.*

In or around September 2008, Bank of America announced that it would purchase Merrill Lynch. Fiore Decl. ¶ 8. In April 2009, the Defendants, Mr. Gaugler, and Mr. DesRochers left Merrill Lynch to join UBS. *Id.* They continued to refer to themselves as the FDG Group. *Id.* ¶ 10. Mr. Gahan was a UBS financial advisor who joined the FDG Group shortly after it came to UBS from Merrill Lynch. *Id.* According to Mr. Fiore, Mr. Gahan also focused primarily on the institutional consulting business. *Id.* Christopher Foster also joined the FDG Group at UBS shortly after the move to UBS, and Mr. Foster worked on much of the reporting that the FDG Group provided to its institutional consulting clients. *Id.*

Mr. Fiore testifies that many of the institutional clients that he worked with at Prudential or Wachovia had followed him to Merrill Lynch and continued to work with him and the MLPFS

---

[5] It is unclear whether these numbers represent just the side of the MLFPS FDG Group's business that focused on "institutional consulting services to corporations, municipalities, non-profits and professional practice groups," or whether it included private wealth management client business. Fiore Decl. ¶ 7.

FDG Group.  Fiore Decl. ¶ 9. He further testifies that when his team moved from Merrill Lynch to UBS in 2009, many of the institutional clients also moved.  *Id.*

### C.    Clients that Defendants Allegedly Introduced to UBS

While the parties generally dispute which clients were ones that Defendants introduced to UBS, *see* Minerva Aff. ¶ 40 (indicating that members of the FDG Group that remained at UBS reported that the Protocol Defendants incorrectly claimed to have introduced certain clients to UBS), that dispute is largely not relevant to Plaintiff's motion for a preliminary injunction.  At the hearing, UBS agreed that its argument as to the Protocol Defendants focused on Procyon's communications with FDG Group clients that were not included on their Protocol Lists when they resigned from UBS.

### D.    Alleged Solicitation of UBS Clients

UBS terminated Mr. Fiore on November 30, 2016.  Fiore Decl. ¶ 16; Compl. ¶ 1.  Mr. Fiore became the owner of Procyon on May 26, 2017, and the registered investment advisor entities owned by Procyon became operational on June 2, 2017.  Fiore Decl. ¶ 16.

On June 2, 2017, the Protocol Defendants resigned from UBS without prior notice to UBS.  Minerva Aff. ¶ 33.  Each of them tendered a resignation letter to Frank Minerva, the Branch Manager of the Stamford office of UBS, where Defendants had worked.  *Id.* ¶¶ 1, 33. Their resignation letters stated that they were joining Procyon.  *Id.* ¶ 34.  Their resignation letters each included a Protocol list.  *Id.* ¶ 36.  These lists included clients' names, addresses, phone numbers, e-mail addresses, and account titles, and no other information.  *Id.* ¶ 38. The lists included both institutional consulting clients and private wealth clients that had been serviced by the FDG group.  *Id.* ¶ 37.  Mr. Foster also resigned from UBS to join Procyon on June 2, 2017. *Id.* ¶ 56.

At the preliminary injunction hearing, Mr. Farrar testified that the Protocol lists specifically excluded about 17 or 18 FDG Group institutional clients.  *See* E-mail, Pl.'s Ex. 5 (attaching document listing institutional clients that Protocol Defendants intended to exclude from their Protocol lists).  Procyon eventually contacted individuals from some of those clients, including Satterlee Stephens, DXL Group, and Apollo.  Additionally, Procyon's communications were also sent to at least one FDG Group private client that had been introduced by Mr. Gaugler rather than one of the Defendants.

### 1.    Conduct Predating June 2, 2017

UBS presented evidence that Mr. Fiore and the Protocol Defendants engaged in certain communications with FDP Group clients between Mr. Fiore's November 30, 2016 termination from UBS and June 2, 2017, when Procyon opened for business and the Protocol Defendants resigned from UBS.  Pl.'s Br. at 8-10, ECF No. 4.  Defendants dispute whether these communications are solicitations or otherwise improper.  Def.'s Br. at 20-22.

### a.    Mr. Fiore

### i.    Jersey City

At the hearing, UBS presented evidence of Mr. Fiore's text messages with Lori Disbrow, the Chief Investment Officer and plan administrator for Jersey City's 457 Plan ("Jersey City"), which had been a significant client of the FDG Group.  Specifically, UBS presented several text messages that Mr. Fiore sent to Ms. Disbrow in the period starting from January 25, 2017 through June 2, 2017.  Mr. Fiore also testified about the larger context of the communications between himself and Ms. Disbrow, including that Jersey City was his long-time client and that he had a close professional relationship with Ms. Disbrow.

On January 25, 2017, Mr. Fiore sent the following text to Ms. Disbrow:

> Hey buddy, so I'm feeling like 90% so I'm on track getting rid of whatever I
> had!! Thanks for caring!! I also signed with Dynasty last night just wanted you to
> know buddy!! Hope you are well pal!!

Pl.'s Ex. 16.

On March 3, 2017, the following text exchange between Mr. Fiore and Ms. Disbrow took

place:

> Mr. Fiore: Hey Buddy; wanted to let you know that we decided on Schwab as our
> custodian! About to finalize real estate – it's getting real Lori!! I hope you are
> good pal!!
> Ms. Disbrow: That's great. I'm glad everything is coming together for you :)
> Keep me updated! I'm doing well.

Pl.'s Ex. 17.  Mr. Fiore's testimony regarding this exhibit indicated that "we" referred to the

Protocol Defendants.  By the time of this exchange, Mr. Fiore also testified that Mr. Farrar was

particularly involved in setting up a planned new entity, which became Procyon, and that they

had come close to finalizing the choice of real estate for the new entity.  Mr. Fiore indicated that

he and Mr. Farrar had been collaborating on most issues.

On June 2, 2017, the day Procyon was founded, Mr. Fiore texted Ms. Disbrow a

photograph of his Procyon business card, and added "This is us Lori!!"  Pl.'s Ex. 18.  Ms.

Disbrow replied, "Congratulations so happy for you guys!"  *Id.*  Mr. Fiore replied, "Thanks

Lori!!"  *Id.*

## ii.    Dr. Aledort

UBS also presented evidence of Mr. Fiore's text messages with Dr. Rob Aledort[6], who is

affiliated with Dental Associates ("Dental Associates"), a FDG Group client.  On February 10,

2017, Dr. Aledort sent Mr. Fiore a text message, proposing a date and time to meet for dinner.

---

[6] Dr. Aledort was also an individual or private client of the FDG Group.  UBS introduced evidence of Dr. Aledort's
text messages with Mr. Fiore during the preliminary injunction hearing, and to the extent that those messages
discussed Dr. Aledort as a possible client of the FDG Group or Procyon, the messages were discussing Dr. Aledort's
individual 401k account.

Pl.'s Ex. 22 at 1.  As the two sent text messages back and forth, Dr. Aledort mentioned that, on

Thursday, February 16, he would have a "[D]ental [A]ssociates meeting."  *Id.* at 2. On Sunday,

February 12, they agreed to meet for lunch the following Friday, February 24.  *Id.* at 3.

On February 12, 2017, immediately after the two had set a time for lunch, Dr. Aledort

texted Mr. Fiore about sending him some documents by e-mail.  Pl.'s Ex. 22 at 4.  Mr. Fiore

replied, "Ok."  *Id.*  Dr. Aledort then sent Mr. Fiore that e-mail on February 12, 2017, and Mr.

Fiore replied the same day and suggested that, as UBS had terminated him and he did not have

access to FDG Group data, that Dr. Aledort should set up a call with Mr. Farrar.  Pl.'s Ex. 21 at

1.  Mr. Fiore also noted that "[g]iven that I'm no longer at UBS it wouldn't be appropriate [for

me] to answer these questions at this time nor do I have access to the requisite data in order to do

so."  *Id.*

Between February 17, 2017 and around March 1, 2017, Dr. Aledort and Mr. Fiore had

various text message conversations regarding Dr. Aledort's 401k account, Dr. Aldedort's

seeming dissatisfaction with the work of Mr. Gaugler, Mr. Fiore's recommendation that Dr.

Aledort work with Mr. Farrar instead, and Dr. Aledort's initial dissatisfaction with Mr. Farrar.

*See* Pl.'s Ex. 22 at 5-17.  These conversations included Mr. Fiore initially trying to facilitate a

meeting between Dr. Aledort and Mr. Farrar on February 28, though Dr. Aledort was too busy.

*Id.* at 8.

Dr. Aledort then asked that Mr. Fiore pass on the message of what he wanted Mr. Farrar

to do with the 401k account, which Mr. Fiore agreed to do:

> Dr. Aledort: Rather than wait me to meet this new guy [sic] I expressed to you
> what I'm looking for. Can he change over my account to better be in line with my
> goals Thanks.
> Dr. Aledort: At our meeting he can explain what he did. I really will have no input
> or suggestions on how to manage my money. The only thing I can do is evaluate
> the results.

Mr. Fiore: I will speak to him today bud!!

Pl.'s Ex. 22 at 9.  Then, between February 28 and March 1, Dr. Aledort sent Mr. Fiore another

message that resulted in the following exchange:

> Dr. Aledort: I haven't heard anything from anyone yet. Is there someone else
> looking over my account and has he rebalanced and changed the investments yet.
> Mr. Fiore: I'm with him now[.]
> Dr. Aledort: It's been almost 2 weeks since we met [] has he already moved my
> account to different positions . . . I feel like I need to go somewhere, where they
> will actually value my account  I know you [] You would feel the same way if
> you felt you were being ignored[.]
> Mr. Fiore: I'm with ya [sic] and yes I'm out of the loop which is complicating this
> a bit and I made a huge tactical error in having Jeff [Farrar] as I'm giving him a
> huge amount of responsibility in building our new operation. But I hear you and
> agree!!! However, give us one more shot!! I will make this right!!
> Mr. Fiore: You will get a call today bud and I own this and apologize. But I
> would hate to see you not part of our family!! Hang in there for me pal[.]

*Id.* at 11-17.

### iii.    Holmes Foundation

On March 3, 2017, Mr. Fiore sent a text message to Jay Holmes, formerly a board

member of the Holmes Foundation, a FDG Group institutional client.  Pl.'s Ex. 19 at 1.  This

message followed a discussion about Mr. Fiore assisting Mr. Fiore's daughter with a presentation

to the Holmes Foundation board of directors.  Mr. Holmes replied with his daughter's contact

information.  On March 15, 2017, Mr. Fiore sent a text to Mr. Holmes indicating that he had

been able to have a call with her, which went well.

Throughout the selected text messages between Mr. Fiore and Mr. Holmes during the

March 3 through March 15 period that are in evidence, Mr. Fiore made several comments that

could be related to his future plans for Procyon, though without more context, could also simply

be evidence of a close personal friendship with Mr. Holmes:

> . . . We are great and will be in touch soon. Pls [sic] give everyone a hug and
> know I will be back soon!!

14

. . . Had a great call with [Mr. Holmes's daughter] are the review for Holmes . . . sh'e [sic] going to do great!!! You know you can't fire me right even though she does a great job!!!

Pl.'s Ex. 19 at 2-3.

On March 23, 2017, UBS received an e-mail from a Holmes Foundation representative, which contained the minutes for a March 20, 2017 meeting of the Holmes Foundation board. Giordano Aff. ¶ 4, ECF No. 7. The UBS employee that received the minutes, Lisa Giordano, "read the minutes to indicate that Mr. Fiore was at the meeting," though the text of the minutes did not support this conclusion. *Id.* ¶ 5.

The minutes referred to a report that Mr. Fiore had previously provided to the Foundation Client "through UBS." 3/20/2017 Minutes at 1, ECF No. 7 Ex. A. Based on Mr. Fiore's testimony, Mr. Holmes's daughter presented on the report after she had a call with Mr. Fiore. Mr. Fiore had reviewed broad investment themes with her, such as asset allocation and how the FDG Group executed trades consistent with that strategy. The minutes noted explicitly that "[Mr. Fiore] was absent as financial advisor, having departed from UBS." 3/20/2017 Minutes at 1.

The Foundation Client's meeting minutes also noted that Mr. Fiore was "in the process of opening a new firm." 3/20/2016 Minutes at 1. The minutes concluded with a discussion about "a date for the October meeting," which would be established after the chairman of the Holmes Foundation's board spoke to Mr. Fiore, "since the spirit of the Board was to continue with Mr. Fiore no matter where he goes to conduct his business." *Id.* at 2.

### iv.    Other FDG Group Clients

UBS also presented evidence of other communications that Mr. Fiore had with individuals associated with other FDG Group clients during the period between his November

2016 termination and the June 2, 2017 founding of Procyon.  Those communications with other

FDG clients included the ones discussed below.

On December 6, 2016, Mr. Fiore sent an email from one of his personal e-mail addresses

to Paula Jacklin from Harland Clarke, a FDG Group client, which stated that:

> I heard that someone had some questions regarding my termination from UBS.
> Please feel free to have anyone contact me directly. My guys are unable to get
> into the weeds like I did with you and if anyone at Harland has a question they
> deserve to hear it from the horses mouth [sic] . . . .
>
> Just please, make sure they understand that WITHOUT a DOUBT this was not a
> client issue, a business issue[,] a practice issue[,] or a team HR issue. It was
> purely internal UBS admin stuff that I go[t] tied up in as we spoke about.

Pl.'s Ex. 24 at 2.  This e-mail shows that Mr. Fiore had already spoken to Ms. Jacklin about

UBS's termination of his employment by December 6, 2016.  Mr. Fiore and Ms. Jacklin

exchanged several additional follow-up e-mails on December 6, 2016.  In one of these emails,

Mr. Fiore stated that "I will be back before you know it[,] Paula and excited to share it with all of

you!!!"  *Id.* at 2.

On February 1, 2017, Mr. Fiore sent Adam Kokas of Atlas Air Group ("Atlas"), a major

FDG Group client, an e-mail from one of his personal e-mail addresses that invited Mr. Kokas to

"grab a cocktail or lunch" so that Mr. Fiore could "fill [him] in on the goings on with [Mr. Fiore]

and also answer questions you may have!!"  Pl.'s Ex. 23.

Around April 24, 2017, Mr. Fiore exchanged text messages with Larry Bates, of Apollo

Global Management ("Apollo"), a FDG Group client.  See Pl.'s Ex. 25. The following text

message exchanges occurred between the two:

> Mr. Bates: All good – how's business plans going?
> Mr. Fiore: Excellent buddy  -looking forward to making a huge announcement
> soon!! I should have done this years ago bro . . .
> . . . .
> Mr. Bates: What's your target date?

Mr. Fiore: I can't say bro but you will know my man

Pl.'s Ex. 25 at 1-2. At the hearing, Mr. Fiore testified that Mr. Bates is not on the retirement plan board at Apollo and that Defendants had excluded Apollo from being solicited by Procyon.

Mr. Fiore's testimony also indicated that, following UBS's termination of his employment, he reached out to around fifteen to twenty FDG Group clients for whom he had been the lead contact, to explain what had happened. To his knowledge, the FDG Group was not aware of these communications.

### v.    Other Communications

On May 26, 2017, Mr. Farrar sent the other Protocol Defendants, Mr. Fiore, and Mr. Foster an email discussing the preparation of Protocol lists for the Protocol Defendants. *See* Email, Pl.'s Ex. 5. Five PDF documents were attached to the email, containing different lists of client information that the group was working from. Mr. Fiore testified that he did not reply to provide feedback because he had no relevant data at that time.

### b.    The Protocol Defendants

The Court finds that, with regards to the Protocol Defendants, the evidence clearly establishes that they, particularly Mr. Farrar, were working with Mr. Fiore prior to June 2, 2017 to establish the new entity that became Procyon.

Mr. Fiore's testimony and the evidence of Mr. Fiore's communications, particularly those with Ms. Disbrow and Dr. Aledort, shows that, as early as February 28, 2017, Mr. Fiore had already given Mr. Farrar a "huge amount of responsibility in building our new operation." Pl.'s Ex. 22 at 11-17. By March 3, 2017, Mr. Fiore was already working with Mr. Farrar and the other Protocol Defendants to set up the entity that became Procyon, including by searching for real estate for the new office. Pl.'s Ex. 17.

On May 26, 2017, Mr. Farrar sent the other Protocol Defendants, Mr. Fiore, and Mr. Foster an e-mail discussing the preparation of Protocol lists. *See* E-mail, Pl.'s Ex. 5. Mr. Farrar's e-mail attached five PDF files, which were (a) one Protocol list of institutional clients that the Protocol Defendants were planning to include on their Protocol lists; (b) one UBS copy of the same list, which had account numbers; (c) one Protocol list of private clients that the Protocol Defendants were planning include on their Protocol lists; (d) one UBS copy of the same list, which had account numbers; and (e) a list of institutional clients that were removed and that "should not be listed on any sheet we are turning in and won't go further than here."[7] *Id.* The Court finds that this evidence shows that, at least on this occasion, the Protocol Defendants sent a UBS file containing confidential client information, in the form of account numbers, to Mr. Fiore, who had been terminated from UBS.

Mr. Farrar's May 26, 2017 e-mail included a few comments of particular relevance:

> Please review this list. It is compiled from the data you provided me. If there are an errors no matter how small lets fix so we don't give UBS any stupid reason to object.
> . . .
> I sorted the [private client] list by Zipcode just to fuck with them a little. It's the small things….

Email, Pl.'s Ex. 5.

Mr. Minerva indicated that he learned that,[8] on June 1, 2017, the day before the Protocol Defendants resigned from UBS, they "informed the FDG Group support staff that they would be having a team bowling event." Minerva Aff. ¶ 55. Instead, the Protocol Defendants actually brought the FDG Group support staff "to Procyon's office and solicited them to join" Procyon.

---

[7] The list of institutional clients that were removed was in the form of an e-mail chain including a forwarded e-mail from Mr. Foster's Gmail account, dated May 24, 2017. Mr. Fiore's testimony noted that the clients on this list were removed from the Protocol Defendants' proposed Protocol lists because they were clients that had not been referred by FDG Group members.

[8] Mr. Minerva's affidavit does not indicate how he learned this information, or from whom. *See* Minerva Aff. ¶ 55.

*Id.* Among the FDG Group support staff that had been at UBS, Mr. Foster, Robert Ossers, and Richard Appaluccio also resigned from UBS to join Procyon. *Id.* ¶ 56. At the hearing, Ms. Giordano testified that she was among the employees Defendants approached and that she, in fact, joined Procyon at its inception and worked there for several days, though she then returned to UBS. Defendants admit that a June 1, 2017 event occurred, but dispute that this event violated relevant non-solicitation provisions. S*ee* Farrar Decl. ¶ 21, ECF No. 45 ("We invited the staff of the FDG Group to a social event on the evening of June 1, 2017. We disclosed our plans to resign the next day and we explained we were launching Procyon. We did not solicit them to come . . . . Some indicated they wanted to join [Procyon]. They were asked to sign statements confirming they were not solicited.").

### 2.    June 2, 2017 Announcements

On June 2, 2017, the day that Procyon opened for business, Mr. Fiore's Procyon email address sent out an e-mail blast with the subject line, "Exciting News: The Team of FDG Group is Now Procyon Partners" (the "Blast E-mail"). Blast E-mail at 1, ECF No. 1 Ex. J. This e-mail was signed by Defendants and Mr. Foster, as partners of Procyon. *Id.* at 2-3. Around this time, Procyon also sent a hard copy mailing that included a cover letter that was essentially identical to the Blast E-mail (the "Letter" and collectively, the "Announcements") as well as account transfer paperwork and documents that included some personal identifying information. Supp. Minerva Aff. ¶ 4, ECF No. 18; *see also* Letter, ECF No. 18 Ex. A. The hard copy mailing also included "account transfer forms and promotional materials about Procyon, among other things." Minerva Aff. ¶ 7.

###### a. Recipient Lists

The testimony at the hearing showed that Defendants sent the Blast E-mail to roughly 1600 email addresses.  Testimony at the hearing also showed that Defendants sent the Letter to roughly 300 private clients from the FDG Group, out of the total of roughly 500 or 600 FDG Group private clients.  Mr. Farrar's testimony admitted to some oversights by Defendants in their preparation of the Announcements' recipient lists, which led to the inclusion of at least some contacts that Defendants did not intend to solicit.

Mr. Farrar testified that Defendants did not use the Protocol lists when sending the Blast E-mail, instead they used the Protocol lists to help compile a distribution list, using a software called Vestorly.  They then used those distribution lists to send the Blast E-mail.

On May 10, 2017, as part of the planning process for the Blast E-mail, Mr. Farrar sent the other Defendants and Mr. Foster an e-mail attaching a spreadsheet of email addresses that they planned to send the Blast E-mail to (the "Spreadsheet").  Pl.'s Ex 6 at 1.  The Spreadsheet had two tabs, the first for "Clients" and the second for "COIS" or "Centers of Influence.[9]  Mr. Farrar's Testimony at the hearing indicated that the Centers of Influence tab was for adding friends and family and others that Defendants wished to notify.  His testimony further indicated that the 1600 e-mail addresses that ultimately received the Blast E-mail included both the people listed under the Clients tab and the Centers of Influence tab.  The Spreadsheet was not yet in its final version, and Mr. Farrar's e-mail asked the others to continue "filling this out separately" before Mr. Farrar would send it to Mr. Foster to compile it.

---

[9] One issue that UBS raised at the preliminary injunction was that the Defendants had, up to July 17, 2016, the date of the preliminary injunction hearing, refused to produce the Centers of Influence tab of the Spreadsheet as part of discovery in this case.  As part of UBS's request for injunctive relief, it is requesting that the Court order Defendants to produce the Centers of Influence tab to them, so that UBS can determine if Defendants have, in UBS's view, wrongfully contacted any other clients that UBS is not yet aware of.

Mr. Farrar testified that the Blast E-mail was sent to at least one individual from Satterlee Stephens, a FDG Group institutional client that was not on the Protocol lists.  He further testified that the Blast E-mail was also sent to at least one individual from DXL Group, a FDG Group institutional client that Mr. Farrar had previously listed as an institutional client that should be excluded from the Protocol lists.  The DXL Group representative responded favorably to the Blast E-mail and set up a meeting with Mr. Gahan and Mr. Gloria.  Mr. Farrar also testified that at least one individual from Apollo had received the Blast E-mail, though, as Mr. Fiore also testified, Apollo was one of the FDG Group institutional clients that Procyon intentionally excluded from the Protocol list.  Procyon representatives have scheduled a meeting with Apollo.

As for the Letter recipients and private clients, Mr. Farrar's testimony showed that at least some of the recipients of the Letter were private clients who were introduced by FDG Group members who remained at UBS, including Ron Edelstein, a client of Mr. Gaugler.

### b.    Announcement Contents

The first paragraph of the Blast E-mail explained the following to recipients:

> We're writing to share exciting news about the launch of our new firm, Procyon Partners. We are now an independent, employee-owned financial advisory firm registered with the SEC. Drawing upon our years of experience and broad expertise, we will continue to serve our clients through a dual focus on [the private wealth management business and the institutional client business].

Blast E-mail at 1.  The e-mail goes on to note that, "[w]ith our firm's two complementary practices, the name Procyon perfectly reflects the long, proud tradition of our founding partners who have helped people along their financial journey for more than 20 years."  *Id.*

The e-mail went on to inform recipients that "[o]ur team will be reaching out to you in the coming days to discuss any questions you may have about this change, including details about the smooth transition of your accounts to our new custodian partner, Schwab Advisor

Services, if applicable." Blast E-mail at 2. It further notes that "[w]hile this is a significant change for our firm, what's most important is what won't be changing: our passionate commitment to serving you." *Id.*

### 3. Communications after June 2, 2017

UBS's motion for a preliminary injunction alleged that Defendants also made various communications after June 2, 2017 that misrepresent Procyon and the status of the FDG Group. *See* Pl.'s Br. at 12-13. The Court finds that much of the evidence that UBS attached to their motion to support these allegations is hearsay evidence that, while admissible in the Court's consideration of a preliminary injunction motion, is ultimately unpersuasive and inconclusive. *See Mullins v. City of N.Y.*, 626 F.3d 47, 52 (2d Cir. 2010) (noting that "hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction" and that the fact that evidence is hearsay "goes to weight, not preclusion at the preliminary stage"); *Country Fare LLC v. Lucerne Farms*, No. 3:11-CV-722 (VLB), 2011 WL 2222315, at *9 (D. Conn. June 7, 2011) (noting that "[c]ourts have wide discretion to assess the affidavit's credibility and generally consider affidavits made on information and belief to be insufficient for a preliminary injunction" and rejecting a declaration as "unpersuasive" because it "was made on unidentified and unsubstantiated information and belief and not on . . . personal knowledge"); *Mullins v. City of N.Y.*, 634 F. Supp. 2d 373, 384 (S.D.N.Y. 2009), *aff'd*, 626 F.3d 47 (2d Cir. 2010) ("The Court may consider hearsay evidence in a preliminary injunction hearing. Nevertheless, a court may weigh evidence based on whether such evidence would be admissible under the Federal Rules of Evidence." (internal quotation marks omitted)).

## II.    DISCUSSION

Because Defendants received notice and participated in an adversarial hearing on UBS's motion for a temporary restraining order and a preliminary injunction, ECF No. 3, the Court treats UBS's motion as a motion for a preliminary injunction. *See Genworth Fin. Wealth Mgmt., Inc. v. McMullan*, 721 F. Supp. 2d 122, 125 (D. Conn. 2010) (treating application for temporary restraining order as motion for preliminary injunction). The standards for entry of a temporary restraining order and a preliminary injunction are identical. *See Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) ("It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction.") (gathering cases). "A party seeking a preliminary injunction must demonstrate: (1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor and (2) irreparable harm in the absence of the injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 116 (2d Cir. 2009) (internal quotation marks and citations omitted).

The parties agree that the subject matter of this case is subject to FINRA arbitration. Nonetheless," the expectation of speedy arbitration does not absolve the district court of its responsibility to decide requests for preliminary injunctions on their merits." *Am. Exp. Fin. Advisors Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998)

### A.    Likelihood of Success on the Merits or Sufficiently Serious Questions Going to the Merits

Before a district court may grant a preliminary injunction, the party seeking it must demonstrate either one of "(a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Faively Transp.*, 559 F.3d at 116.

23

UBS moves for injunctive relief based on all counts in its Complaint. *See* Motion at 2, ECF No. 3. The Complaint brings claims for alleged breach of contract by Mr. Fiore, Compl. ¶¶ 48-51; alleged breach of contract by Mr. Farrar, Mr. Gloria, and Mr. Gahan, *id.* ¶¶ 52-55, alleged misappropriation of trade secrets under CUTSA by all Defendants, *id.* ¶¶ 56-62; alleged violations of CUTPA by all Defendants, *id.* ¶¶ 63-67; Mr. Farrar, Mr. Gloria, and Mr. Gahan's alleged breach of fiduciary duties that they owed to UBS by allegedly collaborating with Procyon prior to their resignation from UBS, *id.* ¶¶ 68-73; and alleged unfair competition by Defendants, *id.* ¶¶ 73-75.

As UBS clarified at the hearing, its request for relief is focused on the following categories of allegations, (1) that Mr. Fiore is not protected by the Protocol and remains bound by non-solicitation provisions of his agreements with UBS, both points that Defendants conceded at the hearing; (2) that Mr. Fiore has made various communications to present or former FDG Group clients, both before and after the June 2, 2017 opening of Procyon, that constitute solicitation and therefore violate his non-solicitation obligations, which Defendants dispute; (3) that the Protocol Defendants had been collaborating with Mr. Fiore prior to their June 2, 2017 resignations from UBS and that they therefore violated fiduciary and other duties to UBS, which Defendants dispute; and (4) that after the Protocol Defendants resigned from UBS on June 2, 2017, Procyon made certain communications to clients that they did not include on their Protocol lists, which violates the Protocol and justifies the Court imposing injunctive relief as to the Protocol Defendants, which Defendants also dispute.

For the reasons discussed below, the Court finds that UBS has shown a likelihood of success on the merits as to Mr. Fiore violating his non-solicitation agreements. The Court also finds that UBS can show neither a likelihood of success on the merits, nor sufficiently serious

questions going to the merits to make them a fair ground for litigation as to the Protocol

Defendants, because of the Protocol.  As will be explained below, because the Court ultimately

finds that UBS will not be able to show irreparable harm in the absence of an injunction and the

Court will therefore not grant its motion for a preliminary injunction.

### 1.    Mr. Fiore

At the hearing, the parties agreed that the Protocol does not apply to Mr. Fiore, and also

agreed that he is governed by non-solicitation obligations arising from his agreements with

UBS.[10]  Thus, the only issue that remains for the Court as to Mr. Fiore is whether any of his

communications with FDG Group clients rose to the level of solicitation and therefore violated

his agreements with UBS.

Mr. Fiore's transition agreement defined "solicit" as communicating in any way with a

client that "may have the effect of inviting, encouraging or requesting a client" to (a) "transfer

his/her [UBS] accounts to [Mr. Fiore] or his/her new employer", (b) "open a new account with

[Mr. Fiore] or his/her new employer", or (c) "otherwise discontinue his/her existing business

relationship with [UBS]."  Fiore Trans. Agr. ¶ 5, ECF No. 1 Ex. A.

Courts have found that a defendant breaches their non-solicitation agreement when

sending an announcement that announces their new firm and their particular expertise to a

targeted recipient list that includes clients from their former firm.  *See Marsh USA Inc. v.*

*Schuhriemen*, 183 F. Supp. 3d 529, 536 (S.D.N.Y. 2016), *amended*, 2016 WL 2731588

(S.D.N.Y. May 3, 2016) (discussing case where defendant "sent an email to [former firm] clients

and others announcing that he had joined [new firm] and indicating his expertise servicing clients

---

[10] Throughout the hearing, Defendants did not argue at any time that Mr. Fiore was not bound by nonsolicitation provisions arising from his contracts with UBS. Instead, Defendants only presented evidence that disputed that Mr. Fiore's various communications with FDG Group clients, both before and after Procyon's June 2, 2017 founding, rose to the level of solicitation.

in the healthcare industry"); *Mercator Risk Servs., Inc. v. Girden*, No. 08-CIV-10795 (BSJ), 2009 WL 466150, at *5 (S.D.N.Y. Feb. 23, 2009) (finding high likelihood that there was solicitation where defendant bound by non-solicitation provision "admitted that he supervised the preparation of an email advertisement for [new firm's] . . . business" and defendant knew that "email would be sent to retail brokers who were customers of [plaintiff] while he was employed there"); cf. *UBS Fin. Servs., Inc. v. Christenson*, No. CIV. 13-1081 MJD/JSM, 2013 WL 2145703, at *5 (D. Minn. May 15, 2013) (finding that a "neutral announcement of [defendant's] new employer and contact information to the former clients with whom [defendant] worked . . . who are listed on the Protocol list . . . is permissible" and would not violate non-solicitation provision if defendant did so but such an "announcement must not encourage clients to leave [plaintiff]; nor may it tout [defendant employee's] new employer").

Courts have found that various other elements can also help establish that a general announcement of a financial advisor's departure to a new firm rises to the level of a solicitation that violates typical non-solicitation provisions like the one here.  To the extent that an announcement "tout[s] [a defendant's] new employer" it could rise to the level of solicitation. *Christenson*, 2013 WL 2145703 at *5.  If such an announcement actually "ask[s] [former firm clients] to continue to do business with" the defendant at his or her new firm, it will be a solicitation. *Morgan Stanley Smith Barney LLC v. O'Brien*, No. 3:13-CV-01598 VLB, 2013 WL 5962103, at *3-5 (D. Conn. Nov. 6, 2013) (finding likelihood of success on merits as to breach of non-solicitation agreement in case where defendant breached Protocol by taking client contact information and sabotaging former firm's copy in addition to making communications to former clients).

26

The Court finds that UBS has shown a likelihood of success on the merits as to Mr. Fiore violating his non-solicitation agreements because the Blast E-mail rose to the level of solicitation. Mr. Fiore, the Protocol Defendants, and Mr. Foster worked together to prepare the list of Blast E-mail recipients, which Mr. Fiore was aware would include FDG Group clients, clients that he had previously worked with at UBS and that were still at UBS. Thus the Blast E-mail was targeted at clients of UBS, clients that Mr. Fiore and the other Defendants clearly hoped to attract to Procyon. *See Marsh*, 183 F. Supp. 3d at 536 (finding likelihood of success on merits as to violation of non-solicitation agreement were defendant sent e-mail to former clients announcing his new firm and his expertise); *Girden*, 2009 WL 466150 at *5 (finding solicitation where defendant admitted that he assisted with preparing an e-mail advertisement for new firm that he knew would be sent to his customers at former firm).

The Blast E-mail announced the launch of Procyon; promoted Procyon's "years of experience and broad expertise"; and indicated that Procyon would "continue to serve our clients," who had been FDG Group clients at UBS; noted that Procyon would "reach[] out to you in the coming days . . . including details about the smooth transition of your accounts to [Procyon] . . . if applicable"; and further stated that Procyon continued to have a "passionate commitment to serving you." Blast E-mail at 1-2. The Blast E-mail was clearly designed to both "encourage clients to leave" the FDG Group and also "tout [Mr. Fiore's] new employer" Procyon. *Christenson*, 2013 WL 2145703 at *5 (explaining factors that would change a communication from a permissible one to a forbidden solicitation); *see also O'Brien*, 2013 WL 5962103 at *3 (finding violation of non-solicitation agreement where defendant contacted former clients and "ask[ed] them to continue to do business with him").

The Court finds that Mr. Fiore was heavily involved in preparing the Blast E-mail and choosing the recipient list, which included UBS FDG Group clients, and therefore the e-mail was solicitation.  The Blast E-mail clearly had "the effect of inviting, encouraging or requesting a client" to transfer UBS accounts to "[Mr. Fiore] or his/her new employer" or "otherwise discontinue his/her existing business relationship with" UBS.  Fiore Trans. Agr. ¶ 5.  Because the Court finds that UBS has shown a likelihood of success on the merits as to Mr. Fiore violating his non-solicitation agreements with UBS through his involvement in the preparation and sending of the Blast E-mail on June 2, 2017, the Court need not reach the question of whether any of his other communications, both before and after June 2, 2017, violated the non-solicitation agreements.

### 2. The Protocol Defendants

#### a. Applicability of the Protocol in light of Alleged Bad Faith

The parties dispute whether the Protocol applies to the Protocol Defendants' conduct in this case because of what UBS alleges to be bad faith conduct.  For the reasons that follow, the Court finds that the Protocol applies.

The Protocol's "principal goal . . . is to further the clients' interests of privacy and freedom of choice" in connection with their financial advisors' movement between firms. Protocol at 1.  It provides that, particularly if its procedural requirements for resigning financial advisors are met, and "[i]f departing [financial advisors] and their new firm follow this protocol, neither the departing [financial advisor] nor the firm that he or she joins would have any monetary or other liability" to the departing financial advisor's former firm "by reason of the [financial advisor]" taking permitted client contact information under the Protocol or "the

solicitation of" the clients that the departing financial advisor is permitted to solicit under the Protocol and/or the applicable employment agreements with the previous firm. *Id.*

Even if there is a dispute about the clients listed on the Protocol lists, "the [financial advisor] will nonetheless be deemed in compliance with this protocol so long as the [financial advisor] exercised good faith in assembling the list and substantially complied with the requirement that only Client Information related to clients" that the Protocol and/or applicable employment agreements permit the financial advisor to solicit. *Id.* Furthermore, signatories to the Protocol "agree to implement and adhere to it in good faith." *Id.*

Some courts have found that a showing of bad faith in serious violation of the spirit, if not the text, of the Protocol by a departing financial advisor will prevent the Protocol and its protections from applying, allowing non-solicitation provisions to apply and leading the courts to find possible trade secrets-related violations. In one such case, another court in this District found that a departing financial advisor who altered his clients' contact information in his employer's database before tendering his resignation letter in compliance "with the *technical* aspects of the Protocol," had violated the Protocol by acting in bad faith as he "undoubtedly intended and knew . . . that his corruption of [plaintiff's] database by altering the telephone numbers in its computer system would create delay and confusion and would impede [plaintiff's] ability to communicate with his clients." *O'Brien*, 2013 WL 5962103 at *4-5 (finding both a breach of the Protocol and CUTPA and CUTSA violations) (Bryant, J.) (emphasis in original). Because the main policy goal of the Protocol is the "clients' interests of privacy and freedom of choice" with respect to their financial advisors, Protocol at 1, the court found that defendant's "calculated corruption" of his previous firm's contact information database "ostensibly to prevent [plaintiff] from immediately contacting his portfolio of clients . . . evidences bad faith

and a contempt for his clients' right to freely choose" which firm to use.  *O'Brien*, 2013 WL 5962103 at *4.

Similarly, another court has found that, where a defendant removed physical client files containing "historical quarterly performance reports" as well as "operational [plaintiff firm] documents, such as contracts [and] authorization forms" for their accounts from his former firm just prior to his resignation and mailed those files to the clients, it "may not have violated the exact words of the Protocol" but "violated the spirit of the Protocol," showing bad faith because he removed the files just prior to his resignation and in violation of internal firm policies.  Order Granting PI at 11-12, 18, *Morgan Stanley v. Choy*, No. Civ. 08-000467 (D. Haw. Oct. 29, 2008), ECF No. 23.  Defendant also deleted his contact list in his work e-mail, along with another "large file containing both personal information and client documents."  *Id.* at 13-14.  The court found further bad faith because defendants' Protocol list "was intentionally formatted to hinder [plaintiff's] ability to properly use" the list, as it was "arranged in alphabetical order by first names, and identified institutional clients only by a client contact rather than listing the actual institution's name," which was intended "to impede [plaintiff's] efforts to contact the clients being solicited by" defendants.  *Id.* at 19.  The Protocol list also omitted at least one of the defendant's large institutional clients.  *Id.* at 19.  Thus, the *Choy* Court found that the defendants "acted in bad faith and violated the spirit, if not the exact terms, of the Protocol" and granted the plaintiff preliminary injunctive relief.  *Id.* at 20.

There is some evidence in the record of questionable behavior on the part of Protocol Defendants here, with respect to the preparation of their Protocol lists.  See Email, Pl.'s Ex. 5 ("I sorted the [private client] list by Zipcode just to fuck with them a little. It's the small things"); PC Protocol List, Farrar Decl. Ex. C, ECF No. 58 (appearing to sort private clients largely by zip

code).  The Court finds that this does not rise to the level of violating the spirit of the Protocol,

unlike in *Choy*, because full private client contact information was still listed in the Protocol lists

and UBS was not, therefore, hindered in its ability to contact the clients on the list.  Furthermore,

unlike in *Choy*, Defendants here did not remove physical files and therefore deprive UBS of any

client files, nor was there active interference with UBS's ability to contact clients, as in *O'Brien*.

Where there were violations by defendant of the code of conduct or internal policies at

their previous firm, courts have not found a violation of the spirit of the Protocol, and have

applied the Protocol's protections.  Even to the extent that a departing financial advisor violates

their former firm's internal policies while preparing for their departure, i.e. by sending a firm file

to a personal email address, courts have not founds a violation of the Protocol.  *See Credit Suisse*

*Sec. (USA) LLC v. Lee*, No. 11-CIV-08566( RJH), 2011 WL 6153108, at *5 (S.D.N.Y. Dec. 9,

2011) ("Credit Suisse, however, points out that Credit Suisse policy prohibits employees from

emailing Credit Suisse information to a personal email account. That may well be so, but that

does not in itself amount to a violation of the Protocol.  Accordingly, [defendant] did not violate

the Protocol by receiving in his personal email a client document." (internal citations omitted)).

So long as there is no evidence that defendants actually solicited clients before their

resignations from their former firms, or evidence that defendants took more information than is

permitted under the Protocol, courts have found the Protocol's protections applicable, preventing

plaintiffs from showing a likelihood of success on the merits.  *See Merrill Lynch, Pierce, Fenner*

*& Smith, Inc. v. Reidy*, 477 F. Supp. 2d 472, 477 (D. Conn. 2007) ("[B]ecause the evidence

shows that defendants substantially complied with the Protocol with respect to providing the

required information to Merrill Lynch upon their departure, and because plaintiff lacks

persuasive evidence that defendants likely took more information than permitted and/or

contacted or solicited clients prior to resigning, it has not shown a likelihood of success on the merits that defendants violated the Protocol thus exposing them to liability on the breach of contract and other claims.")

UBS does not allege that any of the Protocol Defendants took any information besides FDG Group client contact information[11], which is the general type of client information that departing financial advisors may retain under the Protocol, provided that the information corresponds to the categories of clients allowed under the Protocol.[12]  Furthermore, UBS acknowledges that the Protocol allows the Protocol Defendants to solicit clients that they introduced to the FDG Group.  *See* Pl.'s Br. at 18 ("The Protocol, however, does not permit Farrar, Gloria, and Gahan to solicit and use information regarding clients they did not personally introduce to the team.").

The Court finds that the Protocol Defendants complied with the procedural requirements for a resigning financial advisor under the Protocol.  The parties do not dispute that these Defendants each delivered a written resignation letter "to local branch management," specifically Mr. Minerva, Protocol at 1, and that each resignation included a Protocol list.  Compl. ¶ 33.  The listed information, "client name, address, phone number, email address and account title, Protocol at 1, is of the type of Client Information that departing financial advisors may take

---

[11] The testimony of Mr. Gaugler and Ms. Giordano included admissions that, to their knowledge, Defendant had not taken any UBS FDG Group information besides client contact information.  UBS has also not alleged that Defendants took any other types of information or files from UBS.

[12] This provision of the Protocol, as written, allows the departing financial advisor to solicit "clients he or she serviced while at the firm."  Protocol at 1.  The Protocol further provides, however, that "[i]f a[] [financial advisor] is a member of a team or partnership, and where the entire team/partnership does not move together to another firm, the terms of the team/partnership agreement will govern for which clients the departing team members or partners may take Client Information and which clients the departing team members or partners can solicit."  Protocol at 2.  UBS's team agreements with the various Defendants therefore displace the provision of the protocol that allows departing financial advisors to take the Client Information of all "clients that they serviced while at the firm," *id.* at 1, with the provisions of the team agreements, which allow the Protocol Defendants to solicit clients they introduced to UBS.  *See* Dec. 2016 Team Agr. ¶ 5 (governing other Defendants).

under the Protocol, provided that the Client Information at issue belongs to clients that the financial advisor may solicit under the Protocol.

The Court also finds that there is no evidence that Protocol Defendants began actually soliciting or communicating with FDG Group clients until after their June 2, 2017 resignation. The evidence further shows that, by the time Protocol Defendants began soliciting, Protocol Defendants were only using FDG Group client contact information of the type that departing financial advisors may take under the Protocol.[13]

The evidence shows that Procyon and the Protocol Defendants have been sending communications, such as the Blast E-mail and Letter, to certain clients or individuals affiliated with certain clients that were not included on the Protocol lists.  These include the institutional clients Satterlee Stephens, DXL Group, and Apollo, who received the Blast E-mail, but which the Protocol Defendants had specifically excluded from their Protocol lists.  An individual client that Mr. Gaugler had introduced to the FDG Group, Mr. Edelstein, also received the Letter.  UBS has not, however, pointed to any authority showing that this violates the spirit of the Protocol with such bad faith that the Protocol Defendants should be stripped of the Protocol's protections. UBS has not been able to show that Protocol Defendants did anything that actually prevented UBS from "immediately contacting" FDG Group clients upon the Protocol Defendants' resignations, and the Protocol Defendants have not acted in a way that "evidences bad faith and a contempt for [their] clients' right to freely choose" whether to use Procyon or UBS.  *O'Brien*, 2013 WL 5962103 at *4.  The Protocol's main policy goal of "clients' interests of privacy and

---

[13] On May 26, 2016, Mr. Farrar sent an e-mail to the other Protocol Defendants, Mr. Fiore, and Mr. Foster that included attachments from UBS that contained client account numbers.  Account numbers are not a type of information that departing financial advisors may take under the Protocol.  *See* Protocol at 1 (allowing departing financial advisor to retain "only the following account information: client name, address, phone number, email address, and account title").  There is no evidence, however, that the Defendants and Procyon used the client account numbers in their actual solicitation efforts, so the Court finds that this does not rise to the level of a Protocol violation that prevents Protocol Defendants from availing themselves of the protections of the Protocol.

freedom of choice" with respect to their financial advisors has not been violated here, and therefore the Protocol Defendants may still avail themselves of the Protocol's protections. Protocol at 1.

The Court finds that, while some of the Protocol Defendants' conduct may be deemed improper, it does not rise to the level of the type of bad faith Protocol violation that could remove the Protocol Defendants from the protections of the Protocol, as in *O'Brien* and *Choy*. Thus, the Protocol and its protections apply to the Protocol Defendants in this case.

> **b.**     **Effect of the Protocol on Likelihood of Success on the Merits**

To the extent that the Protocol for Broker Recruiting applies to the Protocol Defendants' conduct, the Court finds that UBS will not be able to show either a "likelihood of success on the merits" or "sufficiently serious questions going to the merits to make them a fair ground for litigation," *Faively Transp.*, 559 F.3d at 116, as to its claims based on the Protocol Defendants' alleged use of UBS client contact information through Defendants' contacting of certain clients they worked with at UBS. *See Wachovia Sec., LLC v. Englehardt*, No. 08-CV-6303L, 2008 WL 2725504, at *1 (W.D.N.Y. July 11, 2008) (lifting TRO initially granted in similar case because of need to take into account whether the Protocol applies).  Where "the evidence shows that defendants substantially complied with the Protocol" and "plaintiff lacks persuasive evidence that defendants likely took more information than permitted and/or contacted or solicited clients prior to resigning, it has not shown a likelihood of success on the merits that defendants violated the Protocol thus exposing them to liability on the breach of contract and other claims." *Reidy*, 477 F. Supp. 2d at 477; *see also Lee*, 2011 WL 6153108, at *8 ("Because, as discussed above, that solicitation itself is permissible under the Protocol, the Court finds no reason to issue a preliminary injunction in that regard."); *Barney v. Burrow*, 558 F. Supp. 2d 1066, 1079 (E.D.

Cal. 2008) (finding no breach of employment contracts including non-solicitation provisions between plaintiff firm and defendant where "[plaintiff] fails to explain how the [employment agreements] nullify the Protocol . . . . Based on the current status of matters, including the Protocol, [plaintiff] fails to substantiate probable success on breach of employment agreement claims").

In cases where the Protocol applies, it prevents a departing financial advisor or his or her new firm from having "monetary or other liability" to the financial advisor's previous firm "by reason of the [financial advisor]" either (a) taking the "client name, address, phone number, email address, and account title of" certain clients described by either the Protocol or the relevant team agreements between the financial advisor and his or her previous firm or (b) soliciting those clients. Protocol at 1. The Protocol, to the extent that it applies, also precludes UBS from bringing its trade secrets claims under CUTSA, in addition to the breach of contract claims. *See* Protocol at 1 (providing that departing financial advisor and new firm shall not have "monetary or other liability" to the previous firm if Protocol applies without exception for trade secrets liability); *see also O'Brien*, 2013 WL 5962103 at *4-5 ("[B]ecause it is likely that O'Brien has violated the Protocol, it is also likely that the client information he took upon his resignation constitutes a trade secret."); *Burrow*, 558 F. Supp. 2d at 1081 ("Given the Protocol, [plaintiff] is hard pressed to convince this Court that information regarding clients whom [defendants] serviced qualify as [plaintiff's] confidential trade secrets." (discussing California law)). If the Protocol applies, a defendant's former firm will also be unable to show a likelihood of success on the merits as to unfair competition claims. *See Burrow*, 558 F. Supp. 2d at 1081 ("[Plaintiff's] signing the Protocol indicates that it expected outgoing financial advisors to continue to service their clients and that such continuing service is not unfair competition.").

UBS's briefs alleged that the Protocol Defendants' Protocol lists included certain clients that they did not introduce to the FDG Group, in violation of the Protocol.[14]  *See* Pl.'s Br. at 11; Minerva Aff. ¶ 40 ("I asked certain of the remaining members of the FDG Group to review the client lists submitted by Farrar, Gloria, and Gahan . . . It was reported to me that the list contained numerous clients not introduced to the team by Farrar, Gloria, and Gahan.").  None of UBS's filings specifically identified which clients the Protocol Defendants allegedly improperly identified as being clients that one of them introduced to the FDG Group.  Defendants disputed UBS's allegation, arguing that each of the clients on the Protocol lists were clients that they introduced.  *See* Farrar Decl. ¶¶ 6-7, ECF No. 45; *see also* ECF No. 57-59 (containing sealed copies of the Protocol lists).  At the hearing, UBS stated that it would not be presenting evidence to dispute Protocol Defendants' having introduced their Protocol list clients, and UBS instead focused on presenting evidence to show that Procyon was also soliciting clients not listed on their Protocol lists.  As the Court explained above, while the Court finds that Procyon has contacted at least some individuals not associated with clients on the Protocol lists, but finds that this is not the kind of bad faith violation of the Protocol that results in a defendant being unable to assert the Protocol's protections.[15]

For the reasons explained in the previous section, the Court finds that the Protocol applies in this case and that Defendants have not taken any action that amounts to a bad faith breach of the spirit of the Protocol that prevents them from being subject to its protections.  Thus, because the Protocol applies, UBS will not be able to show a likelihood of success on the merits or

---

[14] Under the Protocol and the Protocol Defendants' employment agreements with UBS, the Protocol Defendants may solicit clients they introduced to UBS.  *See* discussion *supra* note 12. UBS did not provide any evidence allowing the Court to find that the Protocol Defendants did not actually introduce the clients included on their Protocol lists, as UBS does not identify the clients at issue, much less provide any evidence that other individuals remaining at UBS introduced those clients.

[15] Defendants conceded this during the preliminary injunction, as to certain private clients that they admitted their contacted in error, including Mr. Edelstein.  Defendants presented testimony that Procyon then ceased any further communications to those clients.

sufficiently serious questions going to the merits with regards to the Protocol Defendants'

liability for breaching non-solicitation agreements, for trade secrets violations, or for unfair

competition. *See Reidy*, 477 F. Supp. 2d at 477 (discussing breach of employment contract

claims); *Burrow*, 558 F. Supp. 2d at 1081 (discussing trade secrets liability); *Burrow*, 558 F.

Supp. 2d at 1081 (discussing unfair competition claims).

### 2. Other Alleged Misconduct

UBS's briefing also sought injunctive relief on the basis of its allegations that Defendants

made misrepresentations about the FDG Group that remains at UBS to potential clients. *Id.* ¶¶

63-67, 73-75. Their presentation at the preliminary injunction hearing did not focus on these

allegations. The Court finds that UBS has not shown a "likelihood of success on the merits" or

"sufficiently serious questions going to the merits to make them a fair ground for litigation" as to

these claims, *Faively Transp.*, 559 F.3d at 11, due to insufficient evidence, with what little

evidence UBS presented on this issue, primarily through the exhibits attached to their brief,

being mainly in the form of hearsay or unsubstantiated speculation or conjecture. *See Country*

*Fare*, 2011 WL 2222315 at *9 (noting that "[c]ourts have wide discretion to assess the affidavit's

credibility and generally consider affidavits made on information and belief to be insufficient for

a preliminary injunction"). The insufficiencies of the evidence also prevents UBS from being

able to show their risk of irreparable harm in the absence of injunctive relief. *See Faively*

*Transp.*, 559 F.3d at 116. To the extent that allegations of irreparable harm are based on an

"accumulation of inferences" that "is simply too speculative and conjectural," such allegations

will not "supply a predicate for prospective injunctive relief." *Shain v. Ellison*, 356 F.3d 211,

216 (2d Cir. 2004); *see also Brown v. City of N.Y.*, No. 09 CV 1809 (RJD) (MG), 2010 WL

60914, at *2 (E.D.N.Y. Jan. 8, 2010) (denying injunctive relief in part because plaintiffs'
allegations of irreparable harm are too speculative and remote).

### B.      Irreparable Harm in the Absence of the Injunction

To prevail on a motion for a preliminary injunction, the movant must also demonstrate
"irreparable harm in the absence of the injunction." *Faively Transp.*, 559 F.3d at 116.  As
explained above, the Court found that UBS had only been able to show a likelihood of success
on the merits as to Mr. Fiore's breach of his non-solicitation agreements with UBS, due to his
participation in the preparation and sending of the Blast Email.  The parties had agreed, during
the preliminary injunction hearing, that the Protocol did not apply to Mr. Fiore.

Nonetheless, courts have found that where a defendant's previous firm has signed the
Protocol, it can still show that there will not be irreparable harm in the absence of an injunction
preventing a departing financial advisor from soliciting their former clients.  *See Merrill Lynch,
Pierce, Fenner & Smith, Inc. v. Baxter*, No. 09-CV-45 (DAK), 2009 WL 960773, at *5 (D. Utah
Apr. 8, 2009) ("[Plaintiff's] participation in the Protocol for Broker Recruiting impacts this
aspect of the irreparable harm analysis. . . . [Plaintiff's] participation in the Protocol indicates
that they understand the fluid nature of the industry; brokers routinely switch firms and take their
client lists with them.  By agreeing to a procedure for departing brokers to take and use client
contact information, [plaintiff] tacitly accepts that such an occurrence does not cause irreparable
harm."); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Brennan*, No. 07-CV-475, 2007 WL
632904, at *2 (N.D. Ohio Feb. 23, 2007) (finding that even if "[defendant's new firm] is a not a
signatory to" the Protocol which courts in this district have generally found precludes the
Protocol from applying "[plaintiff's] signature indicates that they understand the fluid nature of
the industry; brokers routinely switch firms and take their client lists with them" and "[b]y

38

setting up such a procedure for departing brokers to take client lists, [plaintiff] tacitly accepts that such an occurrence does not cause irreparable harm"); *see also Reidy*, 477 F. Supp. 2d at 477 (finding that plaintiffs can not "demonstrate risk of irreparable harm" in case where the Protocol applies); *Lee*, 2011 WL 6153108 at \*8 (same).

Furthermore, the Court finds that Defendants have shown that any damages potentially resulting from Defendants' conduct does not rise to the level of irreparable harm because it can be quantified as money damages.  "[O]nly harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief."  *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113–14 (2d Cir. 2003).[16]  Mr. Minerva, UBS's own witness, has testified that, for the vast majority of the clients at issue, the revenues are easily calculated.[17] *See* Minerva Dep. 33:19-34:15. That damages in this case would be calculable as money damages further establishes that UBS cannot show irreparable harm in the absence of an injunction, even if the Protocol does not apply to Mr. Fiore's actions.  *See Baxter*, 2009 WL 960773 at \*4 ("Another court has recognized that damages in these types of cases are calculable because  . . . each individual transaction is monitored electronically, every customer transfer is documented, and every dollar earned in fees by [d]efendant doing business with those customers that the plaintiff considers its own can be traced precisely" (internal quotation marks omitted)).

---

[16] At the hearing, UBS argued that Second Circuit and Connecticut law establishes that irreparable harm is presumed from the violation of a restrictive covenant.  The authorities that UBS cited for this proposition in their brief do not, however, address situations involving financial advisors or an industry with the Protocol.  *See United Rentals, Inc. v. Bastanzi*, No. 3:05-CV-596 (RNC), 2005 WL 5543590, at \*8 (D. Conn. Dec. 22, 2005), *adopted in part*, No. 3:05-CV-0596 (RNC), 2006 WL 346317 (D. Conn. Feb. 8, 2006) (discussing contractor supply rental companies); *Weseley Software Dev. Corp. v. Burdette*, 977 F. Supp. 137, 145 (D. Conn. 1997) (discussing software companies).
[17] Even if the Court had found that some of Mr. Fiore's communications with FDG Group clients between his November 2016 termination and the June 2, 2017 founding of Procyon were also solicitation, this would not change the result.  Because the Court finds, and Mr. Minerva admits, that the vast majority of client fees are easy to calculate, UBS would still not be able to show irreparable harm.

**IV.     CONCLUSION**

For the foregoing reasons, the Court **DENIES** Plaintiff's motion for a preliminary

injunction in its entirety.

SO ORDERED at Bridgeport, Connecticut, this 24th day of July, 2017.

    /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge